1  In *Tomaselli v. TransAmerica Insurance Co.* (1994) 25 Cal. App. 4th 1766, 1770, the court said:

2  "The failure to pay benefits owed under a policy is both a breach of contract, entitling the
insured to contractual damages, and a potentially tortious breach of the implied covenant

3  of good faith. However, both sets of obligations, in contract and in tort, spring from and
depend on the existence of the contractual duty to pay."

4

5  Emphasis added.

6  **B.    California Casualty Breached Its Covenant of Good Faith and Fair Dealing.**

7      A cause of action for breach of the implied covenant requires a showing that the plaintiff

8  suffered a loss covered under the policy and that the insurer unreasonably failed to pay for the loss or

9  unreasonably delayed payment, causing harm to the plaintiff. CACI 2331. An insurer can also be liable

10  for breach of the implied covenant if it unreasonably fails to properly investigate a loss and delays

11  payment of the insurance benefits, causing harm to plaintiff. CACI 2332. Finally, an action for breach

12  of the implied covenant is also warranted where an insurer fails to inform the plaintiff of his or her rights

13  under the policy, causing damage to the plaintiff. CACI 2333. Plaintiffs assert that California Casualty

14  violated the breach of the implied covenant in each of these ways.

15      **1.    California Casualty Unreasonably Failed to Investigate the Harolds' Loss**

16      The implied covenant of good faith and fair dealing requires that the insurer conduct a prompt

17  and adequate investigation. *KPFF v. California Union Ins. Co.*, 56 Cal. App. 4th 963, 973 (1997);

18  *Brown v. Guarantee Ins. Co.*, 155 Cal. App. 2d 679, 689 (1957); Ins. Code § 790.03(h)(3), (11). An

19  insurance company is required "to make a diligent effort to ascertain the facts upon which only an

20  intelligent and good-faith judgment may be predicated." *Brown*, 155 Cal. App. 2d at 686. If an insurer

21  fails to exhaust the sources of information open to it to ascertain the facts, then it has not done all that is

22  possible to secure the knowledge upon which a good-faith judgment may be exercised and it may be

23  held liable for bad faith. *Id.* An insurer may be liable for breach of the covenant of good faith and fair

24  dealing not only if the insurer fails to conduct a sufficient investigation, but also if it engages in

25  wrongful conduct in the course of its investigation. *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 578

26  (1973).

12

Exhibit A-101

1    The obligation to investigate is governed by a rule of reasonableness. *Egan v. Mutual of Omaha*

2  *Ins. Co.*, 24 Cal.3d 809, 819 (1979), *cert. denied*, 440 U.S. 912 (1980). CCIC not only handled the

3  Harolds' water claim unreasonably but it acted in a despicable manner by placing its interests above

4  those of its insured. California Casualty acted unreasonably by taking seven days from the Harolds' first

5  notification to California Casualty to examine the water loss. Moulton knew that mold can begin within

6  days, but despite this knowledge did not take action within a reasonable time. Even when Moulton

7  appeared on December 5, 2000, to examine the home and promised the Harolds that California Casualty

8  would take charge of fixing the problem, he did not attempt to make contact with a repair company until

9  he sent a fax at 7:00 P.M. on December 6, 2000, to Westmont Construction Company. Moulton

10  suspected mold on his first visit yet failed to hire a certified industrial hygienist. California Casualty's

11  failure to investigate promptly was an unfair claims practice in violation of Ins. Code §790.03(h)(2).

12    California Casualty also failed to reasonably investigate the Harolds' claim when it hired

13  Westmont, a company with no training or experience with mold. Moulton candidly admitted in

14  deposition that he knew Westmont was not a mold remediation company and that he didn't consider

15  Westmont's work to be mold remediation. Moulton's handling of the mold damage conformed to

16  California Casualty's corporate practice of not hiring a CIH to investigate water loss damage when mold

17  was suspected or confirmed. California Casualty has admitted that prior to the Harolds' claim,

18  California Casualty had not previously hired or paid for a CIH to investigate mold in an insured home in

19  Northern California. California Casualty's failure to hire a CIH to investigate and develop a remediation

20  protocol, when mold related to the Harolds' loss was discovered or even suspected, was unreasonable

21  conduct. California Casualty's practice of not hiring competent contractors to investigate and make

22  needed repairs of water damage claims when mold was suspected was a violation of Ins. Code

23  §790.03(h)(3).

24    By the end of December, Westmont confirmed there was mold. By January, Westmont and

25  California Casualty knew the mold was toxic when they received the Anderson report. This information

26  was concealed from the Harolds. Despite this knowledge, California Casualty still did not hire a CIH or

13

1  a company knowledgeable in mold remediation. This failure to act reasonably was a violation of custom

2  and practice and below the standard of care.

3      During the third phase of this loss, Trudy Howell, another California Casualty insurance adjuster,

4  hired a geotechnical engineer, Timothy Williams, for the stated purpose of evaluating drainage

5  conditions at the Harolds' lot. Instead of being retained by California Casualty to conduct a fair and

6  thorough inspection, however, Williams will testify that he was told by Ms. Howell to look for "other

7  sources of water intrusion." Ms. Howell's intentions were clear; to attempt to develop facts that could

8  be used as a basis to claim that the mold existing in the Harolds' home in the spring and summer of 2002

9  came from a source other than the loss, or that the facts otherwise existed that could be used as a basis to

10  blame the Harolds for the failure of the house to clear, or to deny coverage.  These actions violate

11  California Casualty's duty to conduct a prompt, fair, reasonable and adequate investigation of the

12  Harolds' claim. *Eagan v. Mutual of Omaha Ins. Co.* 24 Cal.3d 809, 819 – 820 (1979).

13      California Casualty's unreasonable failure to properly investigate the Harold's claim was a

14  breach of the covenant of good faith and fair dealing, was in violation of fair claims practices, and

15  exposed the Harolds to mold and ultimately created mold contamination of the entire Harold home and

16  all of their possessions. Mr. Harold also suffered adverse health consequences from his exposure to the

17  mold.

18      **2.    California Casualty Unreasonably Failed to Inform the Harold's of Their Rights
        and Obligations Under the Policy**

19

20      When an insurer receives notice of a claim, the implied covenant of good faith and fair dealing

21  requires that the insurer reasonably advise and promptly inform the insured of the insured's rights and

22  obligations under the policy. *Davis v. Blue Cross of Northern California*, 25 Cal.3d 418, 428 (1979).

23  An insurer must take affirmative steps to insure that the insured is informed of the remedial rights under

24  the policy. *Sarchett v. Blue Cross of California*, 43 Cal.3d 1, 14-15 (1987).  In violation of the implied

25  covenant, California Casualty failed to inform the Harolds of their rights under the policy.

26  //

In conformity with its practice of placing its interests above its insureds, California Casualty told the Harolds that they were entitled to move into a one bedroom apartment while repairs were effectuated. California Casualty failed to tell the Harolds they were entitled to comparable living quarters, which would have costs three to four times as much as a one bedroom apartment. This is a violation of the custom and practice in the insurance industry and 10 C.C.R. §2695.4(a).

In violation of the implied covenant of good faith and fair dealing, California Casualty failed to inform the Harolds that they were entitled to remain in control of the work on their home. Instead, California Casualty unreasonably hired its own contractor, Westmont, and its own CIH, Carls, to develop a remediation protocol without obtaining the Harolds' approval or taking into consideration their wishes of using the CIH of their choosing. Also in violation of the implied covenant, California Casualty failed to inform the Harolds of a third party report that disclosed property damage and health risks.

California Casualty's failure to inform the Harolds of their rights under the policy was in direct violation of the implied covenant of good faith and fair dealing.

3.    **California Casualty Unreasonably Failed to Pay for the Harolds' Loss and Unreasonably Delayed Payment to the Harolds**

The implied covenant of good faith and fair dealing includes a duty by the insurer not to withhold or delay payments unnecessarily. See *Egan*, supra, 24 Cal.3d at 818-820. Implicit in the insurer's obligation to not unreasonably withhold or delay payments is the notion that the insurer must give at least as much consideration to the insured's interests as it gives its own. *Id.* For this reason, the insurer's attitude and motives are substantial factors in determining reasonableness. See e.g., *Blake v. Aetna Life Ins. Co.*, 99 Cal. App. 3d 901, 922 (1979); *Sprague v. Equifax, Inc.*, 166 Cal. App. 3d 1012, 1025 (1985).

No specific period of delay in providing benefits is reasonable or unreasonable per se. Rather, the reasonableness of the delay is a *question of fact* that must be determined on a case by case basis in light of the circumstances. See *Blake*, 99 Cal.App.3d at 922-924; see also *Fleming v. Safeco Ins. Co.*,

15

Exhibit A-104

1    160 Cal.App.3d 31, 36-38 (1984). The reasonableness of an insurer's claims handling practices *only*

2    becomes a question of law when the evidence is undisputed and only one inference can be drawn from

3    the evidence. *Carlton v. St. Paul Mercury Ins. Co.*, 30 Cal. App. 4th 1450, 1456, 1459 (1994). Such is

4    not the case here.

5          The Harolds believe that California Casualty will argue that the "genuine dispute" doctrine will

6    preclude a finding of breach of the covenant of good faith and fair dealing. *Chateau Chamberay*

7    *Homeowners Assn. v. Associated Internat. Ins. Co.* 90 Cal.App.4th 335, 347. Throughout this case

8    California Casualty has been deceptively mischaracterizing the factual basis for the Harolds' cause of

9    action for bad faith by attempting to limit the breach to the question of whether the Harolds' residence

10    could have been remediated or had to be rebuilt. As the *Chateau Chamberay* court recognized,

11    however, the genuine dispute defense does not apply when the dispute arose because the insurance

12    company failed to conduct a thorough investigation. *Chateau Chamberay*, supra, pps. 348 – 349. In

13    other words, a breach of the covenant of good faith and fair dealing can be found even where the insurer

14    harbors actual doubts about the amounts of benefits which should be paid on a covered claim if a

15    reasonable investigation would have disclosed information making those doubts no longer tenable.

16    *Wilson v. 21st Century Insurance Company*, 06 D.D.O.S. 940.

17          In any event, as discussed above, the basis for the Harolds' cause of action for the breach of the

18    implied covenant of good faith and fair dealing is much broader. For example, California Casualty

19    unreasonably failed to pay benefits when it failed to hire a CIH once it knew that harmful mold was

20    present, and further failed to hire a qualified mold remediation contractor. Additionally, California

21    Casualty unreasonably failed to pay benefits due under the policy when it failed to obtain a mold

22    clearance test before canceling the Harolds' additional living expenses. Not only did California

23    Casualty cancel the living expenses, in addition it instructed the Harolds that they could return to their

24    home, absent confirmation that the toxic mold was remediated. There cannot be a "genuine dispute."

25          California Casualty also unreasonably delayed the payment of benefits. California Casualty

26    failed to hire a CIH at the onset of the claim and failed to hire a company with experience in mold

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

Exhibit A-105

1   remediation. The delay in hiring such persons damaged the Harolds' home, possessions and health. The

2   Harolds were not told that the home was tested for mold, they were not given the mold report, they were

3   not told that toxic mold was confirmed in their home, and they were not warned of the health risks of

4   being exposed to mold. California Casualty's wrongful conduct damaged the Harolds' home and their

5   possessions, exposed the Harolds to harmful toxins, and damaged Mr. Harold's health. Having caused

6   the damage through its wrongful conduct, California Casualty has ostensibly spent the Harolds' policy

7   limits to correct the harm it was responsible for causing. The policy limits were not spent on repairing

8   the damage caused by the water loss, they were spent trying to correct the damage caused by California

9   Casualty's tortious conduct. As such, California Casualty unreasonably delayed and denied benefits due

10  under the policy.

11  **B.**    **California Casualty Is Liable for Fraud.**

12      **1.**    **California Casualty Concealed Material Facts from the Harolds.**

13      The evidence produced at trial will show that California Casualty failed in its duty to inform and

14  warn the Plaintiffs about the presence of toxic mold in the property and the foreseeable risk of harm to

15  the Plaintiffs and their property from exposure to contaminants, mold and bacteria. Evidence will also

16  be presented at trial proving that that California Casualty concealed that the Harold's home was tested

17  for mold, that California Casualty concealed the results of the environmental sampling, and concealed

18  the true reason for asking the Plaintiffs to move out of the property (the discovery of harmful or toxic

19  mold). Finally, California Casualty concealed its attempt to clean up the mold through ordinary repair

20  methods, rather than using remediation, contrary to accepted standards.

21      California Casualty also concealed or suppressed from Plaintiffs information concerning the

22  presence of toxic mold and bacteria found during repairs even though California Casualty was aware of

23  the potential health risks associated with mold. For example, California Casualty knew that Westmont

24  had performed its repairs without the benefit of any containment fields. California Casualty knew that

25  some of the Harolds' possessions had not been moved out and were continuously exposed to the

26  uncontained remedial repairs by Westmont. California Casualty knew that these exposed possessions

17

1   were not cleaned before the Harolds moved in. California Casualty knew that it was not proper to send

2   an insured back into a mold contaminated location without first testing to ensure that the mold had been

3   eradicated. Yet, neither California Casualty nor Westmont obtained a mold clearance before telling the

4   Harolds to move back into their home.

5       As a result of Defendants' concealment of the presence of toxic and pathogenic mold and their

6   intent to clean it up through ordinary repair methods, Plaintiffs and their property were exposed to toxic

7   mold and bacteria.

8       **2.    California Casualty Misrepresented Material Facts to the Harolds.**

9       California Casualty represented in its insurance policy that it would cover and indemnify the

10  Harolds for water loss. This representation was false because California Casualty did not intend to hire

11  a CIH to investigate or to pay for proper remediation by a qualified company. California Casualty hired

12  Westmont even though California Casualty suspected that mold existed in the Harolds' house on first

13  visit, and Moulton knew that Westmont was not a mold remediation contractor and in fact had no

14  experience or skill in mold remediation. The evidence will show that California Casualty knowingly

15  and falsely represented to the Harolds that Westmont would take care of the damage caused by the water

16  loss, even though Moulton knew that Westmont was not qualified to deal with mold. California Casualty

17  and Westmont falsely misrepresented to the Harolds that they had to move out of their home during the

18  repair period because of noise and dust when, in reality, the purpose for the move was the existence of

19  the harmful mold. Defendants made false representations as to the habitability and adequacy of the

20  repair to Plaintiffs' home knowing that the representations were false. Defendants knew of the potential

21  health risks associated with mold exposure. Yet, Defendants led Plaintiffs to believe that their house

22  had been repaired.

23      **3.    The Harolds Justifiably Relied on California Casualty's Misrepresentations and
            Were Harmed by California Casualty's Concealment**

24

25      Defendants may argue that the Harolds knew about the existence of mold in March 2001 and, as

26  such, the existence of mold was not concealed nor did the Harolds justifiably rely on any

18

1    misrepresentations by California Casualty or Westmont. This argument fails because in March 2001 the

2    Harolds knew only of the existence of a small patch of mold on a kitchen wall that a painter was to fix.

3    Most importantly, they did not know that the subfloor of their home and the inside of the walls of their

4    house were contaminated with toxic mold, although this information was known to both California

5    Casualty and Westmont. The fact that the Harolds were completely unsophisticated about the hazards of

6    mold and the proper methods to remediate it is proven by the estimate on which the Defendants rely.

7    The estimate suggests priming and painting the small area of mold that was found. California Casualty

8    knew that the suggested repair was inappropriate, but did not share such information with the Harolds,

9    nor did California Casualty inform the Harolds at that time that toxic mold existed in the subfloor and in

10    the walls.

11         The fact that the Harolds knew of a small patch of mold in their home in March 2001 did not

12    make them aware that their home was infested with mold nor that their possessions and health were in

13    danger. Of course, California Casualty knew about the toxic mold and appreciated the health hazards.

14    California Casualty concealed its knowledge and misrepresented the fact and the Harolds' home,

15    possessions and health were damaged as a result.

16    **C.    California Casualty Is Liable to the Harolds for Intentional Infliction of Emotional Distress.**

17         Outrageous conduct is described in general terms as a "case...in which the recitation of the facts

18    to an average member of the community would arouse his resentment against the actor, and lead him to

19    exclaim, "Outrageous!"'" Comment (d), Restatement of the Law, Second, Torts, § 46 (1965). California

20    Casualty's and Westmont's actions, in failing to disclose the presence of harmful toxic mold to the

21    Harolds, intentionally exposing the Harolds to adverse health consequences, failing to hire a CIH and an

22    experienced contractor to remediate the mold, failing to obtain a mold clearance test before returning the

23    Harolds' possessions to their still-contaminated home in May 2001, and cutting off their ALE payments

24    in an attempt to force them back into the uninhabitable house all constitute conduct that would certainly

25    cause any average member of the community to exclaim "Outrageous!"

26

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

Exhibit A-108

1    Reckless disregard has been characterized as acts performed with "little or no thought" to the

2    probable consequences of the conduct. *KOVR-TV v. Superior Court*, 31 Cal. App. 4th 1023, 1031-1032

3    (1995), citing *Miller v. National Broadcasting Co.*, 187 Cal. App. 3d 1463, 1487 (1986). California

4    Casualty and Westmont exhibited reckless disregard to the possibility that their conduct would result in

5    emotional distress to the Harolds.

6    Emotional distress is measured by considering the facts of each case, as well as the intensity and

7    duration of the distress. Comment (j), Restatement of the Law, Second, Torts, § 46 (1965). Substantial

8    evidence exists to prove that the Harolds' emotional distress is severe. The Harolds need not show

9    purely physical symptoms of severe emotional distress. "The requisite emotional distress may consist of

10   any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger,

11   chagrin, disappointment or worry." *Crisci v. Security Ins. Co.*, 66 Cal.2d 425, 433 (1967). The

12   discovery that California Casualty concealed the presence of toxic mold, the fact that Westmont likewise

13   concealed the same information, the failure of California Casualty to hire a mold remediation contractor

14   the revelation that the Harolds had been exposed to toxic mold, the Harolds' inability to come in contact

15   with personal possessions and family treasures and their inability to live in the family home they built

16   together, are all the basis for their severe emotional distress. The Harolds suffered disappointment, fear,

17   sadness and sorrow as a result of California Casualty's and Westmont's actions.

18   Greater proof that mental suffering occurred is found in the Defendants' conduct designed to

19   bring it about than in physical injury that may or may not have resulted therefrom. *Golden v. Dungan*,

20   20 Cal. App. 3d 295, 308 (1971). Defendants engaged in a course of conduct which was intentional,

21   extreme and outrageous, and which was in wanton and reckless disregard of Plaintiffs' rights and

22   interests

23   **D.    California Casualty and Westmont Are Liable for Nuisance.**

24   Nuisance has been found in all manner of activity that causes interference with use and

25   enjoyment of property. See *Stevens v. Moon*, 54 Cal. App. 737 (1921) (damage to trees); *Sierra Screw*

26   *Prods. v. Azusa Greens Inc.*, 88 Cal.App.3d 358 (1979) (golf balls from golf courses); and *McIvor v.*

20

Exhibit A-109

1   *Mercer-Fraser Co.*, 7 Cal. App. 2d 247 (1946) (excavation causing loss of use of strip of land and fear

2   of collapse). A trier of fact may find that California Casualty interfered with the Harolds' use and

3   enjoyment of their property by permitting repairs without containment in a home known to California

4   Casualty to be contaminated with mold, or by exposing the Harolds' possessions to harmful and

5   damaging mold. In addition, Defendants failure to remediate the toxic mold contamination has rendered

6   the Harolds' home completely uninhabitable to this day, thus wholly interfering with their use and

7   enjoyment of their family home – in that they cannot live there without exposing themselves to serious

8   health hazards. Nuisance is defined as "anything which is injurious to health…so as to interfere with the

9   comfortable enjoyment of life or property." Civil Code § 3479. Defendants' conduct and the resulting

10  injury to the Harolds fits squarely within this definition.

11          All of these actions by Defendants constitute substantial and unreasonable interferences of the

12  Harolds' use and enjoyment of their home in every sense of Civil Code § 3479.

13  **E.      California Casualty Has Violated California's Unfair Competition Law.**

14          An unfair business practice is a practice that is "deceptive or sharp." *Klien v. Earth Elements*, 59

15  Cal.App.4th 965, 970 (1997). A fraudulent business practice under §17200, unlike the strict standards

16  for the separate fraud tort cause of action, only requires a showing that "members of the public are likely

17  to be deceived." *South Bay Chevrolet v. General Motors Acceptance Corporation*, 72 Cal. App. 4th 861,

18  888 (1999). The unlawful standard is self-explanatory. California Casualty's practices in this case were

19  clearly fraudulent.

20          In direct violation of Business and Professions Code Section 17200, Defendant California

21  Casualty had a fraudulent practice of misrepresenting its obligations, including it obligations to pay

22  actual cash value, to pay to repair or replace the premises, and to pay additional living expense benefits.

23  In addition, California Casualty had a fraudulent practice of not retaining CIHs and mold abatement

24  contractors in cases where mold appears as a consequence of a water damage claim.

25          It is California Casualty's business practice not to hire a CIH, even when suspected to be needed.

26  Moulton's handling of the Harolds' claim conformed to California Casualty's fraudulent corporate

21

Exhibit A-110

1  practice of not hiring a CIH to investigate water loss damage when mold was suspected or confirmed.

2  California Casualty has admitted that prior to the Harolds' claim, California Casualty had not previously

3  hired or paid for a CIH to investigate mold in an insured's home in Northern California.

4          California Casualty's corporate practices certainly rise to the level of "deceptive or sharp." In

5  addition, a jury could easily find that such practices are "likely to deceive" California Casualty's

6  insureds who reasonably believe that their claims will be handled in a manner to protect the insured's

7  interests. Finally, California Casualty's practices clearly constitute a fraudulent business practice.

8  **IV.    DAMAGES**

9          The Harolds are entitled to recover three types of damages in this case. First, damages for

10  breach of contract, which in a first party case is measured by the benefits due under the policy, together

11  with interest from the dates the benefits were due. The second type of damages are recovered pursuant

12  to the bad faith theories of liabilities, and these damages include both economic and noneconomic harm

13  incurred by the Harolds, in this case, the cost to repair the damage at the Harold home, and the Harolds'

14  emotional distress damages, respectively. The third type of damages are as of this writing available only

15  against the Westmont, i.e., punitive damages.

16          **A.    Contractual Damages.**

17          California Civil Code § 3300 states:

18          "For the breach of an obligation arising from contract, the measure of damages
           . . . is the amount which will compensate the party aggrieved for all the
19         detriment proximately caused thereby, or which in the ordinary course of things
           would be likely to result therefrom."
20

21          The Harolds understand that California Casualty contends that it has paid the Harolds all benefits

22  due under the insurance policy at issue. The Harolds will present evidence that the contract benefits

23  have not been paid them, and in fact that California Casualty owes them several hundred thousand

24  dollars in policy benefits, plus interest.

25  //

26  //

22

Exhibit A-111

B.   Extracontractual damages.

As a result of the wrongful acts described herein, the Harolds will present proof at trial that their home cannot be successfully remediated as is. The Harold home must be razed to the ground, scraped from the lot, and rebuilt from the ground up. The Harolds will present evidence that the cost to repair their residence will exceed $800,000. In addition to their cost of repair damages, the Harolds have incurred personal injury and emotional distress damages and loss of use damages.

Moreover, the Harolds will be entitled to fees and costs pursuant to *Brandt v. Superior Court*, 37 Cal.3d 813, 817 (1985), which states that if breach of the implied covenant of good faith and fair dealing is proved, reasonable and necessary attorney's fees incurred by the insured to recover policy benefits may be recoverable under the extracontractual measure of damages.

**IV    Conclusion**

Plaintiffs estimate that this case will take three to four weeks to try.

Respectfully submitted,

DATED: February 6, 2006.

HINTON, ALFERT & SUMNER

By _____

PETER W. ALFERT

23

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

Exhibit A-112

**PROOF OF SERVICE**

1

2          I am a resident of the State of California, over the age of eighteen years, and not a party to

3    the within action. My business address is 1646 N. California Blvd., Suite #600, , Walnut Creek,

4    California 94596. On February 6, 2006, I caused the within documents to be served:

5                    **Plaintiffs James Harold's and D. Lee Harold's Trial Brief**

6          ( )          by transmitting via facsimile the document(s) listed above to the fax number(s)

7    set for below on this date before 5:00 p.m.

8          ( )          by placing the document(s) listed above in a sealed envelope with postage

9    thereon fully prepaid, in the United States mail at Walnut Creek, California, addressed as set forth

10   below.

11         ( x )          by personally delivering the document(s) listed above to the person(s) at the

12   address(es) set forth below.

13         ( )          by placing a true copy thereon enclosed in a sealed envelope, at a station

14   designated for collection and processing of envelopes and packages for overnight delivery as part

15   of the ordinary business practices of Hinton, Alfert & Sumner described above, addressed as

16   follows:

17   **SEE ATTACHED SERVICE LIST**

18         I am readily familiar with the business practice at my place of business for collection and

19   processing of correspondence for mailing with the United States Postal Service. Correspondence

20   so collected and processed is deposited with the US Postal Service that same day in the ordinary

21   course of business.

22         I declare under penalty of perjury that the foregoing is true and correct, and that this

23   declaration was executed on February 6, 2006, at Walnut Creek, California.

24

25                              SHARI K. MCMURRY

26

27

28

- 1 -
PROOF OF SERVICE

Exhibit A-113

1

### SERVICE LIST
*Harold v. California Casualty Insurance Company, et al.*
Sacramento County Superior Court No. 02AS04291

2

3

4    Attorneys for Defendant California Casualty
Insurance Company

Attorneys for Defendant Westmont
Construction, Inc.

5

6    Robert S. McLay, Esq.
HAYES, DAVIS, ELLINGTON, McLAY &
SCOTT, LLP

7    400 Capitol Mall
Suite 900

8    Sacramento, CA  95814
Fax Number: (916) 449-8257

Ronald E. Enabnit, Esq.
MATHENY, SEARS, LINKERT& LONG
3638 American River Drive
P. O. Box 13711
Sacramento, CA  95853-4711
Fax Number: (916) 978-3430

9

10    Attorneys for Plaintiffs James Harold and D. Lee
Harold

Attorneys for Plaintiffs James Harold and D.
Lee Harold

11    Michael J. Cochrane, Esq.
KING, KING & FISHLEDER

12    The 555 City Center Building
555 Twelfth Street, Suite 1440

13    Oakland, CA  94607-4046
Fax Number: (510) 444-3401

Karen H. Kahn, Esq.
KAHN BROWN & POORE LLP
2200 Powell Street
Suite 745
Emeryville, CA  94608
Fax Number: (510) 923-6285

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A-114

DANIEL A. KING, ESQ. (SBN 130150)
KING, KING & FISHLEDER, A Professional Corporation
Lake Merritt Plaza, Suite 810
1999 Harrison Street
Oakland, California 94612
Telephone: (510) 874-4333
Facsimile: (510) 874-4399

KAREN H. KAHN, ESQ. (SBN 098404)
LAW OFFICES OF KAREN KAHN
2100 Embarcadero, Suite 100
Oakland, CA 94606
Telephone: (510) 532-9575
Facsimile: (510) 535-2579

Attorneys for Plaintiffs
JAMES HAROLD and D. LEE HAROLD

SUPERIOR COURT OF CALIFORNIA

CITY AND COUNTY OF SACRAMENTO

JAMES HAROLD and D. LEE HAROLD,
individuals

                    Plaintiffs,

v.

CALIFORNIA CASUALTY INSURANCE
COMPANY, WESTMONT CONSTRUCTION,
INC. and DOES 1 through 50

                    Defendants.

CASE NO. 02AS04291

FIRST AMENDED COMPLAINT

Jury Trial Demanded

BY FAX

Plaintiffs JAMES HAROLD and D. LEE HAROLD ("Plaintiffs") complain of defendants
CALIFORNIA CASUALTY INSURANCE COMPANY ("California Casualty"), WESTMONT
CONSTRUCTION, INC. ("Westmont Construction"), and DOES 1 through 50, and allege as
follows.

FIRST AMENDED COMPLAINT

Exhibit A-115

## GENERAL ALLEGATIONS

1.      Plaintiffs purchased the homeowners insurance policy described below, and are the insureds and owners of the policy. They sue on behalf of themselves and on behalf of the general public for recovery of the sums and damages herein alleged.

2.      California Casualty is and at all times mentioned was, a business organization of a form unknown to Plaintiffs. Plaintiffs are informed and believe, and thereupon allege, that California Casualty is a corporation authorized under the laws of the State of California to transact business in this state as an insurance company.

3.      Westmont Construction is and at all times mentioned was, a business organization of a form unknown to Plaintiffs. Plaintiffs are informed and believe, and thereupon allege, that Westmont Construction is a corporation authorized under the laws of the State of California to transact business in this state.

4.      Plaintiffs do not know the true names, capacities, and identities, whether corporate, partnership, individual or otherwise, of defendants sued herein as Does 1 through 50, inclusive, and for this reason sue such defendants by such fictitious names in accordance with Section 474 of the Code of Civil Procedure. Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously-named defendants is legally responsible for the events and actions referred to in this Complaint and wrongfully caused injury and damages to them, as alleged below. Plaintiffs will seek leave to amend this complaint to state these defendants' true names and capacities when they are ascertained.

5.      California Casualty issued a homeowners insurance policy to Plaintiffs, policy number 204 1155871 05 03, which took effect on or about September 5, 2001 (the "Policy"). The Policy is presently in full force and effect, and was in full force and effect at all pertinent times mentioned herein. The Policy provides that California Casualty "will pay the reasonable cost incurred by you for necessary repairs" and assumes certain other obligations in the event of direct physical loss to Plaintiffs' property, including their home at 1160 Glen Aulin Court, Carmichael, California 95608 (the "Property"). A copy of the insurance policy provided to the Plaintiffs by California Casualty during the claims process is attached hereto as Exhibit A.

6.      In November 2007, a hot water pipe broke causing direct physical loss to the Property. Plaintiffs promptly reported a claim to California Casualty and otherwise performed all terms and conditions of the Policy which they were required to perform for obtaining payments of insurance benefits.

7.      California Casualty responded to the loss, agreeing that the damage caused by the break in the hot water pipe was covered under the Policy. California Casualty, however, failed to acknowledge its obligations pursuant to the terms of the Policy, including to indemnify Plaintiffs under the terms of the Policy. Instead, California Casualty misrepresented those obligations, including its obligations to pay actual cash value, to pay to repair or replace the premises and to pay additional living expense benefits.

8.      Despite its obligations under the Policy, including the obligation to reimburse Plaintiffs for the cost of repairs, California Casualty volunteered to protect the property from further damage and to repair the damage itself. California Casualty employed Westmont Construction to do this work and assumed the right and responsibility to direct and control work performed by Westmont Construction. Thereafter, California Casualty took control of Plaintiffs' property ostensibly to allow its contractor to perform this work.

9.      During the course of this work, California Casualty (including but not limited to Westmont Construction) learned that the property had become contaminated with toxic mold and bacteria as a result of the break in the hot water pipe. California Casualty (including but not limited to Westmont Construction) was aware that exposure to this type of mold and bacteria could cause serious health problems to Plaintiffs and others.

10.      Knowing that Plaintiffs were being exposed and would continue to be exposed to the toxic mold and bacteria, California Casualty (including but not limited to Westmont Construction) concealed from Plaintiffs the existence of the toxic mold and bacteria at the Property. California Casualty (including but not limited to Westmont Construction) also made misrepresentations in order to hide the existence of the toxic mold and bacteria.

11.      Without Plaintiffs' knowledge, California Casualty (including but not limited to Westmont Construction) attempted to remove visible mold and bacteria using industrial strength

Exhibit A-117

1   clorox and without using any containment to prevent the spread of mold and bacteria.  California

2   Casualty (including but not limited to Westmont Construction) caused further damage, spreading

3   the mold and bacteria throughout the Property and onto Plaintiffs' personal property.

4        12.    In addition to the foregoing, California Casualty engaged in a practice of

5   misrepresenting to Plaintiffs the coverage available for Additional Living Expenses.

6        13.    Plaintiffs are informed and believe, and based thereon allege, that California

7   Casualty's conduct as alleged in paragraphs 8 through 12 are the result of the policies and

8   procedures of California Casualty for handling property insurance claims.

9

10                           **CAUSES OF ACTION**

11                           <u>**First Cause of Action**</u>
                    **(For Breach of Contract Against California Casualty)**

12

13        14.    Plaintiffs reallege and incorporate by this reference in this claim the allegations

14   contained in Paragraphs 1 through 13 of this Complaint.

15        15.    Plaintiffs duly performed each and every condition and obligation that they were

16   required to perform under the Policy.

17        16.    Defendant breached its contractual duties to Plaintiffs by failing to fulfill the

18   express obligations assumed by Defendant, including but not limited to its obligation to pay

19   insurance benefits under the Policy in a timely manner and their obligation to exercise

20   reasonable care in the handling of Plaintiffs' insurance claims.  Also, Defendant breached its

21   contractual duties by intentionally misrepresenting and concealing information concerning its

22   obligations and Plaintiffs' rights under the Policy.

23        17.    As a direct and legal result of Defendant's breach of its obligations, Plaintiffs

24   have suffered and will continue to suffer damages, including but not limited to loss of insurance

25   benefits, interest on those benefits, attorneys' fees, adjusters' fees, medical costs, other financial

26   losses and incidental damages, out-of-pocket expenses, loss of use of the property, and physical

27   injuries, all to their damage in an amount well in excess of the jurisdiction of this Court to be

28   shown according to proof.

Exhibit A-118

Second Cause of Action
(For Breach Of Implied Covenant of Good Faith
And Fair Dealing Against California Casualty)

18.    Plaintiffs reallege and incorporate by reference in this claim the allegations contained in Paragraphs 1 through 17 of this Complaint.

19.    Defendant owed to Plaintiffs the duties of good faith and fair dealing implied by law in every contract of insurance.

20.    Defendant breached these duties by, among other things, unreasonably and wrongfully: (a) refusing to pay to Plaintiffs the benefits due under the Policy; (b) attempting to avoid payment of Plaintiffs' legitimate claims, (c) failing and refusing to properly investigate Plaintiffs' claims for benefits, and (d) intentionally misrepresenting and concealing information concerning its obligations under the Policy.

21.    As a direct and legal result of Defendant's actions, Plaintiffs have suffered and continue to suffer personal injuries, emotional and mental distress, anxiety, injuries to their nervous systems and persons, all of which have caused and continue to cause Plaintiffs mental harm, and physical injury and pain and suffering, in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

22.    As a further direct and legal result of Defendant's actions, Plaintiffs have suffered and will continue to suffer other damages, including but not limited to the loss of benefits due under the Policy, loss of use of the property, interest on those insurance benefits, attorneys' fees, adjusters' fees, medical costs, other financial losses and incidental damages, and other consequential damages and out-of-pocket expenses, in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

23.    The acts complained of in this Complaint were wilful, wanton, malicious, fraudulent and oppressive, and Defendant is guilty of oppression, fraud and malice. Further, all of the alleged acts were performed, authorized or ratified by one or more of Defendant's officers, directors, managing agents, or managerial employees, who acted with knowledge that said conduct would cause Plaintiffs harm. Defendant is therefore subject to the imposition of punitive and exemplary damages.

*Third Cause of Action*
(For Negligence Against Defendant California Casualty
and Does 1 through 10)

24.    Plaintiffs reallege and incorporate by reference in this claim the allegations contained in Paragraphs 1 through 23 of this Complaint.

25.    California Casualty and Does 1 through 10 undertook duties toward Plaintiffs to exercise reasonable care in the investigation, evaluation, and determination of Plaintiffs' claims for benefits under the Policy, including the duty to inform the Plaintiffs of their right to hire a contractor of their own choosing. Defendants breached their duties of due care by failing to exercise ordinary and reasonable care in the investigation, evaluation, and determination of Plaintiffs' claim under the Policy and by failing to inform the Plaintiffs of their right to hire a contractor of their own choosing.

26.    By volunteering and undertaking the responsibility to protect the property from further damage and repair the damage, California Casualty and Does 1 through 10 also undertook duties toward Plaintiffs, including a duty to exercise reasonable care in the selection and supervision of any contractor it employed; to direct and control the repairs; to take special precautions to prevent peculiar, recognizable dangers arising out of the particular kind of work involved; to reasonably establish the scope of work to be performed so that it included all steps necessary to restore the Property to a habitable condition; and to disclose any known risks of harm to Plaintiffs.

27.    California Casualty and Does 1 through 10 also breached their duties of care by failing to exercise ordinary and reasonable care in the selection and supervision of Westmont Construction; failed to take special precautions to prevent the growth and spread of mold which was a foreseeable and likely danger when the repairs to the Property were undertaken; failed to adequately direct and control the contractor with respect to the work performed in order to restore the Property to a habitable condition; limited the scope and extent of repairs performed for, and consequently the amount of benefits paid to, the Plaintiffs by arranging to have the work performed by its own agent, Westmont Construction; and failed to disclose any known risks of harm to Plaintiffs.

28.     As a direct and legal result of those breaches of duty, Plaintiffs have suffered and will continue to suffer damages, including but not limited to the loss of insurance benefits, loss of use of the property, interest on those benefits, attorneys' fees, adjusters' fees, medical costs, and other incidental damages, and other consequential damages and out-of-pocket expenses, all to their damage in an amount in excess of the jurisdiction of this Court to be shown according to proof.

29.     As a further direct and legal result of the actions of California Casualty and Does 1 through 10, Plaintiffs have suffered and continue to suffer personal injuries, emotional and mental distress, anxiety, injuries to their nervous systems and persons, all of which have caused and continue to cause Plaintiffs mental harm, and physical injury and pain and suffering, in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

30.     The acts complained of in this Complaint were wilful, wanton, malicious, fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice. Further, all of the alleged acts were performed, authorized or ratified by one or more of California Casualty's officers, directors, managing agents, or managerial employees, who acted with knowledge that said conduct would cause Plaintiffs harm. Defendants and each of them are therefore subject to the imposition of punitive and exemplary damages.

**Fourth Cause of Action**
**(For Negligence Against Westmont Construction**
**and Does 11 through 25)**

31.     Plaintiffs reallege and incorporate by reference in this claim the allegations contained in Paragraphs 1 through 30 of this Complaint.

32.     Defendants, Westmont Construction and Does 11 through 25, also undertook duties toward Plaintiffs, including the duty to exercise reasonable care in the repair of the Property and to disclose and warn the Plaintiffs about any known risks of harm to Plaintiffs, including the presence and effects on them of toxic mold.

33.     Defendants, Westmont Construction and Does 11 through 25, breached their duties of due care by failing to exercise ordinary and reasonable care in repairing the Property

& Fishleder
Plaza

Exhibit A-121

1  and by failing to disclose and warn the Plaintiffs about any known risks of harm to Plaintiffs,

2  including the presence and effects on them of toxic mold.

3       34.    As a direct and legal result of those breaches of duty, Plaintiffs have suffered and

4  will continue to suffer damages, including but not limited to the loss of insurance benefits, loss

5  of use of the property, interest on those benefits, attorneys' fees, adjusters' fees, medical costs,

6  and other incidental damages, and other consequential damages and out-of-pocket expenses, all

7  to their damage in an amount in excess of the jurisdiction of this Court to be shown according to

8  proof.

9       35.    As a further direct and legal result of the actions of Westmont Construction and

10  Does 1 through 25, Plaintiffs have suffered and continue to suffer personal injuries, emotional

11  and mental distress, anxiety, injuries to their nervous systems and persons, all of which have

12  caused and continue to cause Plaintiffs mental harm, and physical injury and pain and suffering,

13  in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

14       36.    The acts complained of in this Complaint were wilful, wanton, malicious,

15  fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice.  Further,

16  all of the alleged acts were performed, authorized or ratified by one or more of Westmont

17  Construction's officers, directors, managing agents, or managerial employees, who acted with

18  knowledge that said conduct would cause Plaintiffs harm.  Defendants and each of them are

19  therefore subject to the imposition of punitive and exemplary damages.

20

21                          **Fifth Cause of Action**
                (For Intentional Infliction of Emotional Distress Against
22            California Casualty, Westmont and Does 1 through 25)

23       37.    Plaintiffs reallege and incorporate by reference in this cause of action the

24  allegations contained in Paragraphs 1 through 36 of this Complaint.

25       38.    In doing the acts alleged above, Defendants engaged in a course of conduct which

26  was intentional, extreme and outrageous, and which was in wanton and reckless disregard of

27  Plaintiffs' rights and interests.

28

& Fishleder
a Plaza

                                    8                          Exhibit A-122

39.    As a direct and legal result of Defendants' conduct as alleged herein, Plaintiffs

have suffered (and continue to suffer) damages, including but not limited to severe emotional

distress, personal injuries, loss of income, loss of benefits due under the Policy, loss of use of the

property, adjusters' fees, medical costs, and other consequential damages, all to their damage in

an amount well in excess of the jurisdiction of this Court to be shown according to proof.

40.    As a further direct and legal result of Defendants' actions as alleged herein,

Plaintiffs were humiliated, hurt and injured in their health, strength and activity, sustained

injuries to their nervous systems and persons, all of which injuries have caused and continue to

cause Plaintiffs severe emotional distress.  As a result of these injuries, Plaintiffs have suffered

damage in amount to be shown according to proof.

41.    The acts complained of in this Complaint were wilful, wanton, malicious,

fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice.  Further,

all of the alleged acts were performed, authorized or ratified by one or more of Defendants'

officers, directors, managing agents or managerial employees, who acted with knowledge that

said conduct would cause Plaintiffs harm.  Defendants and each of them are therefore subject to

the imposition of punitive and exemplary damages.


**Sixth Cause of Action**
**(For Fraud By Concealment**
**Against Defendants California Casualty,**
**Westmont Construction and Does 1 through 25)**

42.    Plaintiffs reallege and incorporate by reference in this cause of action the

allegations contained in Paragraphs 1 through 41 of this Complaint.

43.    In doing the acts alleged above, Defendants concealed or suppressed information

concerning the presence of toxic mold and bacteria from Plaintiffs.

44.    While preparing the scope of damage to the Plaintiffs' home, Sue Nelson and

Bernard Sequeira, the owners of Westmont Construction and Vern Moulton of California

Casualty became aware of suspect mold growing as a result of the original water damage.

Westmount Construction and California Casualty were aware of the potential health risks

Exhibit A-123

1    associated with the mold.

2         45.     Ms. Nelson, Mr. Sequeira and Mr. Moulton concealed the presence of mold and

3    the potential health risks associated with the mold from Plaintiffs.  They had a duty to inform

4    and warn the Plaintiffs about the presence of mold in the Property and the foreseeable risk of

5    harm to the Plaintiffs from exposure to toxic mold and bacteria, but they concealed the presence

6    of mold with the intent to defraud Plaintiffs.

7         46.     Westmont Construction with the concurrence of California Casualty had the

8    property tested for mold by Anderson Environmental Consulting Group.  They had this testing

9    performed without the knowledge or consent of Plaintiffs.  The testing revealed in January 2001

10   that toxic mold was present in the house.  Anderson Environmental Consulting Group also

11   warned Westmont Construction that the particles produced by the mold were toxic and might

12   cause serious health problems to persons exposed to the mold.  Westmont Construction

13   immediately notified Vern Moulton of California Casualty about the results of the test and the

14   health risks associated with exposure to the mold.  California Casualty and Westmont

15   Construction had a duty to inform and warn the Plaintiffs that mold discovered in the Property

16   had been tested and that toxic mold was present in the Property.  They concealed the presence of

17   toxic mold and the foreseeable risk of harm to the Plaintiffs from exposure to toxic mold and

18   bacteria, with the intent to defraud Plaintiffs.

19        47.     Mr. Sequeira, with the concurrence of Vern Moulton, advised Plaintiffs that they

20   needed to move out of the Property due to work to be performed on the floors.  Mr. Sequeira and

21   Mr. Moulton concealed from Plaintiffs the true reason for asking the Plaintiffs to move out of the

22   Property, which was their discovery of the presence of toxic mold and the intent of California

23   Casualty and Westmont Construction to clean-up the mold contrary to expensive protocols

24   required for abating mold.  Defendants were under a duty to inform and warn the Plaintiffs that

25   they intended to clean up the mold through ordinary repair methods but, instead, they concealed

26   their intent to clean-up the mold contrary to expensive protocols required for abating mold, with

27   the intent to defraud Plaintiffs.

28

ing & Fishleder
nt Plaza

Exhibit A-124

48.    Unaware of the toxic mold because of Westmount's and California Casualty's concealment of the presence of toxic mold and their intent to clean it up through ordinary repair methods, Plaintiffs continued to regularly enter their home in order to obtain supplies and for other reasons. As a result, Plaintiffs unknowingly were exposing themselves to toxic mold and bacteria which could, foreseeably, cause injury to the Plaintiffs. Plaintiffs would not have entered the Property if they had they known of the <u>presence of toxic mold and bacteria which was intentionally concealed from them</u>. They also would have hired competent companies to abate the mold at their property, which would have decreased Plaintiffs' out-of-pocket expenses and time associated with abating the mold problem.

49.    As a direct and legal result of Defendants' conduct as alleged herein, Plaintiffs have suffered (and continue to suffer) damages, including but not limited to severe emotional distress, personal injuries, loss of income, loss of benefits due under the Policy, adjusters' fees, medical costs, and other consequential damages, all to their damage in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

50.    As a further direct and legal result of Defendants' actions as alleged herein, Plaintiffs were humiliated, hurt and injured in their health, strength and activity, sustained injuries to their nervous systems and persons, all of which injuries have caused and continue to cause Plaintiffs severe emotional distress. As a result of these injuries, Plaintiffs have suffered damage in amount to be shown according to proof.

51.    The acts complained of in this Complaint were wilful, wanton, malicious, fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice. Further, all of the alleged acts were performed, authorized or ratified by one or more of Defendants' officers, directors, managing agents, or managerial employees, who acted with knowledge that said conduct would cause Plaintiffs harm. Defendants and each of them are therefore subject to the imposition of punitive and exemplary damages.

Exhibit A-125

<center>Seventh Cause of Action</center>
<center>(For Fraud By Misrepresentation Against Defendants</center>
<center>California Casualty, Westmont Construction and Does 1 through 25)</center>

52.     Plaintiffs reallege and incorporate by reference in this cause of action the allegations contained in Paragraphs 1 through 51 of this Complaint.

53.     In doing the acts alleged above, Defendants made false representations as to the habitability of the Plaintiffs' Property.

54.     While preparing the scope of damage to the Plaintiffs' home, Sue Nelson and Bernard Sequeira, the owners of Westmont Construction and Vern Moulton of California Casualty became aware of suspect mold growing as a result of the original water damage. Westmount Construction and California Casualty were aware of the potential health risks associated with the mold.

55.     Ms. Nelson, Mr. Sequeira and Mr. Moulton made representations about the nature of repairs being performed at the property, indicating that the house continued to be habitable, knowing these representations were false because of the potential health risks associated with the presence of mold in the house. They misrepresented the habitability of the Property and the nature of repairs with the intent to defraud Plaintiffs.

56.     Westmont Construction with the concurrence of California Casualty had the property tested for mold by Anderson Environmental Consulting Group. The testing revealed in January 2001 that toxic mold was present in the house. Anderson Environmental Consulting Group also warned Westmont Construction that the particles produced by the mold were toxic and may cause serious health problems to persons exposed to the mold. Westmont Construction immediately notified Vern Moulton of California Casualty about the results of the test and the health risks associated with exposure to the mold.

57.     Mr. Sequeira, with the concurrence of Vern Moulton, misrepresented to Plaintiffs that they needed to move out of the Property due to work to be performed on the floors. Mr. Sequeira and Vern Moulton knew their representations about the reasons for asking Plaintiffs to move out of the Property were false because the true reason Mr. Sequeira and Vern Moulton wanted the Plaintiffs to move out of the Property was their discovery of the presence of

1  toxic mold and the intent of California Casualty and Westmount Construction to clean-up the

2  mold contrary to expensive protocols required for abating mold.

3      58.    Unaware of the falsity of Defendants' representations concerning the habitability

4  of the Property, Plaintiffs continued to regularly enter their home in order to obtain supplies and

5  for other reasons. As a result, Plaintiffs unknowingly were exposing themselves to toxic mold

6  and bacteria which could, foreseeably, cause injury to the Plaintiffs.

7      59.    Unaware of the falsity of the representations of Westmont and California

8  Casualty concerning the nature of repairs at the Property and the intent of Westmont

9  Construction and California Casualty to use ordinary repair methods to remediate the mold,

10  Plaintiffs were deprived of their rights under the terms of the insurance policy to hire competent

11  companies to abate the mold at their property, which would have decreased Plaintiffs'

12  out-of-pocket expenses and time associated with abating the mold problem.

13      60.    Defendants misrepresented to the Plaintiffs that the Property was habitable, and

14  that ordinary repairs were being made at the Property, with an intent to defraud the Plaintiffs and

15  to induce them to forego further repairs, including expensive protocols for the remediation of

16  toxic mold and bacteria.

17      59.    Plaintiffs were unaware of the falsity of the representations that their Property had

18  been repaired and made habitable and Plaintiffs were also unaware of the concealed fact that

19  toxic mold and bacteria were present in the house. Plaintiffs were justified in relying upon the

20  representations of Defendants who had superior knowledge about the status of repairs of the

21  Property and whose attempts to remove the toxic mold prevented the Defendants from

22  discovering it. In reliance upon the Defendants' representations about the habitability of the

23  Property and the nature of repairs being undertaken at the Property, Plaintiffs initially stayed in

24  the house and thereafter continued to go into the house exposing themselves to toxic mold and

25  suffering personal injuries.

26      60.    As a direct and legal result of Defendants' conduct as alleged herein, Plaintiffs

27  have suffered (and continue to suffer) damages, including but not limited to severe emotional

28  distress, personal injuries, loss of income, loss of benefits due under the Policy, adjusters' fees,

13                                                          Exhibit A-127

1  medical costs, and other consequential damages, all to their damage in an amount well in excess

2  of the jurisdiction of this Court to be shown according to proof.

3      61.    As a further direct and legal result of Defendants' actions as alleged herein,

4  Plaintiffs were humiliated, hurt and injured in their health, strength and activity, sustained

5  injuries to their nervous systems and persons, all of which injuries have caused and continue to

6  cause Plaintiffs severe emotional distress. As a result of these injuries, Plaintiffs have suffered

7  damage in amount to be shown according to proof.

8      62.    The acts complained of in this Complaint were wilful, wanton, malicious,

9  fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice. Further,

10  all of the alleged acts were performed, authorized or ratified by one or more of Defendants'

11  officers, directors, managing agents, or managerial employees, who acted with knowledge that

12  said conduct would cause Plaintiffs harm. Defendants and each of them are therefore subject to

13  the imposition of punitive and exemplary damages.

14

15  **Eighth Cause of Action**
   **(For Nuisance Against Defendants California Casualty,**
16  **Westmont Construction and Does 1 through 25)**

17      63.    Plaintiffs reallege and incorporate by reference in this cause of action the

18  allegations contained in Paragraphs 1 through 62 of this Complaint.

19      64.    Defendants interfered with Plaintiffs' private use and enjoyment of their interest

20  in the Property.

21      65.    The interference was substantial and unreasonable.

22      66.    As a direct and legal result of Defendants' conduct as alleged herein, Plaintiffs

23  have suffered (and continue to suffer) damages, including but not limited to severe emotional

24  distress, personal injuries, loss of income, loss of benefits due under the Policy, loss of use of the

25  property, adjusters' fees, medical costs, and other consequential damages, all to their damage in

26  an amount well in excess of the jurisdiction of this Court to be shown according to proof.

27      67.    As a further direct and legal result of Defendants' actions as alleged herein,

28  Plaintiffs were humiliated, hurt and injured in their health, strength and activity, sustained

1  injuries to their nervous systems and persons, all of which injuries have caused and continue to

2  cause Plaintiffs severe emotional distress. As a result of these injuries, Plaintiffs have suffered

3  damage in amount to be shown according to proof.

4      68.    The acts complained of in this Complaint were wilful, wanton, malicious,

5  fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice. Further,

6  all of the alleged acts were performed, authorized or ratified by one or more of Defendants'

7  officers, directors, managing agents, or managerial employees, who acted with knowledge that

8  said conduct would cause Plaintiffs harm. Defendants and each of them are therefore subject to

9  the imposition of punitive and exemplary damages.

10

11                    **Ninth Cause of Action**
                   **(For Unfair Business Practices Against**
12         **Defendants California Casualty and Does 1 through 25)**

13      69.    Plaintiffs reallege and incorporate by reference in this cause of action the

14  allegations contained in Paragraphs 1 through 68 of this Complaint.

15      70.    California Casualty has committed acts of unfair competition, as defined by

16  Business and Professions Code section 17200, by engaging in the following practices.

17      71.    California Casualty had and continues to have an unfair, unlawful and fraudulent

18  practice of failing to acknowledge its obligations pursuant to the terms of property insurance

19  policies it issues, including its obligation to indemnify policyholders under the terms of the

20  policies. Instead, California Casualty has an unfair, unlawful and fraudulent practice of

21  misrepresenting those obligations, including its obligations to pay actual cash value, to pay to

22  repair or replace the premises and to pay additional living expense benefits as described below.

23      72.    California Casualty had and continues to have an unfair, unlawful and fraudulent

24  practice of representing to policyholders that it will undertake to protect their property from

25  further damage and to repair the damage itself. With respect to this practice, California Casualty

26  has the practice of repairing toxic mold damage without taking proper precautions to protect

27  policyholders from the risk of serious health problems and further damage to property, and

28  without disclosing to policyholders the risks associated with the toxic mold and by concealing

1  the existence of toxic mold from policyholders.

2      73.    California Casualty had and continues to have an unfair, unlawful and fraudulent

3  practice of misrepresenting to policyholders coverage available for Additional Living Expenses.

4      74.    As a direct and legal result of the aforementioned acts, California Casualty has

5  received and continues to receive ill-gotten gains.  The court has extraordinarily broad power

6  under section 17203 of the Business and Professions Code to fashion remedies which will

7  prevent unlawful business practices from occurring in the future and to restore to those who have

8  been injured any money or property, real or personal, and rights thereto, which have been

9  acquired by means of the defendant's unlawful business acts or practices.

10

11                          **Tenth Cause of Action**
                   **(For Negligence Against Does 20 through 50)**

12

13      75.    Plaintiffs reallege and incorporate by reference in this claim the allegations

14  contained in Paragraphs 1 through 6 of this Complaint.

15      76.    Defendants undertook duties toward Plaintiffs to exercise reasonable care in the

16  investigation, evaluation, and repair of the Property.

17      77.    Defendants breached their duties of due care by failing to exercise ordinary and

18  reasonable care in the investigation, evaluation, and repair of the Property.

19      78.    As a direct and legal result of those breaches of duty, Plaintiffs have suffered and

20  will continue to suffer damages, including but not limited to property damage and other

21  incidental damages, and other consequential damages and out-of-pocket expenses, all to their

22  damage in an amount in excess of the jurisdiction of this Court to be shown according to proof.

23      WHEREFORE, Plaintiffs prays for judgment as follows:

24      1.    For all benefits due under the Policy, together with interest thereon at the legal

25  rate;

26      2.    For general damages for emotional distress, mental suffering and physical injury

27  in an amount according to proof;

28

& Fahleder
Plaza
1 Street, Suite 610

16

Exhibit A-130

3.    For consequential damages legally caused by Defendants' conduct in an amount according to proof;

4.    For attorneys' fees and other expenses incurred to obtain the benefits due under the Policy;

5.    For exemplary and punitive damages;

6.    For attorneys' fees and costs of suit herein incurred;

7.    For prejudgment interest;

8.    Pursuant to Business and Professions Code section 17203, and pursuant to the equitable powers of this Court, Plaintiffs pray that the defendants be preliminarily and permanently enjoined from the acts of unfair competition alleged above;

9.    Pursuant to Business and Professions Code section 17203, and pursuant to the equitable powers of this Court, Plaintiffs pray that defendants be ordered to restore to the public all funds acquired by means of any act or practice declared by this Court to be unlawful, unfair or fraudulent or to constitute unfair competition under Business and Professions Code section 17200 *et seq.*; and

10.    For such other and further relief as the Court may deem just and proper.

KING, KING & FISHLEDER,
A Professional Corporation

Dated:   October 28, 2002

By
Daniel A. King
Attorneys for Plaintiffs

F:\WPW\3344-10\11.wpd

Exhibit A-131

17

Re:  HAROLD v. CALIFORNIA CASUALTY, et al.
     Sacramento County Superior Court Case No. 02 AS04291

## PROOF OF SERVICE
[Code Civ. Proc. §§ 1013(a)(3) & 1011]

I am a resident of the United States and employed in Sacramento County. I am over the age

of eighteen years and not a party to the within entitled action. My business address is 3638 American

River Drive, Sacramento, California.

On this date, I served:    **WESTMONT CONSTRUCTION, INC.'S BRIEF
REGARDING JOINT AND SEVERAL LIABILITY
ISSUES**

_____  **BY FAX:** by transmitting via facsimile the document(s) listed above to the fax
number(s) set forth below on this date before 5:00 p.m.

XXX  **BY MAIL:** by placing the document(s) listed above in a sealed envelope with postage
thereon fully prepaid, in the United States mail at Sacramento, California addressed as
set forth below. I am readily familiar with my firm's practice of collection and
processing correspondence for mailing. It is deposited with the U.S. Postal Service on
the same day in the ordinary course of business. I am aware that on motion of party
served, service is presumed invalid if postal cancellation date of postage meter date is
more than 1 day after date of deposit for mailing in affidavit.

_____  **BY OVERNIGHT MAIL:** by causing document(s) to be picked up by an overnight
delivery service company for delivery to the address(es) on the next business day.

_____  **BY PERSONAL DELIVERY:** by causing personal delivery by **of the document(s)
listed above to the person(s) at the addressee(s) set forth below.

| (Lead)Counsel for Plaintiffs: | Co-Counsel for Plaintiffs: |
|---|---|
| Peter W. Alfert, Esq. | Karen H. Kahn, Esq. |
| HINTON, ALFERT & SUMNER | KAHN, BROWN & POORE |
| 1646 N. California Blvd., Suite 600 | 2200 Powell Street, Suite 745 |
| Walnut Creek, CA 94596 | Emeryville, CA 94608 |
| (925) 932-3412 Fax | (510 923-6285 Fax |
| **Co-Counsel for Plaintiffs:** | **Counsel for Def./X-Comp/X-Def. CA Casualty:** |
| Michael Cochrane, Esq. | Stephen M. Hayes, Esq. |
| KING, KING & FISHLEDER | HAYES, DAVIS, ELLINGSON, ET AL. |
| 555 Twelfth Street, Suite 1440 | 203 Redwood Shores Parkway, Suite 480 |
| Oakland, CA 94607 | Redwood Shores, CA 94065 |
| (510) 444-3401 Fax | (650) 637-8071 Fax |
|  |  |
|  | Robert McLay, Esq. |
|  | HAYES, DAVIS, ELLINGSON, ET AL. |
|  | 400 Capitol Mall, 9th Floor |
|  | Sacramento, CA 95814 |
|  | (916) 449-8257 Fax |

MATHENY SEARS LINKERT & LONG LLP
POST OFFICE BOX 13711
SACRAMENTO, CALIFORNIA 95853-4711

Exhibit A-132

1      I declare under penalty of perjury, according to the laws of the State of California, that the

2      foregoing is true and correct.

3      Executed on this __25TH__ day of May, 2006, at Sacramento, California

4

5                                Aline Perusse

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A-133

1   STROOCK & STROOCK & LAVAN LLP
    MICHAEL F. PERLIS (State Bar No. 095992)
2   EMAIL: MPERLIS@STROOCK.COM
    ALLAN S. COHEN (State Bar No. 115532)
3   EMAIL: ACOHEN@STROOCK.COM
    2029 Century Park East
4   Los Angeles, CA  90067-3086
    Telephone: 310-556-5800
5   Facsimile: 310-556-5959

6

7   Attorneys for Defendant
    FEDERAL INSURANCE COMPANY

8

ORIGINAL FILED

MAY 29 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9       UNITED STATES DISTRICT COURT

10      NORTHERN DISTRICT OF CALIFORNIA

11  CALIFORNIA CASUALTY
12  INSURANCE COMPANY,                    Case No.  CV 08-2701 VRW

13          Plaintiffs,                   NOTICE TO ADVERSE PARTY OF
                                          REMOVAL TO FEDERAL COURT
14      vs.

15  FEDERAL INSURANCE COMPANY,
16  DOES 1-10, ROES 1-10, AND MOES 1-
    10, inclusive
17

18          Defendants.

19

20      TO PLAINTIFF CALIFORNIA CASUALTY INSURANCE COMPANY
21  AND ITS ATTORNEYS OF RECORD:

22      PLEASE TAKE NOTICE THAT a Notice of Removal of this action was filed
23  in the United States District Court for the Northern District of California on May 29,
24  2008 under Case No. CV 08-2701 VRW.

25

26

27

28

LA 51052329

1        A copy of said Notice of Removal is attached to this Notice, and is served and

2    filed herewith.

3    Dated:  May 29, 2008          STROOCK & STROOCK & LAVAN LLP
                                MICHAEL F. PERLIS

4                                    ALLAN S. COHEN

5

6                              By: _____
                                Michael F. Perlis

7                              Attorneys for Defendant

8                              FEDERAL INSURANCE COMPANY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COPY

FAXED

1  STROOCK & STROOCK & LAVAN LLP
2  MICHAEL F. PERLIS (State Bar No. 095992)
   EMAIL: MPERLIS@STROOCK.COM
   ALLAN S. COHEN (State Bar No. 115532)
3  EMAIL: ACOHEN@STROOCK.COM
   2029 Century Park East
4  Los Angeles, CA 90067-3086
   Telephone: 310-556-5800
5  Facsimile: 310-556-5959
6
   Attorneys for Defendant
7  FEDERAL INSURANCE COMPANY
8              UNITED STATES DISTRICT COURT
9          NORTHERN DISTRICT OF CALIFORNIA
10
                         CV 08         2701
11 CALIFORNIA CASUALTY          )  Case No.
12 INSURANCE COMPANY,           )
                                )  NOTICE OF REMOVAL OF
13         Plaintiffs,          )  ACTION UNDER 28 U.S.C.
                                )  SECTION 1441(b)
14     vs.                      )
                                )
15 FEDERAL INSURANCE COMPANY,   )
16 DOES 1-10, ROES 1-10, AND MOES 1- )
17 10, inclusive                )
                                )
18         Defendants.          )
19 ─────────────────────────────)

20        TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

21 NORTHERN DISTRICT OF CALIFORNIA:

22        PLEASE TAKE NOTICE that Defendant Federal Insurance Company

23 ("Federal") hereby removes to this Court the State Court action described below:

24        1.    On April 30, 2008 an action was commenced in the Superior Court of

25 the State of California in and for the County of San Mateo entitled *California*

26 *Casualty Insurance Company v. Federal Insurance Company, Does 1-10, Roes 1-10*

27 *and Moes 1-10, inclusive*, as Case No. CIV4I72452. A copy of the Summons and

28 Complaint is attached hereto as Exhibit "A".

LA 51052322

2.    The date upon which Defendant Federal received a copy of said Summons and Complaint was May 6, 2008 when Defendant Federal was served with the Summons and Complaint from the State Court action.

## JURISDICTION

3.    This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. Section 1332, and is one which may be removed to this Court by Defendant Federal pursuant to the provisions of 28 U.S.C. Section 1441(b) in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs because Plaintiff alleges damages in excess of $2,000,000.00. See, Exhibit "A" at paragraph 16 of the Complaint and paragraph 2 of the Prayer for Relief.

4.    Complete diversity of citizenship exists in that: Plaintiff California Casualty Insurance Company is a corporation incorporated under the laws of the State of California and having its principal place of business in the State of California. Defendant Federal is a corporation incorporated under the laws of the State of Indiana and having its principal place of business in the State of New Jersey.

5.    Defendants Does 1-10, Roes 1-10 and Moes 1-10 are all fictitiously named defendants whose citizenship, for purposes of removal, is disregarded. 28 U.S.C. Section 1441(a).

## INTRADISTRICT ASSIGNMENT

6.    This division of the United States District Court for the Northern District of California is the proper Court in which to remove the State Court action as this Court has jurisdiction over cases arising in the County of San Mateo, California. *Local Rule*, 3-2(d) for the Northern District of California.

LA 51052327

1    WHEREFORE, Federal Insurance Company hereby gives notice that the

2 above-referenced action is removed in its entirety from the Superior Court of the

3 State of California for the County of San Mateo to the United States District Court

4 for the Northern District of California.

5

6 Dated:  May 28, 2008                    STROOCK & STROOCK & LAVAN LLP

7                                          MICHAEL F. PERLIS
                                           ALLAN S. COHEN
8
                                           By: _____
9                                              Michael F. Perlis

10                                         Attorneys for Defendant
                                           FEDERAL INSURANCE COMPANY
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA 51052327

SU~ ~ONS
*(CITACION JUDICIAL)*

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
FEDERAL INSURANCE COMPANY, DOES 1-10, ROES 1-10, AND
MOES 1-10, INCLUSIVE

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**FILED**
SAN MATEO COUNTY

APR 3 0 2008

Clerk of the Superior Court
By _____ DEPUTY CLERK

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CALIFORNIA CASUALTY INSURANCE COMPANY

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.   If you cannot pay the filing fee, ask the court clerk for a fee waiver form.   If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.   Una carta o una llamada telefónica no lo protegen.   Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.   Es posible que haya un formulario que usted pueda usar para su respuesta.   Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca.   Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.   Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales.   Es recomendable que llame a un abogado inmediatamente.   Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.   Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.   Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER *(Número del Caso):* **CV 4 7 2 4 5 2** |
|---|---|

SAN MATEO SUPERIOR COURT
400 COUNTY CENTER
400 COUNTY CENTER
REDWOOD CITY, CALIFORNIA 94063
MAIN COURTHOUSE

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David C. Werner, [SBN: 67993]
Bryan E. Quilo, [SBN: 213708]       949-460-9280      949-460-9286
Law Offices of David C. Werner
Laguna Hills, CA 92653

| DATE: *(Fecha)* APR 3 0 2008 | **JOHN C. FITTON** | Clerk, by *(Secretario)* | _____ | Deputy *(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐  as an individual defendant.
2. ☐  as the person sued under the fictitious name of *(specify):*

3. ☐  on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐  by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**



Page 1 of 1
Code of Civil Procedure §§ 412.20, 465

[SEAL]

Exhibit A-4

1   **LAW OFFICES OF DAVID C. WERNER**
    David C. Werner [SBN: 67993]
2   Bryan Quilo [SBN: 213708]
3   23422 Mill Creek Drive, Suite 110
    Laguna Hills, California 92653
4   Telephone: (949) 460-9280
    Facsimile: (949) 460-9286
5
6   Attorneys for Plaintiff: CALIFORNIA CASUALTY
    INSURANCE COMPANY
7

DCW1

**FILED**
SAN MATEO COUNTY

APR 3 0 2008

Clerk of the Superior Court
By _____
       DEPUTY CLERK

8
9                 SUPERIOR COURT OF CALIFORNIA
10                    COUNTY OF SAN MATEO

11  CALIFORNIA CASUALTY          )
    INSURANCE COMPANY            )     CASE NO:  CIV 4 7 2 4 5 2
12                               )
                                 )     HONORABLE:
13              Plaintiffs,      )
        v.                       )     DEPT:
14                               )
    FEDERAL INSURANCE COMPANY,   )
15  DOES 1-10, ROES 1-10, AND MOES 1- )
    10, inclusive                )     Complaint Filed:
16                               )
                                 )
17              Defendants.      )
                                 )
18  _____  )

19                               I
20          **IDENTIFICATION OF PARTIES AND CONTRACTS**

21      1.     The true names and capacities of Does 1-10, Roes 1-10 and Moes 1-10 are unknown to
    this plaintiff and plaintiff therefore sues said Does, Roes and Moes by this fictitious designation.
22
    Wherever the term "Federal Insurance Company" or defendant is used herein, it is meant to include
23
    each of these fictitiously named defendants.  The true names and capacities of said Does, Roes and
24
    Moes will be set forth when the same are known and leave of court will be sought as necessary to set
25
    forth the true names and capacities when ascertained.
26  ///
27  ///
28

Law Offices
Of
David C. Werner

                                    1
                              COMPLAINT

2.    Federal Insurance Company (hereinafter "Federal") is an insurance company that conducts insurance business in the State of California. At all times pertinent herein, Federal Insurance entered into an insurance contract (which is hereinafter set forth as **Exhibit "A"**) providing certain coverages to California Casualty Insurance Company. California Casualty Insurance Company is informed and believes that Federal Insurance does business throughout the State of California and is subject to the jurisdiction of this Court. Specifically, the aforementioned contract (**Exhibit "A"**) was entered into between Federal Insurance and California Casualty Insurance Company at California Casualty Insurance Company's home office in San Mateo, California.

3.    California Casualty Insurance Company (hereinafter "California Casualty") is an insurance company conducting insurance business and providing insurance services in the State of California with a home office in San Mateo, California. At all times relevant herein, the Federal policy, **Exhibit "A"**, was entered into between Federal and California Casualty at the California Casualty home office in San Mateo, California. As set forth hereinafter, California Casualty provides personal lines of insurance including homeowner's coverage. The subject of this lawsuit involves California Casualty's homeowners policy number 204 1155871, (Attached hereto as **Exhibit "B"**) issued to insureds Mr. & Mrs. Harold, providing insurance coverage to their residence.

4.    At all times relevant herein and specifically beginning in September of 2001, Federal Insurance Company issued to California Casualty a policy of insurance providing California Casualty with coverage as specified in the policy. The policy is attached hereto, and marked **Exhibit "A"**, and incorporated herein by this reference. **Exhibit "A"** not only contains the contract of insurance, but also the several endorsements that are applicable to the matters set forth herein. The policy was issued in September of 2001. At all relevant times herein said policy, as set forth in **Exhibit "A"**, was entered into between California Casualty and Federal at the home office of California Casualty, which is in San Mateo, California.

## II

### ALLEGATIONS OF FACT, COMMENTS TO ALL CAUSES OF ACTION

5.    On or about the month of November in the year 2000, Mr. & Mrs. James Harold were insured under a policy of homeowners insurance, policy number 204 1155871, issued by California Casualty.  Said policy is set forth in **Exhibit "B"** and is incorporated herein by this reference.  On or about said date, the Harolds reported a claim under the aforementioned policy.  The claim alleged, amongst other matters, that a water leak had occurred in one of the pipes servicing the Harolds' home. The water leak had caused damage to the home and had resulted in the need for the filing of a claim by the Harolds under California Casualty's homeowner's policy, (**Exhibit "B"** to this action).

6.    California Casualty accepted and acknowledged the claim of the Harolds and undertook to perform certain "insurance services" (as that term is defined in **Exhibit "A"**) and adjustment services for the handling of the claim. Specifically, California Casualty assigned adjusters, as well as experts, and later attorneys, to investigate the cause and nature of the claim as well as to assist the Harolds in adjusting the claim and to provide insurance benefits under California Casualty's homeowner's policy to the Harolds.

7.    During the course of the adjustment of the loss, during the course of providing "Insurance Services" as that term is used in **Exhibit "A"**, both the Harolds and California Casualty Insurance Company discovered that extensive water damage had been done to the Harolds' property, and in addition, that mold had developed in the home.  California Casualty Insurance Company proceeded to retain necessary experts, as did the Harolds, in an attempt to remediate the water damage as well as the mold in the home.  Although extensive efforts were undertaken, the parties continued to have difficulties in remediating the loss during the years 2000, and 2001 into 2002.

///

1    Thereafter, in the year 2002, while the Federal policy, (**Exhibit "A"**), was in full force and
2    effect, the Harolds retained counsel to represent them with regard to their claim for damages, breach
3    of contract, bad faith breach of contract, and other related and associated torts which they claimed to
4    have against California Casualty Insurance Company. The retention of said law firm, as well as the
5    claim for damages as a result of the handling of the claim by California Casualty Insurance Company,
6    arose from California Casualty's alleged mishandling of its "insurance services" to the Harolds. A
7    claim was made against California Casualty Insurance Company for damages beyond the limits of
8    coverage provided by the California Casualty Insurance Company policy, **Exhibit "B"**. Such claim
9    was made within the reporting period and within the policy period of the Federal policy, and certainly
10   prior to July 2002.
11
12        Attached hereto and incorporated herein by this reference is the trial brief of the Harolds'
13   attorneys. Said trial brief is incorporated herein by this reference, as **Exhibit "C"**, for the allegations
14   it makes and the assertions it makes with regard to the identification of the claim being made against
15   California Casualty.
16
17        8.    A lawsuit was filed by the Harolds against California Casualty. A true and correct
18   copy of which is attached hereto as **Exhibit "D"** and incorporated herein by this reference.
19
20        California Casualty retained the law firm of Hayes, Davis, Ellingson, McLay & Scott, LLP to
21   represent its interest and to defend the complaint against California Casualty.
22
23        California Casualty incurred necessary attorneys' fees, court costs, investigative cost, expert
24   fees, and other associated cost with regard to the defense of said action. Said attorneys' fees and costs
25   are fully covered under the Federal policy, (**Exhibit "A"**).
26        9.    The case of *Harold v. California Casualty* went to trial in the Sacramento Superior
27   Court on or about February 21, 2006. Although a jury verdict was rendered, the parties proceeded to
28   mediation. At the time of the mediation, the matter settled. At the time of the mediation the verdict

Law Offices
Of
David C. Werner

4
COMPLAINT

1   was not yet reduced to a judgment, and in fact, no judgment was entered. The parties settled the

2   entire action. At the time of the settlement, the demands and claims of the Harolds were extensive

3   and went beyond the allegations found in the trial. In addition to a claim that there had been damages

4   to the Harolds' home (which exceeded California Casualty's policy limits,) there was an allegation of

5   a breach of good faith and fair dealing; fraud based on concealment; failure to hire a proper contractor

6
7   with a specific risk of harm; nuisance; and attorneys fees under the case of *Brandt v. Superior Court*

8   in the amount of $343,875.43. In addition, there were statutory costs which were demanded in the

9   amount of $75,000.00, and an additional $50,000.00 in cost associated with the trial of the case by the

10  Harolds. The Harolds' full and complete demand at the time of the mediation was $3,023,658.80. In

11
12  addition, the Harolds were seeking in the mediation, and as a part of their claim, to obtain punitive

13  damages against California Casualty with an exposure claimed to be 10 million dollars.

14      California Casualty informed Federal Insurance of these matters, and indeed a representative

15  from Federal Insurance attended the mediation and gave specific permission to resolve the case up to

16  an amount that exceeded the actual settlement amount. The matter settled for 2.5 million dollars.

17
18      At the point in time that the matter settled, California Casualty paid settlement amount to settle

19  all claims of the Harolds. Said payment was undifferentiated between any particular cause of action

20  or claim. The settlement was for any and all claims in excess of the amount already paid to the

21  Harolds under the policy, including general and economic damages, as well as for any claim for bad

22  faith, attorney fees, and costs incurred by the Harolds in the handling of the their claim.

23
24      California Casualty's payment was, therefore, as the result of its provision of "insurance

25  services" as that term in defined and used in the Federal policy, which is attached hereto marked as

26  **Exhibit "A"**, and incorporated herein by this reference.

27      10.    As a part of the Federal coverage, California Casualty is entitled to receive

28  reimbursement for the full amount of all monies expended by California Casualty in the defense of the

Law Offices
Of
David C. Werner

Exhibit A-9

1    action, including attorneys' fees, as well as the court costs and any other associated costs, such as

2    expert witness costs. California Casualty has expended in excess of 1.5 million dollars for these

3    items. The full and complete amount will be set forth at time of trial.

4

5    The full and complete damages that California Casualty therefore seeks by this action is the

6    amount paid in settlement and the 1.5 million dollars plus that was expended by way of costs, attorney

7    fees, and other miscellaneous items associated with the defense of the action.

8

9                                           III
                          FIRST CAUSE OF ACTION:
10                              BREACH OF CONTRACT

11        11.    California Casualty incorporates by references fully set forth herein 1 through 10.

12        12.    California Casualty at all times relevant herein was fully insured by the Federal policy

13    for wrongful acts as that term is defined in the Federal policy, **Exhibit "A"**. The policy required that

14    a claim be made during the policy period, and that the claim be based upon a wrongful act that is

15    identified in the policy. Both such conditions were/are satisfied.

16

17        As set forth in the factual allegations herein, California Casualty did in fact receive a claim for

18    "wrongful acts" (as that term is defined in the Federal policy) from the Harolds regarding handling of

19    their claim by California Casualty Insurance Company under their California Casualty's homeowners

20    insurance policy number 204 1155871, attached hereto and marked (**Exhibit "B"**) above.

21        California Casualty reported the claim (as that term is defined in the Federal policy) to Federal

22    in a timely fashion. The claim did occur during the Federal policy period and California Casualty did

23    provide a timely notice to Federal.

24

25        13.    California Casualty fully and completely cooperated with Federal, providing them with

26    whatever information they desired. California Casualty provided not only notice of the claim but full

27    access to California Casualty's file. Communications ensued between California Casualty and

28    Federal's designated representative throughout the pendency of the claim.

Law Offices
Of
David C. Werner

Exhibit A-10

14.    California Casualty has performed all conditions precedent on its part that it is required to perform in order to perfect the claim under the policy.  California Casualty has in fact performed all such conditions precedent, and there is no excuse or basis in reason for Federal to withhold benefits due under its policy.

15.    Federal Insurance has breached its policy with California Casualty.  Specifically, California Casualty, in settling the claim of the Harolds, has fully complied with all of the terms and conditions of the Federal policy to properly present a claim.  In addition, California Casualty has submitted to Federal a full and complete itemized list of all expenses, attorneys' fees, and other associated cost for which it is making claim.  The amount submitted is in excess of 1.5 Million dollars.  The true and correct amount as well as the total amount will be set forth at time of trial in this action.

Despite the fact that California Casualty has fully complied with all of the provisions and terms of the policy, Federal has refused to honor its obligations under the contract and has breached the contract by refusing to pay any sums that are due to California Casualty under the terms and conditions of the policy.

16.    Wherefore, after considering the deductible, there is presently now due and owing a sum in excess of 2 Million dollars.  California Casualty is damaged in that amount in that it is being denied the benefits of the policy, and is being denied what is rightfully due under the policy due to the breach of contract by Federal.

17.    In addition to the amount due under the policy, California Casualty also submits that the amount due is a sum certain, and therefore requests interest at the legal rate 10% and/or as the court deems just and proper at the time of this action.  California Casualty alleges that interest began at the date of the settlement, which was July 2006.  There is now due and payable from Federal interest in excess of $440,000.00, which is increasing on a daily basis.

Law Offices
Of
David C. Werner

7

COMPLAINT

Exhibit A-11

#### IV
#### SECOND CAUSE OF ACTION:
#### BAD FAITH BREACH OF CONTRACT

18.     California Casualty incorporates by references fully set forth herein 1 through 17.

19.     In every contract of insurance there is an implied duty of good faith and fair dealing. The duty of good faith and fair dealing requires that Federal not withhold unreasonably any sums that are due and owing to California Casualty.  In addition, Federal has a duty to California Casualty to give California Casualty's interest equal consideration as it gives to its own interest, and has a duty to make a proper investigation to determine any valid basis that will support California Casualty's claim. Federal also has a duty to investigate the claim of California Casualty fully and completely and is duty bound not to deny the claim for improper reasons or unreasonably.

20.     California Casualty submitted its claim to Federal in June of 2002.  Federal responded to California Casualty by citing to California Casualty provisions of the Federal policy that did not exist.  Federal submitted to California Casualty its analysis of California Casualty's claim based upon provisions that had been removed from the policy and were no longer a part of the policy.  Following this initial denial, California Casualty requested reconsideration, and Federal determined that its initial denial was improper and based upon improper policy language.

California Casualty kept Federal informed at all times and indeed Federal attended several settlement conferences and the mediations in which the Harolds' claim was eventually settled, and therefore was fully aware of the nature and extent of the claim.

Despite the fact that California Casualty provided full and complete information to Federal, Federal has chosen to deny California Casualty's claim on a frivolous basis unsupported in law, reason, logic, or the facts of the case.  Federal Insurance, for example, has decided to deny California Casualty's claim for benefits under the policy on the basis of the jury verdict that was rendered in the

Law Offices
Of
David C. Werner

8
COMPLAINT

case of *Harold v. California Casualty,* even though no judgment resulted and the parties to that action settled. Federal also chooses to ignore the entire claim of the Harolds which included Brandt fees, costs, and punitive damages. Federal unreasonably, frivolously and without any basis in reason or logic, refuses to properly interpret its own policy and refuses to interpret the language of said policy in a proper and reasonable fashion as is required by the duty of good faith and fair dealing.

21.    As a result of its unreasonable behavior and its unreasonable refusal to acknowledge its own policy terms, Federal has in fact denied the existence of its own coverage and denied the existence of its own contract, acting in bad faith to deny California Casualty its rights under the policy. In addition, Federal has attempted to resolve the claim of California Casualty by offering the sum of $300,000.00 to resolve the claim, arguing that California Casualty is not entitled to the benefits due under the policy, and seeing the claim of California Casualty as a game of negotiations as opposed to the claim of an insured under the policy with rights and duties owing to the insured by the carrier.

22.    As a result of Federal's unreasonable and frivolous interpretation of its own policy, its denial of the existence of the coverages that it provided, its refusal to properly investigate the claim, its refusal to honor its duty to California Casualty to fully and completely investigate and honor the rights of California Casualty, and due to its failure to give equal consideration to the interest of California Casualty and to resolve this matter in a fashion that a reasonable carrier would act, California Casualty has been damaged by the breach of the implied covenant of good faith and fair dealing. The damages include the fact that California Casualty has been forced to retain counsel to represent it in seeking recovery of the benefits due. California Casualty has incurred attorney fees as a result of the bad faith of Federal, and is therefore seeking recovery of attorney fees that it is incurring and will incur, together with all costs associated with the prosecution of this action. It is the allegation of California Casualty that the attorney fees are necessary to obtain the benefits due under

the policy, which are being denied in bad faith.

**WHEREFORE**, California Casualty prays as follows:

1.  That the court declare the rights, duties, and obligations of the parties under the terms of the contract, and specifically the rights of California Casualty to receive benefits due.

2.  For judgment against Federal for breach of contract in the amount to be shown at the time of trial, but not less than 2 Million dollars. That California Casualty be awarded the amounts that are due to it under the Federal policy as a result of the claim of the Harolds', including all moneys (subject to the Federal Policy's deductible) expended in settlement of the case, together with the attorneys fees and associated costs incurred by California Casualty in defending itself, which is a sum that is in excess of 1.5 Million dollars.

3.  That California Casualty be awarded interest on the amount that is due to California Casualty under the terms of the Federal policy; (said interest being in excess of $440,000.00 at the time of the filing of this complaint.)

4.  For attorneys fees based upon the bad faith denial by Federal and the need of California Casualty to retain counsel to pursue and seek recovery of what is due and owing to it under the terms of the Federal policy.

///
///
///
///

Law Offices
Of
David C. Werner

10

COMPLAINT

Exhibit A-14

5.    California Casualty finally prays for such other and further relief as the court

deems just and proper in the premises.

DATED: April 29, 2008

LAW OFFICES OF DAVID C. WERNER

By: _____

DAVID C. WERNER
BRYAN QUILO
Attorneys for Plaintiff:
CALIFORNIA CASUALTY INSURANCE
COMPANY

Law Offices
Of
David C. Werner

11
COMPLAINT

Exhibit A-15

AUG-12-2005 06:35 FROM:                                TO   sh tFAX              P.2

**ITEM 7.**   Extended Reporting Period:

    (A) Additional Premium:  75% of annual premium
    (B) Additional Period:    365 days

**ITEM 8.**   Pending or Prior Date:

    Insuring Clause 1.    **Insurance Services** Professional Liability:  September 1, 2001

    Insuring Clause 2.    **Financial Services** Professional Liability:  September 1, 2001

**ITEM 9.**   Endorsement(s) Effective at Inception:  1 - 3.

**IN WITNESS WHEREOF, THE COMPANY** issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Company.

*Henry A Aulich*

Secretary

September 26, 2001

Date

*Henry R Offine*

President

*Robert Hamburger*

Authorized Representative

Exhibit A-16

05/14/2003 13:20 FAX                                                                              ☒001

**URGENT**

To: Jeff Gunchick
Claims   213-833-5...
From: Anne Matson SFO/DF

CHUBB

Effective date of
this Endorsement:  September 1, 2001

**FEDERAL INSURANCE COMPANY**

Endorsement No:   6

To be attached to and form part of
Policy Number:   70427262

Issued to:  CALIFORNIA CASUALTY MANAGEMENT COMPANY AND

CALIFORNIA CASUALTY INSURANCE COMPANY

---

### AMENDED DECLARATIONS - PARENT ORGANIZATION ENDORSEMENT

It is agreed that ITEM 1. of the Declarations, Parent Organization, is deleted in its entirety and replaced
with the following:

ITEM 1.   **Parent Organization**          (Name and Address):

California Casualty Management Company and
California Casualty Insurance Company
1900 Alameda de las Pulgas
San Mateo, CA  94402

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:

By _Robert Hamberger_
          Authorized Representative

RECEIVED
WZO SPECIALTY CLAIMS
2003 MAY 14  P 2: 14

ICPL Policy
Form 17-02-1636 (Ed. 10-98)

Exhibit A-17

Effective date of
this Endorsement: 9/1/01

**FEDERAL INSURANCE COMPANY**

Endorsement No:   5

To be attached to and form part of
Policy Number:     70427262

Issued to:  CALIFORNIA CASUALTY MANAGEMENT CO.

IT IS UNDERSTOOD AND AGREED THAT ENDORSEMENT #1 FORM 17-02-2539 (ED. 06-01)
ADDITIONAL INSURED ORGANIZATION ENDORSEMENT IS HEREBY DELETED AND NO LONGER
FORMS PART OF THE POLICY.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date: April 11, 2003                    By _____
                                              Authorized Representative

HUG-12-2003 06:35 FRUM:                                    TO:Di9htFAX          P.8

· 06/20/02   11:00

     06/11/02 12:39 PM      Subject: ICPL 7042-82-72 - California Casualty

I'm embarassed to admit that the portion of this e-mail below the * * *'s
has been in my 'draft' folder since last September!  I guess it kind of got
swept aside in all the excitement a few weeks later re cancelling/not
cancelling your policy and I never completed my full review of your policy
form.

As I'm now preparing the renewal application, I have just noticed a major
problem with the captioned, as issued:  the insurance companies aren't
covered!  California Casualty Management Co. is named as the "Parent
Organization" and then is also listed in Endorsement #1, "Additional Insured
Organization Endorsement."  The Additional Insured Organization Endorsement
should, instead, list the following entries:

California Casualty Indemnity Exchange
California Casualty Insurance Company
California Casualty & Fire Insurance Company          OK Annie Mart
California Casualty General Insurance Company
California Casualty Compensation Insurance Company      eff 9/1/d

I trust that issuance of this correction along with the items below will not
be a problem, however, as always, please contact me if you wish to discuss.

Lyn Martin
(650) 572-4447

*   *   *   *

The wording about lawyering "for" policyholders is the language that needs
to be changed in Paragraph 3 of the Employed Lawyers endorsement - - the
exclusion -- not in the definition of Insured person.  (However, I now
notice that the definition requires that the employed lawyer be full-time
and salaried.  We may from time-to-time employ lawyers on a part-time basis,
so the definition also needs to be amended.)

A.) We believe that the Employed Lawyers' endorsement needs to include the
following:

Need to
talk to
Paul
on this

1.  It is agreed that Section 26, Definitions, is amended by adding the
following:

Employed Lawyer means any person admitted to practice law who is, was or
becomes an employee of an Insured Organization (eliminate requirement that
they be salaried and full-time).

2.  The definition of Insured is amended to include any Employed Lawyer.

3.  Section 4, Exclusions, is amended by adding the following:

   based upon , arising from, or in consequence of any Employed Lawyer's
service as a director, officer, trustee, member of any entity, or lawyer for
anyone other than the Insured Organization or an insured under a policy of
insurance issued by the Insured Organization, even if directed or requested
by the Insured Organization to serve such other entity or client.  (bolded
language added)

B.) In order to attempt to be as broad as the prior policy (which Chubb
committed to doing), Chubb's definition of Insurance Services needs to be
amended to read as follows:

OK

Insurance Services means only those services rendered or required to be

JM
OK 7/1/d

Exhibit A-19

AUG 12 2002 08:58 FROM                                           Through tFAX                P.9/27

08/20/02  10:59  ☎

**CHUBB**

Effective date of
this Endorsement:  September 1, 2001

**FEDERAL INSURANCE COMPANY**

Endorsement No:    1

To be attached to and form part of
Policy Number:    70427262

Issued to:  CALIFORNIA CASUALTY MANAGEMENT CO.

## ADDITIONAL INSURED ORGANIZATION ENDORSEMENT

It is agreed that:

1.   The Insured Organization shall include the following:

     California Casualty Management Co.

2.   With respect to the Insured Organizations listed in 1. above, the Company shall not be liable to
     make any payment for Loss in connection with any Claim based upon, arising out of, relating to, in
     consequence of, or in any way involving:

     a.   any litigation, arbitration, claims, demands, causes of action, equitable, legal or quasi-legal
          proceedings, decrees or judgments (collectively referred to as litigation) occurring prior to or
          pending as of September 1, 2001, of which the Insured has received notice or otherwise had
          knowledge as of such date; or

     b.   any subsequent litigation arising from, or based on substantially the same matters alleged in
          the litigation included in a. above; or

     c.   any Wrongful Act which gave rise to the prior or pending litigation included in a. above.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date: September 26, 2001                    By_____
                                                 Authorized Representative

RECEIVED
W20 SPECIALTY CLAIMS
2002 JUN 20  P 45

Post-it® Fax Note    7671    Date 6/20/02  pages ▶ 3
To Jeff Gunchick         From Anne Matson
Co./Dept. Claims         Co. CB / SFO / DFI
Phone #                  Phone # 415-954-040?
Fax # 213-833-5200       Fax #

iCPL Policy
Form 17-02-2539 (Ed. 6-01)                          Exhibit A-20

AUG-12-2003 06:36 FROM:                                      ightFAX                P.10/27

**Chubb Group of Insurance Companies**

15 Mountain View Road, Warren, New Jersey 07059

# DECLARATIONS
# INSURANCE COMPANY
# PROFESSIONAL LIABILITY POLICY

**ITEM 1.** Parent Organization (Name and Address):

CALIFORNIA CASUALTY MANAGEMENT CO.

1900 Alameda De Las Pulgas
San Mateo, CAL 94402

Policy Number: 70427262 (DFI)

**FEDERAL INSURANCE COMPANY**

Incorporated under the laws of Indiana,
a stock insurance company, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

---

**THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE COMPANY TO DEFEND THOSE INSURED UNDER THE POLICY. PLEASE READ CAREFULLY.**

**ITEM 2.**   Limits of Liability:

| | | | |
|---|---|---|---|
| (A) | Each Loss | $ | 5,000,000 |
| (B) | Aggregate Limit of Liability Each Policy Period | $ | 5,000,000 |

**NOTE:**   **THE LIMITS OF LIABILITY AND ANY DEDUCTIBLE AMOUNTS ARE REDUCED OR EXHAUSTED BY DEFENSE COSTS.**

**ITEM 3.**   Coverage Applicable:

Unless "Covered" is inserted opposite a specified Insuring Clause, such Insuring Clause and any other reference thereto in this Policy shall be deemed to be deleted in their entirety.

| | | |
|---|---|---|
| Insuring Clause 1. | **Insurance Services** Professional Liability: | Covered |
| Insuring Clause 2. | **Financial Services** Professional Liability: | Covered |

**ITEM 4.**   Coinsurance Percent:  0%

**ITEM 5.**   Deductible Amount:

| | | | |
|---|---|---|---|
| Insuring Clause 1. | **Insurance Services** Professional Liability | $ | 2,000,000 |
| Insuring Clause 2. | **Financial Services** Professional Liability | $ | 2,000,000 |

**ITEM 6.**   Policy Period:  from: 12:01 a.m. on September 1, 2001
to: 12:01 a.m. on July 1, 2002
Local time at the address shown in ITEM 1.



---

ICPL Policy
Form 17-02-1378 (Ed. 10-98)

Page 1 of 2

   Exhibit A-21

In consideration of payment of the premium and subject to the Declarations, limitations, conditions, provisions and other terms of this Policy, the Company agrees as follows:

### Insuring Clause 1

**Insurance Services Professional Liability**

1.  **To pay on behalf of the Insureds for Loss which the Insureds shall become legally obligated to pay as a result of any Claim first made against the Insureds during the Policy Period or, if elected, the Extended Reporting Period, arising out of any Wrongful Act committed by the Insureds or any person for whose acts the Insureds are legally liable during or prior to the Policy Period while performing Insurance Services including the alleged failure to perform Insurance Services.**

### Insuring Clause 2

**Financial Services Professional Liability**

2.  **To pay on behalf of the Insureds for Loss which the Insureds shall become legally obligated to pay as a result of any Claim first made against the Insureds during the Policy Period or, if elected, the Extended Reporting Period, arising out of any Wrongful Act committed by the Insureds or any person for whose acts the Insureds are legally liable during or prior to the Policy Period while performing Financial Services including the alleged failure to perform Financial Services.**

### Extended Reporting Period

3.  If this Policy is terminated or nonrenewed for any reason other than for nonpayment of premium, the Parent Organization, on behalf of the Insureds shall have the right, upon payment of the additional premium set forth in ITEM 7.(A) of the Declarations for this Policy, to an extension of the coverage granted by this Policy for the period set forth in ITEM 7.(B) of the Declarations for this Policy (Extended Reporting Period) following the effective date of termination or nonrenewal with respect to any Claim or Claims made during the Extended Reporting Period, but only for any Wrongful Act occurring prior to the effective date of termination or nonrenewal. This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days following the effective date of termination or nonrenewal. Any Claim made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding Policy Period.

    If the Extended Reporting Period is purchased, the entire premium noted in ITEM 7.(A) of the Declarations shall be deemed fully earned at the inception of the Extended Reporting Period.

### Exclusions

**Exclusions Applicable to Insuring Clauses 1 and 2**

4.  The Company shall not be liable to make any payment for Loss in connection with any Claim made against the Insureds:

    a.  based upon, arising from, or in consequence of any demand, suit or other proceeding pending, or order, decree or judgment entered against any Insureds prior to the Pending or Prior Date set forth in ITEM 8. of the Declarations, or the same or substantially the same fact, circumstance or situation underlying or alleged therein;



 Exhibit A-22

RightFAX      P.12/27

## Exclusions

*Exclusions Applicable to Insuring Clauses 1 and 2 (continued)*

b.   based upon, arising from, or in consequence of deliberate conflicts of interest, any dishonest, deliberately criminal or deliberately fraudulent act or omission, gaining any profit or advantage to which one is not legally entitled, or deliberate non-compliance with any statute or related regulation on the part of the Insureds or any person for whose actions the Insureds are legally liable; provided, however, that this Exclusion shall not apply unless it is established in fact that such Claim was brought about or contributed to by any deliberate conflicts of interest, dishonest or deliberately criminal or deliberately fraudulent act or omission, dishonest, gaining any profit or advantage to which one is not legally entitled or deliberate non-compliance with any statute or related regulation on the part of the Insureds or any person for whose actions the Insureds are legally liable and provided this Exclusion shall not apply to a Claim for both fraud and bad faith in the handling and adjusting of claims;

c.   based upon, arising from, or in consequence of:

   i.   any Wrongful Act or any fact, circumstance or situation that has been the subject of notice under any policy of insurance in effect prior to the inception date of this Policy; or

   ii.   any other Wrongful Act, whenever occurring, which together with a Wrongful Act that has been the subject of such notice would constitute Interrelated Wrongful Acts;

d.   based upon, arising from, or in consequence of:

   i.   the insolvency, conservatorship, receivership, bankruptcy or liquidation of any banking firm; investment company; investment banker; broker or dealer in securities or commodities; insurance or reinsurance company; insurance or reinsurance agent, broker or intermediary; joint underwriting association; or other such organizations of a similar nature, or the failure to pay or suspension of payment by such entities in connection with Financial Services; or

   ii.   the Financial Impairment of any Insured;

e.   based upon, arising from, or in consequence of any pension, profit sharing, health and welfare or other employee benefit plan or trust, including but not limited to any violation of the Employee Retirement Income Security Act of 1974, amendments thereto or similar provisions of any federal, state or local statutory law or common law, sponsored or established by the Insured Organization for the Insured Individuals;

f.   for defamation, discrimination, libel, slander, wrongful termination of employment, disparagement, sexual harassment, violation of rights of privacy, wrongful eviction or other violation of the rights of private occupancy, wrongful entry, false arrest, false imprisonment, malicious prosecution, assault, battery or damage to or destruction of any tangible property including loss of its use;

g.   for bodily injury, mental or emotional distress, sickness, disease, or death of any person; provided, however, this Exclusion shall not apply to a Claim based solely on the Insured's failure to provide Insurance Services;

h.   based upon, arising from, or in consequence of:

   i.   the actual, alleged or threatened discharge, release, escape, dispersal or disposal of Pollutants into or on real or personal property, buildings, water, land or atmosphere;

Exhibit A-23

## Exclusions

*Exclusions Applicable to*
*Insuring Clauses 1 and 2*
*(continued)*

    ii.   any direction or request that the **Insureds** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so; including but not limited to any **Claim** for any financial **Loss** to the **Insureds**, its security holders, its creditors or others based upon, arising from, or in consequence of the matters described in i. or ii. of this Exclusion; or

    iii.   the **Insured's** failure to provide **Insurance Services** or **Financial Services** to a customer relating to any of the matters described in i. or ii. of this Exclusion;

i.   by, on behalf of, or at the behest of any **Insureds** against any other **Insureds**, or by, on behalf of, or at the behest of any business enterprise which is operated, managed or owned, directly or indirectly, in whole or in part by any **Insured**, provided, however, this Exclusion shall not apply:

    i.   where the claimant is an **Insured Individual** and was allegedly provided with or entitled to be provided with **Insurance Services** or **Financial Services** and is bringing such **Claim** solely in his capacity as a customer of the **Insured Organization**, and where such **Claim** is brought without the solicitation, assistance or participation of any other **Insureds**; or

    ii.   to a **Claim** brought or maintained by an **Insured Individual** for contribution or indemnity, if the **Claim** directly results from another **Claim** covered under this **Policy**;

j.   by, on behalf of, or at the behest of any person or concern (including but not limited to any shareholder, bondholder, policyholder or debentureholder), their estate, heirs, legal representatives or assigns, with a legal or equitable interest in any stock, bond, debenture, or other form of security of the **Insureds**, or any other ownership interest, when such **Claim** is based upon, arises out of, or pertains to any interest in said security, provided, however, that this Exclusion shall not apply where the claimant is an **Insured Individual** and was provided with or was entitled to be provided with **Insurance Services** or **Financial Services** and is bringing such **Claim** solely in his capacity as a customer of the **Insured Organization**, and where such **Claim** is brought without the solicitation, assistance or participation of any other **Insureds**;

k.   based upon, arising from, or in consequence of the underwriting of insurance, including any decisions involving the classification, selection, or renewal of risks as well as the rates and premiums charged to insure or reinsure risks;

l.   for any express representations, warranties or guarantees, estimates of construction costs, or costs exceeding estimates made in connection with **Insurance Services** or **Financial Services**;

m.   based upon, arising from, or in consequence of any **Insured's** service as a director, officer, trustee, employee, participant or member of any entity, pool or association other than the **Insured Organization**, even if directed or requested to serve such other entity;

## Exclusions

*Exclusions Applicable to
Insuring Clauses 1 and 2
(continued)*

n.  based upon, arising from, or in consequence of the adequacy or inadequacy of any claim reserves of the Insured Organization or of any entity to which the Insureds provide Insurance Services or Financial Services;

o.  by, on behalf of, or at the behest of, any reinsurer of any contract, risk or program of the Insureds, provided, however, this Exclusion shall not apply to any Claim brought by a reinsurer while in the capacity of a customer or prospective customer of the Insured Organization, and where such Claim is brought without the solicitation, assistance or participation of any other Insureds;

p.  for any amounts which constitute benefits, coverage or amounts due or allegedly due, including any amount which constitutes interest thereon, from the Insureds as:

   i.  an insurer or reinsurer under any policy or contract or treaty of insurance, reinsurance, suretyship, annuity or endowment; or

   ii. an administrator under any employee welfare benefit plan;

q.  based upon, arising from, or in consequence of the purchase, sale, participation, grant, commitment, restructure, termination, transfer, repossession or foreclosure of any loan, lease, mortgage or extension of credit, or any failure to do any of the foregoing, or the rendering of advice in connection with any loan, lease, mortgage or extension of credit;

r.  for any of the following activities:

   i.  the underwriting, securitizing, syndicating, promoting, or market making (as defined in Section 3(A)(38) of the Securities Exchange Act of 1934 as amended) of any debt or equity security or other evidence of indebted-ness, or any loan or other extension of credit, or any other similar invest-ment banking activity;

   ii. the rendering of advice or recommendations regarding any actual, at-tempted or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, insolvency pro-ceeding, reorganization, capital restructuring, recapitalization, spin-offs, primary or secondary offerings of debt or equity securities or other evidence of indebtedness, dissolution or sale of all or substantially all of the assets or stock of a business entity or any effort to raise or furnish capital or financing for any enterprise or entity;

   iii. the rendering of a fairness opinion regarding the valuation of any assets or business entity not held by the Insureds as trustee; or

   iv. any acquisition or sale of securities by the Insureds for their own account,

   or any disclosure requirements in connection with any of the foregoing; or

s.  based upon, arising from, or in consequence of the liability of a party, other than the Insureds, assumed by the Insureds pursuant to contract, except liability for Loss that the Insureds would have had in the absence of such contract.

P. 15/27

| Severability of Exclusions | 5. | The Wrongful Act of any Insured Individual shall not be imputed to any other Insured Individual for the purposes of determining the applicability of the Exclusions in Section 4. |
|---|---|---|

| Aggregate Limit of Liability, Coinsurance Percents and Deductible Amounts | 6. | All Loss arising out of the same Wrongful Act and all Interrelated Wrongful Acts of the Insureds shall be deemed one Loss, and such Loss shall be deemed to have originated in the earliest Policy Period in which a Claim is first made against the Insureds alleging any such Wrongful Act or Interrelated Wrongful Acts. |

The Company's maximum liability for each Loss, whether covered under Insuring Clause 1 or Insuring Clause 2 or both, shall be the Limit of Liability for each Loss set forth in ITEM 2.(A) of the Declarations. The Company's maximum aggregate liability for all Loss on account of all Claims first made during the same Policy Period, whether covered under Insuring Clause 1 or Insuring Clause 2 or both, shall be the Aggregate Limit of Liability for each Policy Period set forth in ITEM 2.(B) of the Declarations.

The Company's liability under Insuring Clause 1 or Insuring Clause 2 or both shall apply only to that part of each Loss which is excess of the applicable Deductible Amount set forth in ITEM 5. of the Declarations and such Deductible Amount shall be borne by the Insureds uninsured.

If a single Loss is covered in part under Insuring Clause 1 and in part under Insuring Clause 2, the maximum Deductible Amount applicable to the Loss shall be the larger of the two Deductible Amounts in ITEM 5. of the Declarations.

With respect to all Loss (excess of the Deductible Amount) originating in any one Policy Period, the Insureds shall bear uninsured that percent of all such Loss specified as the Coinsurance Percent in ITEM 4. of the Declarations, and the Company's liability hereunder shall apply only to the remaining percent of all such Loss.

In the event that more than one of the Insureds is included in the same Claim, the total amount of the available Aggregate Limit of Liability shall be apportioned in proportion to their respective Loss.

The Limit of Liability available during the Extended Reporting Period, if exercised, shall be the remaining portion, if any, of the Aggregate Limit of Liability provided by the immediately preceding Policy Period.

| Defense and Settlement | 7. | Subject to this Section, it shall be the duty of the Insureds and not the duty of the Company to defend Claims made against the Insureds. |

The Insured shall have the sole obligation under this Policy to retain defense counsel, which shall be subject to the approval of the Company.

The Insured agrees not to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the Company's written consent, which shall not be unreasonably withheld. The Company shall not be liable for any settlement, Defense Costs, assumed obligation or admission of liability to which it has not consented.

Exhibit A-26

P. 16/27

| | |
|---|---|
| **Defense and Settlement** *(continued)* | The Company shall have the right and shall be given the opportunity to effectively associate with the Insureds in the investigation, defense and settlement, including but not limited to the negotiation of a settlement, of any Claim that appears reasonably likely to be covered in whole or in part by this Policy. |

The Insureds agree to provide the Company with all information, assistance and cooperation which the Company reasonably requests and agree that, in the event of a Claim, the Insureds will do nothing that may prejudice the Company's position or its potential or actual rights of recovery.

**Defense Costs are part of and not in addition to the Limits of Liability set forth in ITEM 2. of the Declarations for this Policy, and the payment by the Company of Defense Costs reduces such Limits of Liability.**

---

**Reporting and Notice**

8.  The Insureds shall, as a condition precedent to exercising their rights under this Policy, give to the Company written notice as soon as practicable, but in no event later than ninety (90) days after the termination of the **Policy Period**, of any Claim made against the Insureds for a **Wrongful Act**.

If any Insured becomes aware of circumstances which could give rise to a Claim and gives written notice of such circumstances to the Company during the Policy Period, then any Claims subsequently arising from such circumstances shall be considered to have been made during the Policy Period in which the circumstances were first reported to the Company.

The Insureds shall, as a condition precedent to exercising their rights under this Policy, give to the Company such information and cooperation as it may reasonably require, including but not limited to a description of the Claim or circumstances, the nature of the alleged Wrongful Act, the nature of the alleged or potential damage, the names of actual or potential claimants, and the manner in which the Insureds first became aware of the Claim or circumstances.

---

**Notice**

9.  Notice to the Company under this Policy shall be given in writing addressed to:

<u>Notice of Claim:</u>                                    <u>All Other Notices:</u>

Home Office Claims Department              Department of Financial Institutions
Chubb Group of Insurance Companies     Chubb Group of Insurance Companies
15 Mountain View Road                          15 Mountain View Road
Warren, N.J. 07059                                 Warren, N.J. 07059

Such notice shall be effective on the date of receipt by the Company at such address.

---

**Estates and Legal Representatives**

10. Coverage shall extend to Claims for the Wrongful Acts of Insured Individuals made against the estates, heirs, legal representatives or assigns of Insured Individuals who are deceased or against the legal representatives or assigns of Insured Individuals who are incompetent, insolvent or bankrupt.

---

Exhibit A-27

AUG-12-2008 08:59 FROM:                                              ightFAX                    P.17/27

**Spousal Liability**     11.   If a **Claim** against an **Insured Person** includes a claim against the lawful
                                spouse of such **Insured Person** solely by reason of such spouse's status as a
                                spouse or such spouse's ownership interest in property which the claimant seeks
                                as recovery for an alleged **Wrongful Act** of such **Insured Person**, all loss
                                which the spouse becomes legally obligated to pay on account of such **Claim**
                                shall be treated as **Loss** which the **Insured Person** becomes legally obligated
                                to pay on account of the **Claim** made against such **Insured Person**. All
                                limitations, conditions, provisions and other terms of coverage applicable to the
                                **Insured Person's Loss** shall also be applicable to the spousal loss. However,
                                coverage shall not apply to the extent any claim alleges any **Wrongful Act** by
                                the **Insured Person's** spouse.

**Other Insurance**       12.   If any **Loss** arising from any **Claim** made against any **Insured** is insured under
                                any other valid policy(ies), prior or current, then this Policy shall cover such
                                **Loss**, subject to its limitations, conditions, provisions and other terms, only to
                                the extent that the amount of such **Loss** is in excess of the amount of payment
                                from such other insurance whether such other insurance is stated to be primary,
                                contributory, excess, contingent or otherwise, unless such other insurance is
                                written only as specific excess insurance over the Limits of Liability provided on
                                this Policy. This Policy is primary of any reinsurance purchased by the **Insured**
                                and the **Company** will not assert subrogation rights against the **Insureds'**
                                reinsurers.

## Changes In Exposure

*Acquisition or Creation of*   13.   If the **Insured Organization**, after the inception date of this Policy:
*Another Organization*

                                a.   acquires securities or voting rights in another organization or creates
                                     another organization, which as a result of such acquisition or creation
                                     becomes a **Subsidiary**; or

                                b.   acquires any organization by merger into or consolidation with the **Insured
                                     Organization**,

                                coverage shall apply to such organization under this Policy but only with respect
                                to **Wrongful Acts** occurring after such acquisition or creation unless the
                                **Company** agrees, after presentation of a complete application and all
                                appropriate information, to provide coverage by endorsement for **Wrongful
                                Acts** occurring prior to such acquisition or creation.

                                If the fair value of the assets of the acquired or created organization exceeds
                                10% of the total assets of the **Insured Organization** as reflected in the **Parent
                                Organization's** most recent audited consolidated financial statements, or the
                                value of the fiduciary assets under management by the acquired or created
                                organization exceeds 10% of the total fiduciary assets under management of the
                                **Insured Organization** as reflected in the **Parent Organization's** most recent
                                audited consolidated financial statements, the **Parent Organization** shall give
                                written notice of such acquisition or creation to the **Company** as soon as
                                practicable together with such information as the **Company** may require and
                                shall pay any reasonable additional premium required by the **Company**.

Exhibit A-28

HUG-12-2000 00:39 FROM:                                    RightFAX                  P.18/27

---

### Changes in Exposure
(continued)

**Acquisition of Parent Organization By Another Organization**

14. If:

   a. the **Parent Organization** merges into or consolidates with another organization; or

   b. another organization or person or group of organizations and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other organizations(s) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Parent Organization**; or

   c. the **Insured Organization** completely ceases to actively engage in its primary business ("cessation"); or

   d. **Financial Impairment of the Insured Organization** occurs,

   coverage under this Policy shall continue until termination of this Policy, but only with respect to **Claims** for **Wrongful Acts** occurring by the **Insureds** prior to such merger, consolidation, acquisition, cessation or **Financial Impairment**. The **Parent Organization** shall give written notice of such merger, consolidation, acquisition, cessation or **Financial Impairment** to the Company as soon as practicable and shall provide such information as the Company may require. The full premium, including any installments due for the **Policy Period** shall be deemed fully earned immediately as of the effective date of any event outlined in a. through d. above.

**Cessation of Subsidiaries**

15. In the event an organization ceases to be a **Subsidiary** before or after the inception date of the Policy, coverage with respect to such **Subsidiary** and its **Insured Individuals** shall continue until termination of this Policy but only with respect to **Claims** for **Wrongful Acts** occurring prior to the date such organization ceased to be a **Subsidiary**.

**Representations and Application Form**

16. It is agreed by the **Insureds** that the particulars and statements contained in the Application Form and the attachments and materials submitted with the Application Form (which shall be retained on file by the Company and shall be deemed attached hereto, as if physically attached hereto) are true and are the basis of the Policy and are to be considered as incorporated in and constituting a part of this Policy. It is further agreed by the **Insureds** that such particulars and statements are material to the decision to issue this Policy and that the Policy is issued in reliance upon the truth of such particulars and statements.

**Investigation and Settlement**

17. The Company may make any investigation it deems necessary and may make any settlement of a **Claim** it deems expedient with the written consent of the **Parent Organization**, on behalf of the **Insureds**, which consent shall not be unreasonably withheld.



**Subrogation**

18. In the event of any payment under this Policy, the Company shall be subrogated, to the extent of such payment, to all the **Insureds'** rights of recovery, and the **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Company effectively to bring suit in the name of the **Insureds**.

---

Exhibit A-29

| | | |
|---|---|---|
| **Action Against the Company** | 19. | No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy. No person or organization shall have any right under this Policy to join the Company as a party to any action against the Insureds to determine the Insureds' liability nor shall the Company be impleaded by the Insureds or their legal representatives. |
| **Bankruptcy or Insolvency** | 20. | Bankruptcy or insolvency of an Insured or the estate of an Insured Individual shall not relieve the Company of its obligations nor deprive the Company of its rights under this Policy. |
| **Authorization Clause** | 21. | By acceptance of this Policy, the Parent Organization agrees to act on behalf of all Insureds with respect to the giving and receiving of notice of Claim or termination, the payment of premiums and the receiving of any return premiums that may become due under this Policy, the negotiation, agreement to and acceptance of endorsements, and the giving or receiving of any notice provided for in this Policy, and the Insureds agree that the Parent Organization shall act on their behalf. |
| **Alteration or Assignment** | 22. | No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy which is signed by a duly authorized representative of the Company. |

**Termination of Policy**  23.  This Policy shall terminate at the earliest of the following times:

    a.   ten (10) days after receipt by the Parent Organization of written notice from the Company of termination resulting from non-payment of premium;

    b.   upon receipt by the Company of written notice of termination from the Parent Organization;

    c.   upon expiration of the Policy Period as set forth in ITEM 6. of the Declarations of this Policy;

    d.   sixty (60) days after receipt by the Parent Organization of the Company's notice of nonrenewal. Such notice shall be in conformance with applicable state laws and regulations; or

    e.   at such other time as may be agreed upon by the Company and the Parent Organization.

The Company shall refund the pro rata unearned premium if the Policy is terminated.

**Valuation and Foreign Currency**  24.  All premiums, limits, deductibles, Loss and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of Loss under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is entered, the amount of the settlement is agreed upon or the other element of Loss is due, respectively.

Exhibit A-30

| **Territory** | 25. | Coverage shall extend to Claims anywhere in the world. |
|---|---|---|

| **Definitions** | 26. | When used in the Policy: |
|---|---|---|

Claim means:

a. a written demand for monetary damages;

b. a civil proceeding commenced by the service of a complaint or similar pleading;

c. a criminal proceeding commenced by the return of an indictment; or

d. a formal administrative or regulatory proceeding brought by or on behalf of policyholders or customers commenced by the filing of a notice of charges, formal investigative order or similar document,

brought by or on behalf of a customer of the Insured against any Insured for a Wrongful Act or Interrelated Wrongful Act, including any appeal therefrom.

A Claim shall be deemed to have been made against the Insureds on the date any Insured first received written demand for monetary damages, the date that the judicial or administrative proceeding is served upon any Insured in any state, provincial or federal court or administrative agency, or the date any Insured first received written notice regarding the filing of a notice of charges, formal investigative order or similar document from a state, provincial or federal regulatory agency.

Defense Costs means that part of Loss consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the Insured Organization) incurred in defending or investigating Claims and the premium for appeal, attachment or similar bonds.

Financial Impairment means the status of the Insured Organization resulting from:

a. the appointment by any state, provincial or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the Insured Organization; or

b. the Insured Organization becoming a debtor in possession.

Financial Services means only those services performed by or on behalf of the Insureds for or on behalf of a customer of the Insureds, pursuant to an agreement between such customer and the Insureds for a fee, commission or other monetary consideration or other remuneration which inures to the benefit of the Insureds, provided, however, that Financial Services shall not include:

a. managed care; medical or health care services; real estate appraisal, development or management services; architectural or construction management services; the practice of law or the rendering of legal services;

b. services performed by any entity of which the Insureds shall have acquired ownership or control as security for a loan or other extension of credit; or

c. services included in the definition of Insurance Services.



Exhibit A-31

**Definitions**
(continued)

**Insurance Services** means only those services rendered or required to be rendered by or on behalf of the **Insureds** solely in the conduct of the **Insureds'** claims handling and adjusting; insurance risk management; safety engineering, inspection and loss control operations; personal injury rehabilitation operations; salvage operations; recovery subrogation services; premium financing operations; actuarial consulting services; or insurance pool management; provided, however, that **Insurance Services** shall not include:

a.  managed care; medical or health care services; real estate appraisal, development or management services; architectural or construction management services; the practice of law or the rendering of legal services;

b.  services performed by any entity of which the **Insureds** shall have acquired ownership or control as security for a loan or other extension of credit; or

c.  services included in the definition of **Financial Services**.

**Insured(s)** means the **Insured Organization** and the **Insured Individuals**, or any one of them.

**Insured Individuals** means any past, present or future director, officer, trustee, (in the United States of America, or any equivalent executive position under applicable law in any country other than the United States of America) or employee of the **Insured Organization** in his/her capacity as such.

**Insured Organization** means the **Parent Organization** and any **Subsidiary**.

**Interrelated Wrongful Acts** means all causally connected **Wrongful Acts**.

**Loss** means the total amount which the **Insured** becomes legally obligated to pay as a result of each **Claim** or for all **Claims** in each **Policy Period** and the **Extended Reporting** period, if exercised, made against the **Insureds** for **Wrongful Acts** for which coverage applies, including, but not limited to, compensatory damages, punitive or exemplary damages multiplied damages, judgments, settlements, costs and **Defense Costs**.

For the purpose of resolving any dispute between the **Company** and the **Insured** regarding whether the punitive or exemplary damages or the multiplied portion of any multiplied damage award specified above are insurable under this Policy, the law of the jurisdiction most favorable to the insurability of those damages shall control, provided that such jurisdiction is where:

a.  those damages were awarded or imposed;

b.  any **Wrongful Act** occurred for which such damages were awarded or imposed;

c.  any **Insured Organization** is incorporated or has its principal place of business; or

d.  the **Company** is incorporated or has its principal place of business.

**Loss** does not include:

a.  regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization**;

HUG-12-2008 06:41 FROM:                                    TO:P 9hCFAX          P.22/27

| | | |
|---|---|---|
| **Definitions**<br>(continued) | b. | loss of the actual money, securities, property or other items of value in the custody or control of the **Insureds**; or diminution in value or damages resulting from the diminution in value of money, securities, property or any other items of value unless caused by a **Wrongful Act** of the **Insureds** in the execution or implementation of investment advice or investment decisions; |
| | c. | fines or penalties imposed by law or any other matters or sanctions which may be deemed uninsurable under the law pursuant to which this Policy shall be interpreted; |
| | d. | any amounts which constitute premiums; fees and charges; return or refund of premiums; commissions or taxes; or loss arising out of any commingling of funds; or |
| | e. | principal, interest, or other moneys either paid, accrued or due as the result of any loan, lease or extension of credit. |

**Parent Organization** means the entity that is named in ITEM 1. of the Declarations, as legally constituted at the inception date of this Policy.

**Policy Period** means the period of time specified in ITEM 6. of the Declarations, subject to prior termination in accordance with Section 23. Regardless of whether this period is less than, equal to or greater than one year, the Limits of Liability specified in ITEM 2. of the Declarations shall be the Company's maximum limit of liability under this Policy for the entire period.

**Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products and any noise.

**Subsidiary**, means any organization that, at the inception date of this Policy, is named in the Application Form and of which more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors is owned or controlled by the **Parent Organization** either directly or through one or more of its **Subsidiaries** or any entity of which more than 50% of the outstanding securities or voting rights representing the right to vote for election of directors was owned or controlled by the **Parent Organization** either directly or through one or more of its **Subsidiaries** prior to the inception date of this Policy.

**Wrongful Act** means any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted, or allegedly committed or attempted, by the **Insureds** or any person for whose acts the **Insureds** are legally liable, which arises solely from the **Insureds** or any person for whose acts the **Insureds** are legally liable, performing **Insurance Services** or **Financial Services** including al- leged failure to perform **Insurance Services** or **Financial Services**.

For the purposes of these definitions, the singular includes the plural and the plural includes the singular, unless otherwise indicated.

Exhibit A-33

Effective date of
this Endorsement: September 1, 2001

**FEDERAL INSURANCE COMPANY**

Endorsement No:   2

To be attached to and form part of
Policy Number:   70427262

Issued to:  CALIFORNIA CASUALTY MANAGEMENT CO.

---

### EMPLOYED LAWYERS PROFESSIONAL LIABILITY EXTENSION ENDORSEMENT

| NOTICE: | THIS POLICY FORM AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. |
|---|---|

1.   It is agreed that Section 26., Definitions, is amended by adding the following:

  **Employed Lawyer** means any person admitted to practice law who is, was or becomes a full-time, salaried employee of an **Insured Organization**.

2.   The definition of **Insured** is amended to include any **Employed Lawyer**.

3.   Section 4., Exclusions, is amended by adding the following:

  T.   based upon, arising from, or in consequence of any **Employed Lawyer's** service as a director, officer, trustee, member of any entity, or lawyer for anyone other than the **Insured Organization**, even if directed or requested to serve such other entity or client.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date: September 26, 2001

By _Robert Hamburger_____
                                   Authorized Representative

ICPL Policy
Form 17-02-2585 (Ed. 1-01)
2-14179 (NYFTZ)

Exhibit A-34

Effective date of
this Endorsement:  September 1, 2001

**FEDERAL INSURANCE COMPANY**

Endorsement No:    3

To be attached to and form part of
Policy Number:    70427262

Issued to:  CALIFORNIA CASUALTY MANAGEMENT CO.

---

### PREMIUM ENDORSEMENT

It is agreed that:

1.    The premium for this Policy for the period September 1, 2001 to July 1, 2002 is:

Premium:  ($ 249,000)

2.    This premium is subject to change during the period in 1. above if amendments are added to this Policy at the request of the Parent Organization.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date: September 26, 2001

By _____
                Authorized Representative

ICPL Policy
Form 17-02-2557 (Ed. 1-01)

Exhibit A-35

AUG-12-2005 06:42 FROM:                                    TO        h LFAX                P.25/27

## Notice To Our Producers
## California Insurance Guarantee Association Assessments

The California Insurance Guarantee Association assesses insurers for funds to cover the claim liabilities of insolvent insurers.   The Guarantee Law requires insurers to recoup the assessments paid to the association through a surcharge on premiums for insurance policies to which the law applies.

Policies effective January 1, 1995, and all corresponding transactions may reflect this surcharge.   On return premiums and cancellations, the surcharge will be returned only if previously collected.   The charge will be shown as a seperate item on both policies and bills.   It will be identified as "CIGA Surcharge".   If applicable, this surcharge must be paid with the first premium installment.   PLEASE NOTE: By law the surcharge is not considered premium, therefore, no commission is payable on this item.

If you have any questions or require additional information about the surcharge, please contact your local underwriter.

Form 99-10-0214 (Ed.4-95)

Exhibit A-36

**California Casualty**

*NEW204 1155871D4    FILE COPY                                                      0006
FRCO 3
*****                                          HOMEOWNER POLICY
          RENEWAL DECLARATION * * EFFECTIVE 09/05/00

| Policy Number | Policy Period 12:01 A.M. standard Time at the Insured location as stated herein. Effective / Expiration | Coverage Is Provided By | Agency |
|---|---|---|---|
| 204 1155871 | 09/05/00 / 09/05/01 | CA CASUALTY INSURANCE CO | 150290000 |

| Addressee | Named Insured |
|---|---|
| HAROLD, N-JAMES & D-LEE<br>1160 GLEN AULIN CT<br>CARMICHAEL, CA  95608 | HAROLD, N-JAMES & D-LEE<br>1160 GLEN AULIN CT<br>CARMICHAEL, CA            95608 |

THE PREMISES COVERED BY THIS POLICY IS LOCATED
   1160 GLEN AULIN CT CARMICHAEL, CA 95608.

RATING INFORMATION— AUTOMATIC VALUE-UP AT RENEWAL, FRAME, PRIMARY RESIDENCE,
   PROTECTION CLASS 3, TERRITORY 55, $250 SECTION I LOSS DEDUCTIBLE, 1 FAMILY,
   PREMIUM GROUP 322, OUTSIDE CITY LIMITS.

COVERAGE AT THE ABOVE DESCRIBED LOCATION IS PROVIDED ONLY WHERE A LIMIT OF
LIABILITY IS SHOWN OR A PREMIUM IS STATED

| SECTION I COVERAGE | LIMIT OF LIABILITY | PREMIUMS |
|---|---|---|
| A. DWELLING | $325,000 | $1,544.00 |
| B. OTHER STRUCTURES | $32,500 | |
| C. PERSONAL PROPERTY | $243,750 | INCLUDED |
| D. LOSS OF USE | $65,000 | |
| SECTION II COVERAGE | | |
| E. PERSONAL LIABILITY | $500,000 EACH OCCURRENCE | |
| F. MEDICAL PAY- TO OTHERS - | $2,000 EACH PERSON | $40.00 |
| TOTAL BASIC PREMIUM | | $1,584.00 |

ADDITIONAL PREMIUMS
H070 LIABILITY EXTENDED TO PROPERTY DESCRIBED HEREIN                 $10.00
H0314 DWELLING REPLACEMENT COST                                      $1.00
H061 PERSONAL ARTICLES FLOATER                                       $50.00
              TOTAL ADDITIONAL PREMIUMS - - - - - - - - - -          $61.00
              SUB-TOTAL ANNUAL PREMIUM - - - - - - - - - -           $1,645.00
POLICY PERIOD 12:01 AM.    STANDARD TIME AT THE RESIDENCE PREMISES.

   MORTGAGEE #0392319800
      SUMITOMO BANK OF CALIFORNIA
      320 CALIFORNIA STREET 7TH FL.
      SAN FRANCISCO, CA            94104

CONTINUED ON NEXT PAGE

            * FOR POLICY SERVICE/CLAIMS CONTACT *

            FOR SERVICE, CALL 800-800-9410.
            FOR CLAIMS, CALL 800-800-9410.

Exhibit A-37

LP-1144 (8/94) Billing information will be mailed under separate cover.

I, _Danny Klehn, underwriting analyst_
     (Name)                    (Title)
certify under penalty of perjury that this is
a true and correct duplicate of the original
_DEC PAGE_ as it existed on the date of
certification shown below. This is issued as
a duplicate and does not constitute additional
or contributing insurance.

Policy #204 1155871 Date of Cert. _6/28/02_

Signature _Danny Klehn_ Date _6/28/02_

San Mateo, California

Exhibit A-38

California Casualty
*NEW204 115587104   FILE COPY
FRCO                                                                    0006

                              HOMEOWNER POLICY
        RENEWAL DECLARATION * * EFFECTIVE 09/05/00

| Policy Number | Policy Period 12:01 A.M. standard Time at the insured location as stated herein Effective | Expiration | Coverage is Provided By | Agency |
|---|---|---|---|---|
| 204 1155871 | 09/05/00 | 09/05/01 | CA CASUALTY INSURANCE CO | 150290000 |

| Addressee | Named Insured |
|---|---|
| | HAROLD N JAMES & D LEE |
| | 1160 GLEN AULIN CT |
| | CARMICHAEL CA                    95608 |

FORMS AND ENDORSEMENTS - UP-426 05/95, HO300CA 05/95, HO0996 06/84, HO-966 05/95,
  HO-290 05/95, HO-216 07/82, HO-70 07/90, HO-90 07/84, HO-314 05/95,
  HO-61 04/88, HO-322 07/90.

THIS POLICY DOES NOT INCLUDE BUILDING CODE UPGRADE COVERAGE.

THIS POLICY DOES NOT PROVIDE EARTHQUAKE COVERAGE

                                                                    07/17/00
                                                                    DATE

DESCRIPTION OF ADDITIONAL COVERAGES

NON-SMOKER DISCOUNT

LIABILITY EXTENDED TO PREMISES AS LISTED BELOW
  NUMBER OF FAMILIES IS 1. MEDICAL PAYMENTS DO NOT APPLY. TERRITORY IS 03.
  1836 BEVERLY WAY, SACRAMENTO, CA  95818

WORKERS' COMPENSATION
  COVERAGE FOR OCCASIONAL SERVANT.

PREMISES ALARM OR FIRE PROTECTION SYSTEM DISCOUNT
  COVERAGE APPLIES. TYPE 2 PROTECTIVE DEVICES.
  SMOKE ALARM & BURGLAR ALARM

                        CONTINUED ON NEXT PAGE

                                                        Exhibit A-39

UP-1144 (8/94) Billing information will be mailed under Separate Cover

California Casualty

*NEW204 115587104 FILE COPY 0006

FRCO

HOMEOWNER POLICY

RENEWAL DECLARATION * * EFFECTIVE 09/05/00

| Policy Number | Policy Period 12:01 A.M. standard Time at the Insured location as stated herein. Effective | Expiration | Coverage is Provided By | Agency |
|---|---|---|---|---|
| 204 1155871 | 09/05/00 | 09/05/01 | CA CASUALTY INSURANCE CO | 150290000 |

| Addressee | Named Insured |
|---|---|
| | HAROLD, N.JAMES & D.LEE<br>1160 GLEN AULIN CT<br>CARMICHAEL, CA 95608 |

DESCRIPTION OF ADDITIONAL COVERAGES

PERSONAL PROPERTY REPLACEMENT COST

DWELLING REPLACEMENT COST

FURS-SCHEDULED COVERAGE-DESCRIPTION ON FILE
AMOUNT OF LIABILITY IS $ 12500, TERRITORY IS 03.
SEE SCHEDULE

I ________________________
(Name) (Title)
certify under penalty of perjury that this is a true and correct duplicate of the original as it existed on the date of ____________ certification shown below. This is issued as a duplicate and does not constitute additional or contributing insurance.
Policy # ____________ Date of Cert. ____________
Signature ____________ Date ____________
San Mateo, California

---S T A T E M E N T O F A C C O U N T--- 2041155871 0403
HAROLD, N.JAMES & D.LEE

TOTAL AMOUNT................ $1,645.00

THANK YOU FOR LETTING US SERVE YOU

UP-1144 (8/94) Billing information will be mailed under Separate Cover

I, _Danny Kiehn, underwriting analyst_
     (Name)                    (Title)

certify under penalty of perjury that this is
a true and correct duplicate of the original
_Homeowners Policy_ as it existed on the date of
certification shown below. This is issued as
a duplicate and does not constitute additional
or contributing insurance.

Policy # _204 115587_ Date of Cert. _6/28/02_

Signature _____ Date _6/28/02_

San Mateo, California



YOUR PLAIN LANGUAGE

HOMEOWNERS

POLICY

UP-426 (5/95)

HOMEOWNERS POLICY

California Casualty Insurance Co.
California Casualty Indemnity Exchange
California Casualty & Fire Insurance Company

**HOME OFFICES: SAN MATEO, CALIFORNIA**

**YOUR HOMEOWNERS POLICY
QUICK REFERENCE**

DECLARATIONS PAGE

Your Name
Location of Your Residence
Coverages Applicable to Your Policy
Amounts of Insurance in Your Policy
Your Deductible

Beginning
On Page

AGREEMENT ...................................... 1

DEFINITIONS ..................................... 1

SECTION I
YOUR
PROPERTY

LOSS DEDUCTIBLE ....................... 3

COVERAGES ................................... 3
   Coverage A - Dwelling ................... 3
   Coverage B - Other Structures ...... 4
   Coverage C - Personal Property ... 4
   Coverage D - Loss of Use ............. 6
ADDITIONAL COVERAGES ............. 7
   Debris Removal ............................ 7
   Reasonable Repairs ...................... 8
   Trees, Shrubs and Plants .............. 8
   Fire Department Service Charge ... 8
   Property Removed ......................... 9
   Credit Card, Fund Transfer Card ... 9
   Collapse ...................................... 10
   Lost Luggage ............................... 11
   Loss Assessment ......................... 11
   Glass or Safety Glazing Material . 11

PERILS INSURED AGAINST ......... 12
   Coverage A - Dwelling ................ 12
   Coverage B - Other Structures .... 12
   Coverage C - Personal Property . 13

UP-426 (5/95)

Exhibit A-43

EXCLUSIONS ....... ...................16

CONDITIONS ..............................19
   Insurable Interest ...................... 19
   Duties After Loss ......................19
   Loss Settlement ..........................20
   Loss to a Pair or Set...................22
   Glass Replacement ................... 22
   Appraisal ....................................22
   Other Insurance ..........................23
   Suit Against Us ...........................23
   Our Option ................................ 23
   Loss Payment .............................23
   Abandonment of Property ...........23
   Mortgage Clause.........................23
   No Benefit to Bailee ................... 24
   Nuclear Hazard Clause...............24
   Volcanic Eruption Period .............25

SECTION II YOUR LIABILITY — COVERAGES ..............................25
   Coverage E - Personal Liability ...25
   Coverage F - Medical Payments 25

EXCLUSIONS ..............................26

ADDITIONAL COVERAGES ..........31
   Claim Expenses ..........................31
   First Aid Expenses......................31
   Damage to Property of Others.....32
   Loss Assessment........................32

CONDITIONS ..............................33
   Limit of Liability ...........................33
   Severability of Insurance .............33
   Duties After Loss ........................33
   Duties of an Injured Person .........34
   Payment of Claim .......................34
   Suit Against Us ...........................34
   Bankruptcy of an Insured.............35
   Other Insurance ..........................35

SECTION I and SECTION II — CONDITIONS ..............................35
   Policy Period ...............................35
   Concealment or Fraud ................35
   Liberalization Clause...................35
   Waiver or Change of Policy .........35
   Cancellation ................................36
   Non-Renewal ..............................37
   Assignment. ................................37
   Subrogation .................................37

Death .........................................37
Conformity to Statute .................37

PARTICIPATING AND RECIPROCAL PROVISIONS .................................38

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Copyright, Insurance Services Office, Inc., 1989, 1990, 1994

UP-426 (5/95)

UP-426 (5/95)

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

Throughout this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

1.  **"Bodily injury"** means bodily harm, sickness or disease, including required care, loss of services and death resulting therefrom.

2.  **"Business"** means any full-time or part-time trade, profession, occupation or activity, engaged in for monetary or other compensation. This definition includes the providing of home day care services to a person other than an insured. Mutual exchange of home day care services or the providing of home day care services by an **insured** to a relative of an **insured** is not considered a **business**.

3.  **"Insured"** means you and the following residents of your household:

    a.  Your relatives;

    b.  Any other person under the age of 21 who is in the care of any person named above.

    Under Section II, **"insured"** also means:

    c.  With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3.a. or 3.b. A person or organization using or having custody of these animals or watercraft in the course of any **business** or without permission of the owner is not an **insured**;

    d.  With respect to any vehicle to which this policy applies:

    (1)  .... erson while engaged in your employment or the employment of any person included in 3.a or 3.b.; or

    (2)  Any other person using the vehicle on an **insured location** with your permission.

4.  "**Insured location**" means:

    a.  The **residence premises**;

    b.  The part of any other premises, other structures and grounds used by you as a residence and:

    (1)  Which is shown in the Declarations; or

    (2)  Which is acquired by you during the policy period for your use as a residence;

    c.  Any premises used by you in connection with the premises included in 4.a. or 4.b. above;

    d.  Any part of a premises not owned by an **insured** and where an **insured** is temporarily residing;

    e.  Vacant land, other than farm land, owned by or rented to an **insured**;

    f.  Land owned by or rented to an **insured** on which a one or two family dwelling is being constructed as a residence for an **insured**;

    g.  Individual or family cemetery plots or burial vaults of an **insured**;

    h.  Any part of a premises occasionally rented to an **insured** for other than **business** purposes.

5.  "**Occurrence**" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

    a.  **Bodily injury**; or

    b.  **Property damage**.

6.  "**Property damage**" means physical injury to or destruction of tangible property, including loss of use of this property.

7.  "**Residence employee**" means an employee of an

1          UP-426 (5/95)

2          UP-426 (5/95)

insured who performs du___ connection with the maintenance or use of the re:___nce premises, including household or domestic services, or who performs duties elsewhere of a similar nature not in connection with the **business** of an **insured**.

8. **"Residence premises"** means:

   a. The one or two family dwelling, other structures, and grounds; or

   b. That part of any other building:

   where you reside and which is shown as the **"residence premises"** in the Declarations.

---

## SECTION I - LOSS DEDUCTIBLE

In case of loss under Section I of this policy, we cover only that part of the loss over the deductible stated in the Declarations. The deductible does not apply to Coverage D - Loss of Use.

---

## SECTION I - COVERAGES

### COVERAGE A - Dwelling

We cover:

1. The dwelling on the **residence premises** shown in the Declarations used principally as a private residence, including structures attached to the dwelling;

2. Materials and supplies located on or adjacent to the **residence premises** for use in the construction, alteration or repair of the dwelling or other structures on the **residence premises**; and

3. Wall-to-wall carpeting fastened to the dwelling.

This coverage does not apply to land, including land on which the dwelling is located.

### COVERAGE B - Other Structures

We cover other structures on the **residence premises**, separated from the dwelling by clear space. This coverage includes:

1. Structures connected to the dwelling by only a fence, utility line, or similar connection;

2. Wall-to-wall carpeting fastened to the structure; and

3. Fences, driveways, and walks on the **residence premises**.

We do not cover other structures:

1. Used in whole or in part for **business** purposes; or

2. Rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

This coverage does not apply to land, including land on which other structures are located.

---

### COVERAGE C - Personal Property

We cover personal property owned or used by an **insured** while it is anywhere in the world. At your request, we will cover personal property owned by others while the property is on the part of the **residence premises** occupied by an **insured**. In addition, we will cover at your request, personal property owned by a guest or a **residence employee**, while the property is in any residence occupied by an **insured**.

Our limit of liability for personal property usually situated at an **insured's** residence, other than the **residence premises**, is 10% of the limit of liability for Coverage C, or $1,000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days immediately after you begin to move the property there.

**Special Limits of Liability.** These limits do not increase the Coverage C limit of liability. The special limit for each following numbered category is the total limit for each loss for all property in that numbered category.

1. $200 on money, bank notes, bullion, gold other than

goldware, silver other than __ __are, platinum, coins and medals.

2. $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps.

3. $1000 on watercraft, including their trailers, furnishings, equipment and outboard motors.

4. $1000 on trailers not used with watercraft.

5. $1000 on grave markers.

6. $1000 for loss by theft of jewelry, watches, furs, precious and semi-precious stones.

7. $2500 for loss by theft of silverware and goldware.

Silverware and goldware include:

a. Platedware, flatware, hollowware, tea sets, trays, trophies and the like;

b. Other utilitarian items made of or including silver or gold.

8. $5000 for loss by theft of firearms.

9. $200 on property used at any time or in any manner for any **business** purpose except property subject to the Special Limit of Liability in 10. below.

10. $5,000 on computers and electronic data processing equipment, except that property used at any time or in any manner for the purpose of sales, repair, service, delivery or storage of computers or electronic data processing equipment is subject to the Special Limit of Liability in 9. above.

11. $10,000 on loss by theft of rugs, carpets, or other woven or knit floor coverings or wall hangings, subject to a limit of $2,500 on the theft of any one article.

**Property Not Covered.** We do not cover:

1. Articles separately described and specifically insured in this or any other insurance;

2. Animals, birds or fish;

3. Motor vehicles or all other motorized land con-

veyance __ __ is includes:

a. Equipment and accessories;

b. Any device or instrument for the transmitting, recording, receiving or reproduction of sound or pictures which is operated by power from the electrical system of motor vehicles or other motorized land conveyances;

c. Accessories or antennas; or tapes, wires, records, discs or other media for use with any device or instrument described in paragraph b. above.

We do cover vehicles or conveyances not subject to motor vehicle registration which are:

a. Used to service an **insured's** residence; or

b. Designed for assisting the handicapped.

4. Aircraft and parts;

5. Property of roomers, boarders and other tenants, except property of roomers and boarders related to an **insured**;

6. Property contained in an apartment regularly rented or held for rental to others by an **insured;**

7. Property rented or held for rental to others while away from the **residence premises;**

8. (a)    Books of account, drawings or other paper records; or

(b)    Electronic data processing tapes, wires, records, discs or other software media;

containing information or data used at any time or in any manner for any **business** purpose. But, we do cover the cost of blank or unexposed records or media.

9. Credit cards or fund transfer cards except as provided in Additional Coverages 6.

---

**COVERAGE D - Loss of Use**

The limit of liability for Coverage D is the total limit for all the following coverages.

5

6

Exhibit A-47

1.  If a loss covered under this ⟨...⟩ n makes that part of the **residence premises** where you reside uninhabitable, we cover:

    **Additional Living Expense**, meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living;

    Payment shall be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2.  If a loss covered under this Section makes that part of the **residence premises** rented to others or held for rental by you uninhabitable, we cover:

    **Fair Rental Value**, meaning the fair rental value of that part of the **residence premises** rented to others or held for rental by you less any expenses that do not continue while the premises is uninhabitable.

    Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3.  If a civil authority prohibits you from use of the **residence premises** as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1. and 2. above for a period not exceeding two weeks during which use is prohibited.

The periods of time under 1., 2. and 3. above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

---

## ADDITIONAL COVERAGES

1.  **Debris Removal**. We will pay your reasonable expense for the removal of:

    a.  Debris of covered property if a Peril Insured Against causes the loss; or

    b.  Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property

contained in a building.

This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

We will also pay your reasonable expense for the removal of fallen trees from the **residence premises** if:

a.  Coverage is not afforded under Additional Coverage 3. Trees, Shrubs and Other Plants for the peril causing the loss; or

b.  The tree is not covered by this policy;

provided the tree damages covered property and a Peril Insured Against under Coverage C causes the tree to fall. Our limit of liability for this coverage will not be more than $500 in the aggregate for any one loss.

2.  **Reasonable Repairs**. We will pay the reasonable cost incurred by you for necessary repairs made solely to protect covered property from further damage provided coverage is first afforded for the peril that has caused the loss which is then apparent. We will not pay for repairs of damage caused by an excluded or non-covered peril. We will not pay for repairs made as a preventative measure prior to an actual loss by a covered peril. This coverage does not increase the limit of liability applying to the property being repaired.

3.  **Trees, Shrubs and Other Plants**. We cover trees, shrubs, plants or lawns on the **residence premises**, for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the **residence premises**, Vandalism or malicious mischief or Theft. The limit of liability for this coverage shall not exceed 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants and lawns nor more than $500 for any one tree, shrub or plant. We do not cover property grown for **business** purposes.

This coverage is additional insurance.

4.  **Fire Department Service Charge** (Does not apply in Arizona). We will pay up to $250 for your liability assumed by contract or agreement for fire department

7          UP-426 (5/95)

8          UP-426 (5/95)

charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response This coverage is additional insurance. No deductible applies to this coverage.

5. **Property Removed.** Covered property while being removed from a premises endangered by a Peril Insured Against and for not more than 30 days while removed is covered for direct loss from any cause. This coverage does not change the limit of liability applying to the property being removed.

6. **Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

   We will pay up to $1000 for:

   a. The legal obligation of an **insured** to pay because of the theft or unauthorized use of credit cards issued to or registered in an **insured's** name;

   b. Loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal or transfer of funds, issued to or registered in an **insured's** name;

   c. Loss to an **insured** caused by forgery or alteration of any check or negotiable instrument; and

   d. Loss to an **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency.

   We do not cover use by a resident of your household, a person who has been entrusted with the credit card or fund transfer card or any person if an **insured** has not complied with all terms and conditions under which the credit card or fund transfer card is issued.

   We do not cover loss arising out of **business** pursuits or dishonesty of an **insured**.

   All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

   No deductible applies to this coverage.

Defense.

a. We may make any investigation and settle any claim or suit that we decide is appropriate.

   Our obligation to defend any claim or suit ends when the amount we pay for the loss equals our limit of liability.

b. If a suit is brought against an **insured** for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

c. We have the option to defend at our expense an **insured** or an **insured's** bank against any suit for the enforcement of payment under the Forgery coverage.

7. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

   a. Perils Insured Against in Coverage C - Personal Property. These perils apply to covered building and personal property for loss insured by this Additional Coverage, 7. Collapse;

   b. Hidden decay;

   c. Hidden insect or vermin damage;

   d. Weight of contents, equipment, animals or people;

   e. Weight of rain which collects on a roof; or

   f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

   Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b, c, d, e and f unless the loss is a direct result of the collapse of a building.

   Collapse does not include settling, cracking, shrinking, bulging or expansion.

   This coverage does not increase the limit of liability

9                UP-426 (5/95)

10               UP-426 (5/95)

Exhibit A-49

applying to the damaged cov~ ~ roperty.

8. **Lost Luggage.** We cover lost luggage and personal property while in the care, custody or control of a commercial passenger carrier. We will pay up to $500 for any one incident subject to the policy deductible. A claim must be submitted to the commercial passenger carrier within 30 days of loss, and this coverage shall be excess over any insurance provided by the carrier. This extension of coverage does not apply to loss of money, checks or money orders.

9. **Loss Assessment.** We will pay up to $1000 for your share of any loss assessment charged during the policy period against all unit owners by a corporation or association of property owners. This only applies when the assessment is made as a result of each direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Coverage C - Personal Property, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises**.

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

10. **Glass or Safety Glazing Material.**

We cover:

a. The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window; and

b. Damage to covered property by glass or safety glazing material which is part of a building, storm door or storm window.

This coverage does not include loss on the **residence premises** if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

Loss for damage to glass will be settled on the basis of replacement with safety glazing material when required by ordinance or law.

This coverage does not increase the limit of liability

that appl~ ~he damaged property.

---

## SECTION I - PERILS INSURED AGAINST

---

### COVERAGE A - DWELLING and

### COVERAGE B - OTHER STRUCTURES

We insure for direct physical loss to the property described in Coverages A and B except damage caused by:

1. Collapse, other than as provided in Additional Coverage 7;

2. Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed unless you have used reasonable care to:

   a. Maintain heat in the building; or

   b. Shut off the water supply and drain the system and appliances of water;

3. Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

   a. Fence, pavement, patio or swimming pool;

   b. Foundation, retaining wall or bulkhead;

   c. Pier, wharf or dock;

4. Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is completed and occupied;

5. Vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

6. Continuous or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from with-

Exhibit A-50

in a household appliance;

7. Any of the following:

a. Wear and tear, marring, deterioration;

b. Inherent vice, latent defect, mechanical break-down;

c. Rust, mold, wet or dry rot;

d. Smog, smoke from agricultural smudging or indus-trial operations;

e. Settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;

f. Birds, vermin, rodents, insects or domestic ani-mals;

g. Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dis-persal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.

Pollutant means any solid, liquid, gaseous or ther-mal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

If any of these cause water damage not otherwise excluded from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or house-hold appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appli-ance. We do not cover loss to the system or appliance from which this water escaped.

8. Losses excluded under Section I - Exclusions.

Under items 1. through 7., any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

---

## COVERAGE C - PERSONAL PROPERTY

We insure for direct physical loss to property described in Coverage C caused by a peril listed below unless the loss

is excluded in ___ ion I - Exclusions.

1. **Fire or lightning.**

2. **Windstorm or hail.**

This peril does not include loss to the property con-tained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

This peril includes loss to watercraft and their trailers furnishings, equipment, and outboard motors, only while inside a fully enclosed building.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft**, including self-propelled missiles and space-craft.

6. **Vehicles.**

7. **Smoke,** meaning sudden and accidental damage from smoke.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or malicious mischief.**

This peril does not include loss to property on the res-idence premises if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not consid-ered vacant.

9. **Theft,** including attempted theft and loss of property from a known location when it is likely that the proper-ty has been stolen.

This peril does not include loss caused by theft:

a. Committed by:

(1) An **insured**;

(2) A tenant of the **residence premises**; or

(3) An employee of a tenant or a resident of a

13          UP-426 (5/95)

14          UP-426 (5/95)

Exhibit A-51

tenant's household.

b. In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is completed and occupied; or

c. While the **residence premises** is rented to other than an **insured**, of;

    (1)   money, bank notes, bullion, gold, goldware, silver, silverware, pewterware, platinum, coins and medals;

    (2)   securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets and stamps; or

    (3)   jewelry, watches, furs, precious and semi-precious stones.

This peril does not include loss caused by theft that occurs away from the **residence premises** of:

a. Property while at any other residence owned, rented to, or occupied by an **insured**, except while an **insured** is temporarily residing there. Property of a student who is an **insured** is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;

b. Watercraft, including its furnishings, equipment and outboard motors; or

c. Trailers and campers.

10. **Falling objects.**

This peril does not include loss to property contained in a building unless the roof or an exterior wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

12. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

This peril does not include loss:

a. To the appliance from which the water or steam escaped;

b. Caused by or resulting from freezing; or

c. On the **residence premises** caused by accidental discharge or overflow which occurs off the **residence premises**.

13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the **residence premises** while the dwelling is unoccupied, unless you have used reasonable care to:

a. Maintain heat in the building; or

b. Shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage from artificially generated electrical current.** This peril does not include loss to a tube, transistor or similar electronic component.

16. **Volcanic Eruption**, other than loss caused by earthquake, land shock waves or tremors.

---

## SECTION I - EXCLUSIONS

---

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

a. **Ordinance or Law**, meaning any ordinance or law:

    (1)   Requiring or regulating the construction, demolition, remodeling, renovation or repair of property including removal of any

15       UP-426 (5/95)

16       UP-426 (5/95)

Exhibit A-52

resulting debris. T... ...lusion a.(1) does not apply to the amou... ...of coverage that may be provided for under Additional Coverage 10, Glass or Safety Glazing Material;

(2) The requirements of which result in a loss in value to property; or

(3) Requiring any **insured** or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

Pollutant means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This exclusion applies whether or not the property has been physically damaged.

b. **Earth Movement**, meaning any loss caused by, resulting from, contributed to or aggravated by earthquake, including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting; unless direct loss:

(1) By fire;

(2) By explosion other than the explosion of a volcano; or

(3) To glass or safety glazing material which is part of a building, storm door or storm window by breakage;

ensues and then we will pay only for the ensuing loss.

This exclusion does not apply to loss by theft.

c. **Water Damage**, meaning any loss caused by, resulting from, contributed to or aggravated by:

(1) Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

(2) ... which backs up through sewers or d... ...s; or

(3) Water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

Direct loss by fire, explosion or theft resulting from water damage is covered.

d. **Power Interruption**, meaning the interruption of power or other utility service if the interruption takes place away from the **residence premises**. If a Peril Insured Against ensues on the **residence premises**, we will pay only for loss caused by the ensuing peril.

e. **Neglect**, meaning neglect of the **insured** to use all reasonable means to save and preserve property at and after the time of a loss.

f. **War**, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon shall be deemed a warlike act even if accidental.

g. **Nuclear Hazard**, to the extent set forth in the Nuclear Hazard Clause of Section I - Conditions.

h. **Intentional Loss**, meaning any loss arising out of any act committed:

(1) By or at the direction of an **insured**; and

(2) With the intent to cause a loss.

2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

a. **Weather conditions**, including rainfall. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss;

17          UP-426 (5/95)

18          UP-426 (5/95)

b. **Acts or decisions**, inc... the failure to act or decide, of any person, group, ...anization or governmental body;

c. **Faulty, inadequate or defective**:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property whether on or off the **residence premises**.

---

### SECTION I—CONDITIONS

---

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we shall not be liable:

   a. To the **insured** for an amount greater than the **insured's** interest at the time of loss: or,

   b. For more than the applicable limit of liability.

2. **Your Duties After Loss.** In case of a loss to which this insurance may apply, you shall see that the following duties are performed:

   a. Give immediate notice to us or our agent, and in case of theft also to the police. In case of loss under the Credit Card or Fund Transfer Card coverage, also notify the credit card or fund transfer card company;

   b. Protect the property from further damage, make reasonable and necessary repairs required to protect the property, and keep an accurate record of repair expenditures;

   c. Prepare an inventory of damaged personal property showing in detail, the quantity, description, actual cash value and amount of loss. Attach to the inventory all bills, receipts and related docu-

ment... substantiate the figures in the inventory;

d. As often as we reasonably require:

(1) Exhibit the damaged property;

(2) Provide us with records and documents we request and permit us to make copies; and

(3) Submit to examination under oath and subscribe the same;

e. Submit to us within 60 days (90 days in Oregon) after we request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

(1) The time and cause of loss;

(2) Interest of the **insured** and all others in the property involved and all encumbrances on the property;

(3) Other insurance which may cover the loss;

(4) Changes in title or occupancy of the property during the term of the policy;

(5) Specifications of any damaged building and detailed estimates for repair of the damage;

(6) An inventory of damaged personal property described in 2.c.;

(7) Receipts for additional living expenses incurred and records supporting the fair rental value loss; and

(8) Evidence or affidavit supporting a claim under the Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.** Covered property losses are settled as follows:

a. (1) Personal property;

(2) Awnings, carpeting, domestic appliances, outdoor antennas, and outdoor equipment, whether or not attached to buildings; and

Exhibit A-54

(3)    Structures that are buildings;

at actual cash value at the time of loss but not exceeding the amount necessary to repair or replace.

b.    Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

(1)    If at the time of loss the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately prior to the loss, we will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts:

(a)    The limit of liability under this policy applying to the building;

(b)    The replacement cost of that part of the building damaged for equivalent construction and use on the same premises; or

(c)    The amount actually and necessarily spent to repair or replace the damaged building.

(2)    If at the time of loss the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately prior to the loss, we will pay the larger of the following amounts, but not exceeding the limit of liability under this policy applying to the building:

(a)    The actual cash value of that part of the building damaged; or

(b)    That proportion of the cost to repair or replace, without deduction for depreciation, of that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

(3)    In determining the amount of insurance

red to equal 80% of the full replacement cost of the building immediately prior to the loss, you shall disregard the value of excavations, foundations, piers and other supports which are below the undersurface of the lowest basement floor or, where there is no basement, which are below the surface of the ground inside the foundation walls, and underground flues, pipes, wiring and drains.

(4)    When the cost to repair or replace the damage is more than $1000 or more than 5% of the amount of insurance in this policy on the building, whichever is less, we will pay no more than the actual cash value of the damage until actual repair or replacement is completed.

(5)    You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis and then make claim within 180 days after loss for any additional liability on a replacement cost basis.

4.    **Loss to a Pair or Set.** In case of loss to a pair or set we may elect to:

a.    Repair or replace any part to restore the pair or set to its value before the loss; or

b.    Pay the difference between actual cash value of the property before and after the loss.

5.    **Glass Replacement.** Loss for damage to glass caused by a Peril Insured Against shall be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

6.    **Appraisal.** If you and we fail to agree on the amount of loss, either one can demand that the amount of the loss be set by appraisal. If either makes a written demand for appraisal, each shall select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers shall then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the **residence premises** is located to select an umpire. The appraisers shall then set the

amount of the loss. If the a_____sers submit a written report of an agreement to us, the _____ount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any two of these three shall set the amount of the loss. Each appraiser shall be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire shall be paid equally by you and us.

7. **Other Insurance.** This insurance is excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

8. **Suit Against Us.** No action shall be brought unless there has been compliance with the policy provisions and the action is started within one year after the date of loss or damage.

9. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the property damaged with equivalent property.

10. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days (30 days in Arizona, California, Kansas, Kentucky and Utah) after we receive your proof of loss and:

    a. Reach agreement with you; or

    b. There is an entry of a final judgement; or

    c. There is a filing of an appraisal award with us.

11 **Abandonment of Property.** We need not accept any property abandoned by an **insured**.

12. **Mortgage Clause.**

    The word "mortgagee" includes trustee.

    If a mortgagee is named in this policy, any loss payable under Coverage A or B shall be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named the order of payment shall be the same as the order of precedence of the mortgages.

If we den___ or claim, that denial shall not apply to a valid claim_____ e mortgagee, if the mortgagee:

a. Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

b. Pays any premium due under this policy on demand if you have neglected to pay the premium; and

c. Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

If the policy is cancelled or not renewed by us, the mortgagee shall be notified at least 10 days before the date cancellation or nonrenewal takes effect.

If we pay the mortgagee for any loss and deny payment to you:

a. We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

b. At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we shall receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Subrogation shall not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

13. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this policy.

14. **Nuclear Hazard Clause.**

a. **"Nuclear Hazard"** means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

b. Loss caused by the **nuclear hazard** shall not be considered loss caused by fire, explosion, or

Exhibit A-56

smoke, whether the ~~perils~~ are specifically named in or otherwise inclu~~d~~ within the Perils Insured Against in Section 1.

c. This policy does not apply under Section I to loss caused directly or indirectly by **nuclear hazard**, except that direct loss by fire resulting from the **nuclear hazard** is covered.

15. **Volcanic Eruption Period.** One or more volcanic eruptions that occur within a 72 hour period will be considered as one volcanic eruption.

---

### SECTION II - LIABILITY COVERAGES

---

#### COVERAGE E—Personal Liability

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury or property damage** caused by an **occurrence** to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which the **insured** is legally liable; and

2. Provide a defense at our expense by counsel of our choice, even if the allegations are groundless, false or fraudulent. We may make any investigation and settle any claim or suit that we decide is appropriate.

   Our obligation to defend any claim or suit ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

---

#### COVERAGE F—Medical Payments To Others

We will pay the necessary medical expenses incurred or medically ascertained within three years from the date of an accident causing **bodily injury.** Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household other than **residence employees.** As to others, this coverage applies only:

1. To a person on the **insured location** with the permission of an **insured**; or

2. To a pe~~rson~~ off the **insured location**, if the **bodily injury:**

   a. Arises out of a condition in the **insured location** or the ways immediately adjoining;

   b. Is caused by the activities of an **insured**;

   c. Is caused by a **residence employee** in the course of the **residence employee's** employment by an **insured**; or

   d. Is caused by an animal owned by or in the care of an **insured.**

---

### SECTION II - EXCLUSIONS

---

1. **Coverage E—Personal Liability and Coverage F—Medical Payments to Others** do not apply to **bodily injury or property damage:**

   a. Which is expected or intended by an **insured**;

   b. Arising out of the **business pursuits of an insured** including the rental or holding for rental of any part of any premises by an **insured.** This exclusion does not apply to:

      (1) Activities which are usual to non-**business** pursuits;

      (2) The rental or holding for rental of an **insured location:**

         (a) On an occasional basis if used only as a residence;

         (b) In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

         (c) In part, as an office, school, studio, or private garage;

   c. Arising out of the rendering or failing to render professional services;

   d. Arising out of any premises owned or rented to an

---

insured which is not a(n) ...ured location;

e.  Arising out of the:

(1)  Ownership, maintenance, use, loading or unloading of motor vehicles or other motorized land conveyances, including any trailers, owned or operated by or rented or loaned to an **insured**;

(2)  Entrustment by an **insured** of a motor vehicle or any other motorized land conveyance to any person.

(3)  Vicarious parental liability imposed by statute for the actions of a child or minor using any conveyance excluded in paragraph **(1)** or **(2)** above.

This exclusion does not apply to:

(1)  A trailer not towed by or carried on a motorized land conveyance;

(2)  A motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and:

(a)  Not owned by an **insured**; or

(b)  Owned by an **insured**, but only on an **insured location**;

(3)  A motorized golf cart while used to play golf on a golf course;

(4)  A motorized land conveyance designed for assisting the handicapped or for the maintenance of an **insured location** which is:

(a)  Not designed for travel on public roads; and

(b)  Not subject to motor vehicle registration;

f.  Arising out of:

(1)  The ownership, maintenance, use, loading or unloading of a watercraft described below;

(2)  The entrustment by an **insured** of a water-

craft described below to any person;

(3)  Vicarious parental liability imposed by statute for the actions of a child or minor using any watercraft described below.

Watercraft:

(i)  With inboard or inboard-outdrive motor power owned by an **insured**;

(ii)  With inboard or inboard-outdrive motor power of more than 50 horsepower rented to an **insured**;

(iii)  That is a sailing vessel, with or without auxiliary power, 26 feet or more in length owned by or rented to an **insured**; or

(iv)  Powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an **insured**.

This exclusion does not apply while the watercraft is stored;

g.  Arising out of:

(1)  The ownership, maintenance, use, loading or unloading of an aircraft;

(2)  The entrustment by an **insured** of an aircraft to any person;

(3)  Vicarious parental liability imposed by statute for the actions of a child or minor using an aircraft.

An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

h.  Caused directly or indirectly by war, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon shall be deemed a warlike act even if accidental;

i.  Arising out of the transmission of a communicable

disease by an insu[...]

j.    Arising out of sexual molestation, physical or mental abuse;

k.    Arising out of or in any way connected with discrimination, harassment, abuse or wrongful termination on account of race, color, religion, sex, sexual orientation, age, marital state, national origin or in any way connected with a violation of any state or federal civil rights law.

Exclusions d, e, f, and g do not apply to **bodily injury** to any **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured.**

2.    **Coverage E - Personal Liability**, does not apply to:

a.    Liability:

(1)    For your share of any loss assessment charged against all members of an association of property owners;

(2)    Under any other contract or agreement except those written contracts directly relating to the maintenance of the **insured location** not excluded in (1) above or elsewhere on this policy;

b.    **Property damage** to property owned by the **insured;**

c.    **Property damage** to property rented to, occupied or used by or in the care of the **insured.** This exclusion does not apply to **property damage** caused by fire, smoke or explosion;

d.    **Bodily injury** to any person eligible to receive any benefits:

(1)    Required to be provided; or

(2)    Voluntarily provided;

by the **insured** under any:

(1)    Workers' or workmen's compensation law;

(2)    Non-occupational disability law; or

(3)    Occupational disease law;

e.    B[...] [inj]ury or **property damage** for which an **insured** [...]ler this policy:

(1)    Is also an **insured** under a nuclear energy liability policy; or

(2)    Would be an **insured** but for its termination upon exhaustion of its limit of liability.

A nuclear energy liability policy is a policy issued by:

(1)    American Nuclear Insurers;

(2)    Mutual Atomic Energy Liability Underwriters;

(3)    Nuclear Insurance Association of Canada;

or any of their successors;

f.    **Bodily injury** to you and an **insured** within the meaning of part a. or b. of Definition 3 **"Insured"**; i. or

g.    Punitive or exemplary damages, regardless of any other provision of this policy.

3.    **Coverage F—Medical Payments to Others**, does not apply to **bodily injury**:

a.    To a **residence employee** if the **bodily injury**:

(1)    Occurs off the **insured location**; and

(2)    Does not arise out of or in the course of the **residence employee's** employment by an **insured;**

b.    To any person eligible to receive any benefits:

(1)    Required to be provided; or

(2)    Voluntarily provided;

under any:

(1)    Workers' or workmen's compensation  law;

(2)    Non-occupational disability law; or

(3)    Occupational disease law;

c. . From any:

(1)     Nuclear reaction;

(2)     Nuclear radiation; or

(3)     Radioactive contamination;

all whether controlled or uncontrolled or however caused; or

(4)     Any consequence of any of these; or

d.     To any person other than a **residence employee** of an **insured,** regularly residing on any part of the **insured location.**

---

## SECTION II - ADDITIONAL COVERAGES

---

We cover the following in addition to the limits of liability:

1.     **Claim Expenses.** We pay:

a.     Expenses incurred by us and costs taxed against an **insured** in any suit we defend;

b.     Premiums on bonds required in a suit defended by us, but not for bond amounts greater than the limit of liability for Coverage E. We are not obligated to apply for or furnish any bond;

c.     Reasonable expenses incurred by an **insured** at our request, including actual loss of earnings (but not loss of other income) up to $50 per day for assisting us in the investigation or defense of any claim or suit;

d.     Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies;

e.     Prejudgment interest awarded against the **insured** on that part of the judgment we pay. If we make an offer to pay the applicable limit of liability, we will not pay any prejudgment interest based on that period of time after the offer.

2.     **First Aid Expenses.** We will pay expenses for first aid to others incurred by an **insured** for **bodily injury**

covered                  this policy. We will not pay for first aid to you or an      ured.

3.     **Damage to Property of Others.** We will pay on a replacement cost basis up to $500 per **occurrence** for **property damage** to property of others caused by an **insured.**

We will not pay for **property damage:**     —

a.     To the extent of any amount recoverable under Section I of this policy;

b.     Caused intentionally by an **insured** who is 13 years of age or older;

c.     To property owned by or rented to an **insured,** a tenant of an **insured** or a resident in your household; or

d.     Arising out of:

(1)     **Business** pursuits;

(2)     Any act or omission in connection with a premises owned, rented or controlled by an **insured,** other than the **insured location;** or

(3)     The ownership, maintenance, or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

4.     **Loss Assessment.** We will pay up to $1000 for your share of any loss assessment charged during the policy period against all unit owners by a corporation or association of property owners, when the assessment is made as a result of:

a.     Each **occurrence** to which Section II of this policy would apply;

b.     Liability for each act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:

(1)     The director, officer or trustee is elected by the members of a corporation or association of property owners; and

(2)     The director, officer or trustee serves without deriving any income from the exercise of duties which are solely on  behalf of a

31          UP-426 (5/95)

32          UP-426 (5/95)

Exhibit A-60

corporation or a ........ tion of property own-
ers.

This coverage applies only to loss assessments charged against you as owner or tenant of the residence premises.

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Section II - Coverage E - Personal Liability Exclusion 2.a.(1) does not apply to this coverage.

## SECTION II - CONDITIONS

1. **Limit of Liability.** Regardless of the number of **insureds**, claims made or persons injured, our total liability under Coverage E stated in this policy for all damages resulting from any one **occurrence** shall not exceed the limit of liability for Coverage E stated in the Declarations.

   Our total liability under Coverage F for all medical expense payable for **bodily injury** to one person as the result of one accident shall not exceed the limit of liability for Coverage F stated in the Declarations.

2. **Severability of Insurance.** This insurance applies separately to each **insured**. This condition shall not increase our limit of liability for any one **occurrence**.

3. **Duties After Loss.** In case of an accident or occurrence, the **insured** shall perform the following duties that apply. You shall cooperate with us in seeing that these duties are performed:

   a. Give written notice to us or our agent as soon as practicable, which sets forth:

      (1)  The identity of the policy and **insured**;

      (2)  Reasonably available information on the time, place and circumstances of the accident or **occurrence**; and

      (3)  Names and addresses of any claimants and witnesses;

   b. Promptly forward to us every notice, demand, summons or other process relating to the accident or **occurrence**;

   c. At our request, assist in:

      (1)  Making settlement;

      (2)  The enforcement of any right of contribution or indemnity against any person or organization who may be liable to an **insured**;

      (3)  The conduct of suits and attend hearings and trials;

      (4)  Securing and giving evidence and obtaining the attendance of witnesses;

   d. Under the coverage - Damage to Property of Others - submit to us within 60 days after the loss, a sworn statement of loss and exhibit the damaged property, if within the **insured's** control;

   e. The **insured** shall not, except at the **insured's** own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the **bodily injury**.

4. **Duties of an Injured Person—Coverage F— Medical Payments to Others.**

   The injured person or someone acting on behalf of the injured person shall:

   a. Give us written proof of claim, under oath if required, as soon as practicable;

   b. Execute authorization to allow us to obtain copies of medical reports and records; and

   c. The injured person shall submit to physical examination by a physician selected by us when and as often as we reasonably require.

5. **Payment of Claim—Coverage F—Medical Payments to Others.** Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us.** No action shall be brought against us unless there has been compliance with the policy provisions.

33  UP-426 (5/95)

34  UP-426 (5/95)

No one shall have any right _ _ us as a party to any action against an **insured**. Fu_ _r, no action with respect to Coverage E shall be brought against us until the obligation of the **insured** has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured.** Bankruptcy or insolvency of an **insured** shall not relieve us of any of our obligations under this policy.

8. **Other Insurance—Coverage E - Personal Liability.** This insurance is excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

---

### SECTION I AND II—CONDITIONS

---

1. **Policy Period.** The effective time of this policy is 12:01 A.M. standard time at the **residence premises** on the effective date shown in the Declarations. With our consent this policy may be renewed for successive policy periods if the renewal premium for rules and forms then in effect is paid and accepted before the end of the current policy period.

   This policy applies only to loss under Section I or **bodily injury** or **property damage** under Section II, which occurs during the policy period.

2. **Concealment or Fraud.** The entire policy will be void if, whether before or after a loss, an **insured** has:

   a. Intentionally concealed or misrepresented any material fact or circumstance;

   b. Engaged in fraudulent conduct; or

   c. Made false statements;

   relating to this insurance.

3. **Liberalization Clause.** If we adopt any revision which would broaden the coverage under this policy without additional premium within 60 days prior to or during the policy period, the broadened coverage will immediately apply to this policy

4. **Waiver or Change of Policy Provisions.** A waiver or change of any provision of this policy must be in writing by us to be valid. Our request for an appraisal or

examin_ _ _ shall not waive any of our rights.

5. **Cancellation.**

   a. You may cancel this policy at any time by returning it to us or by notifying us in writing of the date cancellation is to take effect.

   b. We may cancel this policy only for the reasons stated below by notifying you in writing of the date cancellation takes effect. This cancellation notice may be delivered to you or mailed to you at your mailing address shown in the Declarations.

   Proof of mailing shall be sufficient proof of notice.

   (1) When you have not paid the premium, whether payable to us or to our agent or under any finance or credit plan, we may cancel at any time by notifying you at least 10 days (30 days in Idaho) before the date cancellation takes effect.

   (2) When this policy has been in effect for less than 60 days (70 days in Nevada) and is not a renewal with us, we may cancel for any reason by notifying you at least 10 days (30 days in Idaho, Kansas, Missouri and Oregon) before the date cancellation takes effect.

   (3) When this policy has been in effect for 60 days (70 days in Nevada) or more, or at any time if it is a renewal with us, we may cancel if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy or if the risk has changed substantially since the policy was issued. This can be done by notifying you at least 30 days before the date cancellation takes effect.

   (4) When this policy is written for a period longer than one year, we may cancel for any reason at anniversary by notifying you at least 30 days (45 days in California) before the date cancellation takes effect.

   c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

d. If the return premium not refunded with the notice of cancellation or en this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

6. **Non-Renewal.** We may elect not to renew this policy. We may do so by delivery to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days (45 days in California) before the expiration date of this policy. Proof of mailing shall be sufficient proof of notice.

7. **Assignment.** Assignment of this policy shall not be valid unless we give our written consent.

8. **Subrogation.** An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

   If an assignment is sought, an **insured** shall sign and deliver all related papers and cooperate with us in any reasonable manner.

   Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

   a. We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

   b. Insured also includes:

      (1) Any member of your household who is an **insured** at the time of your death, but only while a resident of the **residence premises**; and

      (2) With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

10. **Conformity to Statute.** If the provisions of this policy are in conflict with the statutes of the state in which the **residence premises** is located, the provisions are amended to conform to such statutes.

37                    UP-426 (5/95)

## PARTICIPATING AND RECIPROCAL PROVISIONS

If this policy is written in the California Casualty Indemnity Exchange the following provisions apply:

This policy is made and accepted in consideration of your premium payment to us. It is also in consideration of the power of attorney you signed as part of your application and the information you gave us on your application. Some of your statements actually become part of the policy which we call "The Declarations".

When you signed the power of attorney authority on your application, you authorized California Casualty Management Company to execute interinsurance policies between you and other subscribers through the California Casualty Indemnity Exchange.

This is a participating policy, and you will participate in the distribution of savings as fixed and determined by the Advisory Committee as provided by the Underwriters Agreement, which is made part of this policy in its entirety. Such savings shall be forfeited on policies cancelled for nonpayment of premium.

*Thomas R. Brown*
Chairman of the Board

*Peter Goldberg*
President

*John G. Vilseck*
Secretary—Treasurer

38                    UP-426 (5/95)

Exhibit A-63



YOUR PLAIN LANGUAGE

**ENDORSEMENTS**

PRINTED WITNESS ABOVE

**Please see the Declarations Page to determine coverages.**

**The following endorsements are only applicable to this policy if they are listed by endorsement number and edition date on the most current Declarations page issued for this policy.**

UP-450 (5/95)



California Casualty Insurance Co.
California Casualty Indemnity Exchange
California Casualty & Fire Insurance Company


**HOME OFFICE: SAN MATEO, CALIFORNIA**

## TABLE OF CONTEN

| | | |
|---|---|---|
| UP-12 | Premium Modification . . . . . . . . . . . . . . . | 1 |
| HO-32 | Unit-Owners Special Coverage . . . . . . . . | 1 |
| HO-35 | Loss Assessment Coverage . . . . . . . . . . | 3 |
| HO-40 | Other Structures Rented to Others . . | 4 |
| HO-41 | Additional Interest . . . . . . . . . . . . . . . . . | 4 |
| HO-42 | Permittted Incidental Business Occupancy . . . . . . . . . . . . . . . . . . . . | 5 |
| HO-48 | Other Structures . . . . . . . . . . . . . . . . . | 7 |
| HO-61 | Personal Articles Floater . . . . . . . . . . . . | 7 |
| HO-61C | Electronic and Computer Equipment . . | 11 |
| HO-65 | Coverage C - Increased Special Limit of Liability . . . . . . . . . . . . . . . . . | 14 |
| HO-70 | Additional Residence Premises . . . . . . . | 14 |
| HO-72 | Incidental Farming Personal Liability . . . . . . . . . . . . . . . . . . . . . . | 15 |
| HO-74 | Residence Premises, Three or Four Family . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| HO-80 | Theft Coverage . . . . . . . . . . . . . . . . . . . | 15 |
| HO-84 | Mine Subsidence . . . . . . . . . . . . . . . . . | 16 |
| HO-87 | Mine Sub., Other Structures . . . . . . . . . . | 18 |
| HO-137 | Contract of Sale Clause . . . . . . . . . . . . | 19 |
| HO-216 | Premises Alarm or Fire Protection System . . . . . . . . . . . . . . . . . . . . | 20 |
| HO-290 | Personal Property Replacement Cost . . . | 20 |
| HO-312 | Increased Limits on Business Property . . . . . . . . . . . . . . . . . . . . . . | 21 |
| HO-313 | Incidental Motorized Land Conveyances . . . . . . . . . . . . . . . . . . | 22 |
| HO-314 | Replacement or Repair Cost Protection, Coverage A . . . . . . . . . . . . . . . . . . . | 22 |
| HO-322 | Home Day Care Business . . . . . . . . . . . | 24 |
| HO-323 | Home Day Care Coverage . . . . . . . . . . | 25 |
| HO-372 | Mortgagee Clause . . . . . . . . . . . . . . . . | 27 |
| HO-377 | Inflation Protection . . . . . . . . . . . . . . . . | 28 |
| 438BFU | Lender's Loss Payable . . . . . . . . . . . . . . | 28 |
| HO-966 | Educators and School Employees Excess Liability . . . . . . . . . . . . . . . . . . . | 31 |
| MH-200 | Mobile Home Policy - Homeowners Policy . . . . . . . . . . . . . . . . . . . . | 33 |
| MH-200DP | Mobile Home Policy - Dwelling Property Policy . . . . . . . . . . . . . . . . . . | 34 |

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Copyrighted, Insurance Services Office, Inc., 1984, 1985, 1987, 1990, 1994

---

## PREMIUM MODIFICATION ENDORSEMENT
### UP-12 (Ed. 6/84)

For a premium credit we acknowledge that the **residence premises** fulfills all of the following requirements;

The **residence premises** is:

(1) Located within 5 miles travel distance of a recognized fire department that will respond;

(2) Located within 1,000 feet of a public fire hydrant;

(3) Occupied by not more than two family units; and

(4) Not located in a severe brush or forest fire area.

All other provisions of this policy apply.

---

## UNIT-OWNERS
### Special Coverage
### Condominium Form Only
### HO-32 (Ed. 5/95)

For an additional premium the Perils Insured Against applying to Coverage A are amended as follows:

**Perils Insured Against**

We insure against risk of direct loss to property described in Coverage A, only if that loss is a physical loss to property; however, we do not insure loss:

1. Involving collapse, other than as provided in Additional Coverages - Collapse.

2. Caused by:

   a. Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the unit is vacant, unoccupied or being constructed unless you have used reasonable care to:

      (1) Maintain heat in the building; or

      (2) Shut off the water supply and drain the system and appliances of water;

   b. Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(1)                    UP-450 (5/95)

(1) Fence, pavement, patio or swimming pool;

(2) Foundation, retaining wall, or bulkhead;

(3) Pier, wharf or dock;

c. Theft in or to a unit under construction, or of materials and supplies for use in the construction until the unit is finished and occupied;

d. Vandalism and malicious mischief or breakage of glass and safety glazing materials if the unit has been vacant more than 30 consecutive days immediately before the loss. A unit being constructed is not considered vacant;

e. Constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance;

f. Any of the following:

(1) Wear and tear, marring, deterioration;

(2) Inherent vice, latent defect, mechanical breakdown;

(3) Smog, rust, mold, wet, or dry rot;

(4) Smoke from agricultural smudging or industrial operations;

(5) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.

Pollutant means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

(6) Settling, cracking, shrinking, buldging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;

(7) Birds, vermin, rodents, insects, or domestic animals.

If any of these cause water damage not otherwise excluded from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover the loss caused

by the staff including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

**3.** Excluded under Section I — Exclusions.

Under items 1. and 2. any ensuing loss to property described in Coverage A not excluded or excepted in this policy is covered.

**The following exclusions are added to Section I — Exclusions:**

We do not insure for loss to property described in Coverage A caused by any of the following. However, any ensuing loss to property described in Coverage A not excluded or excepted in this policy is covered.

a. **Weather conditions.** However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Section I — Exclusions, other than exclusions b. and c. below, to produce the loss;

b. **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body;

c. **Faulty, inadequate or defective:**

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property whether on or off the **residence premises.**

All other provisions of this policy apply.

---

**LOSS ASSESSMENT COVERAGE**
Condominium or Homeowners Forms only
HO-35 (Ed. 6/84)

**Increased Limit — Residence Premises**

For an additional premium, the limit of liability for Section I — Additional Coverage 9 and Section II — Additional Coverage 4, Loss Assessment, is increased to:

(2)    UP-450 (5/95)

(3)    UP-450 (5/95)

* Increase in Limit of Liability    $

* Total Limit of Liability    $

* Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

---

## OTHER STRUCTURES RENTED TO OTHERS
### HO-40 (Ed. 4/85)

For an additional premium we cover the following structures on the **residence premises** rented or held for rental to any person not a tenant of the dwelling for use as private residence.

### SECTION I:

We insure for direct physical loss to these structures caused by the Perils Insured Against for the limit of liability stated below:

| Location of Structures* | Limit of Liability* |
|---|---|
| 1. | $ |
| 2. | $ |
| 3. | $ |

### SECTION II

Under Coverage E — Personal Liability and Coverage F — Medical Payments to Others, the structures listed above are included in the definition of the **insured location.**

With respect to the structures listed above, the first paragraph of Exclusion 1.b. under Section II Exclusions — Coverage E — Personal Liability and Coverage F — Medical Payments to Others, is deleted and replaced by the following:

b. Arising out of **business** pursuits of an **insured.**

* Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

---

## ADDITIONAL INTEREST
### Residence Premises
### HO-41 (Ed. 7/87)

### OPTION I:

Name and Address of Person or Organization *

Interest *

(4)    UP-450 (5/95)

---

The definition of **insured** in this policy includes the person or organization named above with respect to:

### SECTION I

Coverage A — Dwelling and Coverage B — Other Structures; and

### SECTION II

Coverage E — Personal Liability and Coverage F — Medical Payments to Others but only with respect to the **residence premises.**

This coverage does not apply to **bodily injury** to any employee arising out of or in the course of the employee's employment by the person or organization.

* Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

---

### OPTION 2:

Name of Person*

The definition of **insured** in this policy includes the persons named above with respect to:

### SECTION I

Coverage C — Personal Property and Coverage D — Loss of Use; and

### SECTION II

Coverage E — Personal Liability and Coverage F — Medical Payments to Others.

* Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

---

## PERMITTED INCIDENTAL BUSINESS OCCUPANCY
### Residence Premises
### HO-42 (Ed. 5/95)

The following additional definition applies to coverage provided by this endorsement.

**"Permitted Incidental Business"** means the office, private school, studio or other business pursuit conducted solely on the **residence premises** and from which you derive no more than half of your income.

(5)    UP-450 (5/95)

Exhibit A-68

## SECTION I — COVERAGE C

Special Limits of Liability Items 9. and 10. do not apply to the furnishings, supplies, and equipment of the **permitted incidental business.**

## SECTION II

Exclusion 1.b. of Coverage E — Personal Liability and Coverage F — Medical Payments to Others is deleted and replaced by the following:

b. (1) Arising out of **business** pursuits of an **insured** or the rental or holding for rental of any part of any premises by an **insured;**

This exclusion (b.1) does not apply to:

(a) Activities which are usual to non-**business** pursuits or to the necessary or incidental use of the premises to conduct the **permitted incidental business** operated by you.

(b) The rental or holding for rental of an **insured location:**

(i) On an occasional basis if used only as a residence;

(ii) In part for use only as a residence unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

(iii) In part as an office, school, studio or private garage.

(2) Arising out of products sold or exchanged.

This insurance does not apply to **bodily injury** to:

a. Any employee of an **insured** arising out of the **permitted incidental business** use described above other than to a **residence employee** while engaged in the employee's employment by an **insured;** or

b. Any pupil arising out of corporal punishment administered by or at the direction of the **insured.**

## SECTION I AND II — CONDITIONS

The following additional condition applies to coverage provided by this endorsement:

The **residence premises** must be substantially unmodified to accommodate this **permitted incidental business.**

All other provisions of this policy apply.

(6)        UP-450 (5/95)

## OTHER STRUCTURES
### Increased Limits
### HO-48 (Ed. 4/84)

For an additional premium we cover the structures described below on the **residence premises** for the additional limit of liability shown. This is additional insurance for these structures.

| Description* | Limit of Liability* |
|---|---|

This endorsement does not affect the limit of liability that applies to all structures insured under Coverage B — Other Structures.

\* Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions for this policy apply.

## PERSONAL ARTICLES FLOATER
### HO-61 (Ed. 4/88)

### NEWLY ACQUIRED PROPERTY:

With respect to jewelry, furs, cameras and musical instruments, we cover newly acquired property of a class of property already insured for an amount not to exceed 25% of the amount of insurance for that class of property or $10,000, whichever is less; provided the **insured** reports this newly acquired property to us within 30 days of acquisition and pays the additional premium from the date acquired.

When Fine Arts are scheduled, we cover other objects of art acquired during the policy period for their actual cash value but no more than 25% of the amount of insurance for fine arts scheduled, provided the **insured** reports these objects to us within 90 days of acquisition and pays the additional premium from the date acquired.

### PERILS INSURED AGAINST

We insure against causes of direct physical loss to the property described except:

1. Wear and tear, gradual deterioration, insects, vermin or inherent vice;

(7)        UP-450 (5/95)

Exhibit A-69

2. War, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon shall be deemed a warlike act even if accidental.

3. Nuclear Hazard, to the extent set forth in the Nuclear Hazard Clause of Section I — Conditions.

4. If Fine Arts are covered:

   a. Damage caused by any repairing, restoration or retouching process;

   b. Breakage of art glass windows, glassware, statuary, marble, bric a brac, porcelains and similar fragile articles. We cover loss by breakage if caused by fire, lighting, aircraft, windstorm, malicious damage, theft, explosion, earthquake, flood or collision, derailment or overturn of conveyance.

   c. Loss to property on exhibition at fair grounds or premises of national or international expositions unless the premises are covered by this policy.

5. If either of the classes of property, Postage Stamps or Rare and Current Coin collections, are covered:

   a. Fading, creasing, denting, scratching, tearing, thinning, transfer of colors, inherent defect, dampness, extremes of temperature, gradual depreciation, or any damage from handling or being worked upon;

   b. Disappearance of individual stamps, coins, or other articles unless the item is described and scheduled with a specific amount of insurance, or if the item is mounted in a volume and the page to which it is attached is also lost;

   c. Loss to property in the custody of transportation companies; nor shipments by mail other than registered mail;

   d. Theft from any unattended automobile unless being shipped as registered mail;

   e. Loss to property which is not an actual part of a stamp or coin collection.

## TERRITORIAL LIMITS:

We cover the property described while it is anywhere in the world. However, Fine Arts are covered only while within the United States and Canada.

(8)        UP-450 (5/95)

## SPECIAL PROVISION:

1. Fine Arts: You agree that the covered property will be packed and unpacked by competent packers.

2. Golfer's Equipment includes your other clothing while contained in a locker when you are playing golf. We cover golf balls for loss by fire or burglary provided there are visible marks of forcible entry into the building, room or locker.

3. Postage Stamps includes due, envelope, official, revenue, match and medicine stamps, covers, locals, reprints, essays, proofs and other philatelic property, including their books, pages and mountings, owned by or in the custody or control of the **insured**.

4. Rare and Current Coins includes medals, paper money, bank notes, tokens of money and other numismatic property, including coin albums, containers, frames, cards and display cabinets in use with such collection, owned by or in custody or control of the **insured**.

## CONDITIONS:

1. Loss Clause: The amount of insurance under this endorsement shall not be reduced except for a total loss of a scheduled article. We will refund the unearned premium applicable to such article after the loss or you may apply it to the premium due for the replacement of the scheduled article.

2. Loss Settlement: Covered property losses are settled as follows:

   a. Fine Arts - We will pay the amount shown for each scheduled article which is agreed to be the value of the article.

   In case of loss to a pair or set, we agree to pay you the full amount of the set as shown in the schedule and you agree to surrender the remaining article or articles of the set to us.

   b. **POSTAGE STAMPS OR RARE AND CURRENT COIN COLLECTION - IN CASE OF LOSS TO ANY SCHEDULED ITEM, THE AMOUNT TO BE PAID WILL BE DETERMINED IN ACCORDANCE WITH PARAGRAPH 2.c. OTHER PROPERTY.**

   **WHEN COINS OR STAMPS ARE COVERED ON A BLANKET BASIS. WE SHALL PAY THE CASH MARKET VALUE AT THE TIME OF LOSS BUT NOT MORE THAN $1,000 ON ANY UNSCHEDULED**

(9)        UP-450 (5/95)

COIN COLLECTION NOR MORE ᴛHAN $250 FOR ANY ONE STAMP, COIN, OR INDIVIDUAL ARTICLE OR ANY ONE PAIR, STRIP, BLOCK, SERIES SHEET, COVER, FRAME OR CARD.

WE SHALL NOT PAY A GREATER PROPORTION OF ANY LOSS ON BLANKET PROPERTY THAN THE AMOUNT INSURED ON BLANKET PROPERTY BEARS TO THE CASH MARKET VALUE AT THE TIME OF LOSS.

c. OTHER PROPERTY - THE VALUE OF THE PROP-ERTY INSURED IS NOT AGREED UPON BUT SHALL BE ASCERTAINED AT THE TIME OF LOSS OR DAMAGE. WE WILL NOT PAY MORE THAN THE LEAST OF THE FOLLOWING AMOUNTS:

(1) THE ACTUAL CASH VALUE OF THE PROP-ERTY AT THE TIME OF LOSS OR DAMAGE;

(2) THE AMOUNT FOR WHICH YOU COULD REAS-ONABLY BE EXPECTED TO HAVE THE PROP-ERTY REPAIRED TO ITS CONDITION IMMEDI-ATELY PRIOR TO THE LOSS;

(3) THE AMOUNT FOR WHICH YOU COULD REAS-ONABLY BE EXPECTED TO REPLACE THE ARTICLE WITH ONE SUBSTANTIALLY IDENTICAL TO THE ARTICLE LOST OR DAM-AGED; OR

(4) THE AMOUNT OF INSURANCE.

3. PAIR, SET OR PARTS OTHER THAN FINE ARTS:

a. LOSS TO A PAIR OR SET

IN CASE OF A LOSS TO A PAIR OR SET WE MAY ELECT TO:

(1) REPAIR OR REPLACE ANY PART TO RESTORE THE PAIR OR SET TO ITS VALUE BEFORE THE LOSS; OR

(2) PAY THE DIFFERENCE BETWEEN THE ACTU-AL CASH VALUE OF THE PROPERTY BEFORE AND AFTER THE LOSS.

b. PARTS

IN CASE OF A LOSS TO ANY PART OF COVERED PROPERTY, CONSISTING OF SEVERAL PARTS WHEN COMPLETE, WE SHALL PAY FOR THE VALUE OF THE PART LOST OR DAMAGED.

(10)          UP-450 (5/95)

4. Appraisal: ... nd we fail to agree on the amount of loss, either one can demand that the amount of the loss be set by appraisal. If either makes a written demand for appraisal, each shall select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers shall then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the **residence premises** is located to select an umpire. The appraisers shall set the amount of the loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any two of these three shall set the amount of the loss. Each appraiser shall be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire shall be paid equally by you and us.

All other provisions of this policy apply.

### PERSONAL ARTICLES FLOATER ELECTRONIC AND COMPUTER EQUIPMENT HO-61C (Ed. 7/90)

For an additional premium, we cover the classes of personal property indicated by an amount of insurance. This coverage is subject to the Definitions, Section I — Conditions, and Sections I and II — Conditions of the policy. The Section I deductible as shown on the declara-tions does not apply to this coverage.

| Class of Personal Property | Amount of Insurance* | Premium* |
|---|---|---|
| Computers and data processing equip-ment including peripheral hardware and software media and programs. | | |
| Electronic equipment used for the transmitting, recording, receiving or reproduction of sound or pictures. | | |

(11)          UP-450 (5/95)

This does not include records, tapes, reel to reel, video tapes and all other media for use with covered equipment.

**THE AMOUNTS OF INSURANCE SHOWN IN THE SCHED-ULE ARE LIMITED BY THE SPECIAL SETTLEMENT PROVISIONS IN THIS ENDORSEMENT.**

| Article* | Schedule Description* | Amount of Insurance |
|----------|----------------------|---------------------|

\* Entries may be left blank if shown elsewhere in this policy for this coverage.

**NEWLY ACQUIRED PROPERTY**

We cover newly acquired property of a class of property already insured. The limit of insurance applying to such newly acquired property is 25% of the amount of insurance for that class of property.

When you acquire new property you must:

1. Report this property to us within 30 days; and

2. Pay the additional premium from the date acquired.

**PERILS INSURED AGAINST**

We insure against causes of direct physical loss to the property described. We do not insure loss caused by any of the following:

1. Diminution of value caused by obsolescence due to introduction of new designs or models;

2. Wear and tear, gradual deterioration, marring, insects, vermin or inherent vice;

3. War, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure of use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon shall be deemed a warlike act even if accidental.

4. Nuclear hazard, to the extent set forth in the Nuclear Hazard Clause of Section I — Conditions.

(12)          UP-450 (5/95)

5. Loss arising o ... of any act committed by or at the direction of any insured with the intent to cause a loss.

**PROPERTY NOT COVERED**

We do not cover:

1. The cost of reproducing books of accounts, abstracts, drawings, indexes or other records created or complied by you; or

2. The cost of software, programs or operating systems which are not both protected by copyright law and commercially available.

We will cover the cost of tapes, drums, discs, cells or other magnetic recording or storage media for electronic data processing in unexposed or blank form.

**CONDITIONS**

**Loss Clause:** The amount of insurance under this endorse-ment will not be reduced except for a total loss to a scheduled article. We will refund the unearned premium applicable to such an article after the loss. The refund will be pro rata.

**LOSS SETTLEMENT**

**COVERED PROPERTY LOSSES ARE SETTLED AS FOLLOWS:**

A. **Computers** - at replacement cost, meaning the amount necessary to repair or replace the property, subject to the Loss Settlement Option below. The total amount we pay for any one loss will not exceed the amount of insurance by more than 20%. We will not pay more than $500 for any unscheduled com-puter program or software.

B. **Electronic sound or video equipment** - at replace-ment cost at the time of the loss. The total amount we will pay for any one loss will not exceed the amount of insurance by more than 20%. Covered losses are settled subject to the Loss Settlement Option below.

**LOSS SETTLEMENT OPTION**

We may repair or replace any covered property or any part of the property with merchandise of similar function and capability. The value of the property insured is not agreed upon, but will be ascertained at the time of damage or loss.

All other provisions of this policy apply.

(13)          UP-450 (5/95)

## COVERAGE C — INCREASED SPECIAL LIMITS OF LIABILITY
### HO-65 (Ed. 5/95)

For an additional premium, the Special Limits of Liability under Coverage C — Personal Property are increased as follows:

|  | Increase in Limit of Liability* |
|---|---|
| 7. Silverware and goldware for loss by theft | $ |
| 8. Firearms for loss by theft | $ |

*  Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

## ADDITIONAL RESIDENCE PREMISES
### 1, 2 3 or 4 Families
### HO-70 (Ed. 7/90)

**SECTION II**

For an additional premium under **Coverage E — Personal Liability and Coverage F — Medical Payments to Others,** the premises listed below are included in the definition of **insured location.**

With respect to the premises listed below, the first paragraph of Exclusion 1.b. under **Section II Exclusions — Coverage E — Personal Liability and Coverage F — Medical Payments to Others,** is deleted and replaced by the following:

  b.  Arising out of **business** pursuits of an **insured.**

Under Additional Coverage 4, Loss Assessment, we will pay up to $1,000 for your share of covered loss assessments arising out of the premises listed below.

| Location* | Number of Families* |
|---|---|
|  | □ 1  □ 2  □ 3  □ 4 |

*  Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

(14)            UP-450 (5/95)

## INCIDENTAL FARMING PERSONAL LIABILITY
### HO-72 (Ed. 5/95)

For an additional premium, under **Coverage E — Personal Liability and Coverage F — Medical Payments to Others,** we will pay up to our limit of liability for **bodily injury** or **property damage** arising out of farming operations that are conducted on the **residence premises;** however, Coverage E and Coverage F do not apply to **bodily injury** or **property damage** arising out of products sold or exchanged.

All other provisions of this policy apply.

## RESIDENCE PREMISES
### THREE OR FOUR FAMILY DWELLING
### HO-74 (Ed. 7/87)

For an additional premium, the definition of **residence premises** is amended to include the three or four family dwelling described in the Declarations of this policy.

All other provisions of this policy apply.

## THEFT COVERAGE ENDORSEMENT
### HO-80 (Ed. 7/87)

**SECTION I — Perils Insured Against**

For an additional premium, the following peril is added:

**Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

This peril does not include loss caused by theft:

  a.  Committed by you or any resident of your household;

  b.  In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or

  c.  From that part of a **residence premises*** rented to other than you or any resident of your household.

This peril does not include loss caused by theft that occurs off the **residence premises*** of:

(15)            UP-450 (5/95)

Exhibit A-73

a. Property while at any other res     nce owned by, rented to, or occupied by you or any member of your family residing with you, except while you or that family member is temporarily living there. Covered property of a student while at a residence away from home is covered, if the student has been there at any time during the 45 days immediately before the loss;

b. Watercraft, and their furnishings, equipment and outboard motors; or

c. Trailers and campers.

* When this endorsement is attached to a Dwelling Property Policy, the term "Described Location" is substituted for the term **"residence premises"**.

All other provisions of this policy apply.

---

## MINE SUBSIDENCE COVERAGE ENDORSEMENT
## KENTUCKY
## HO-84KY (Ed. 5/95)

1. The following definitions apply to the insurance provided by this endorsement.

   a. **Mine subsidence** means the collapse of underground coal mines resulting in direct damage to a **structure**. It does not include loss caused by:

      (1) Earthquake or earth movement, landslide or volcanic eruption; or

      (2) Collapse of storm, water seepage, or sewer drains.

   b. **Structure(s)** means a dwelling, building or fixture permanently affixed to realty, but does **not** include land, trees, plants or crops.

2. For an additional premium, we insure by this endorsement for direct physical loss caused by **mine subsidence**, to **structures** located in Kentucky and insured under Coverge A or B of this policy.

   In the event of a covered loss under this endorsement, we will also pay for removal of debris of the **structures** damaged by **mine subsidence**. Payment for debris removal is limited to and included in the amount of coverage provided under the terms of this endorsement for the damaged property.

   This endorsement does **not** insure the cost of filling land.

(16)          UP-450 (5/95)

---

3. The Earth Mov    nt exclusion in this policy does not apply to loss caused by **mine subsidence**.

4. **Limit of Liability — Mine subsidence Coverage Endorsement**. Our total limit of liability under this endorsement for all damages is the least of the following amounts:

   a. The limit of liability for Coverage A stated in the Declarations; or

   b. $50,000.

   You may apply up to 10% of this limit to cover loss to **structures** covered under Coverage B.

5. The following amend the Loss Settlement condition of this policy with respect to Mine Subsidence Coverage:

   The provisions of this policy will determine the settlement of covered losses, provided, however, that regardless of any policy provision to the contrary:

   a. We will not pay more than the least of the following amounts for a covered loss to any **structure**:

      (1) $50,000; or

      (2) The limit applicable to the **structure** under the terms of item 4. of this endorsement; or

      (3) The amount available in the Mine Subsidence Insurance Fund to reimburse us.

   b. Our total limit of liability under this endorsement for a loss event, regardless of the number of **structures** affected, shall not exceed the lesser of the following amounts:

      (1) The Limit of Liability — Mine Subsidence Coverage Endorsement, shown in item 4. above or elsewhere in this policy; or

      (1) The amount available in the Mine Subsidence Insurance Fund to reimburse us.

6. The following deductible provision applies to loss covered under this endorsement:

   We will pay only that part of the loss which exceeds 2% of this endorsement's Limit of Liability, but in no event shall the deductible be less than $250 nor more than $500.

No other deductible in this policy applies to the coverage provided by this endorsement.

All other provisions of this policy apply.

(17)          UP-450 (5/95)

Exhibit A-74

## MINE SUBSIDENCE COVERAGE
## OTHER STRUCTURES
## KENTUCKY
### HO-87KY (Ed. 5/95)

For an additional premium we cover the structure described below on the **residence premises** for the additional limit of liability shown. This is additional insurance for these structures.

Description*                    Limit of Liability*

1. The following definitions apply to the insurance provided by this endorsement:

    a. **Mine Subsidence** means the collapse of underground coal mines resulting in direct damage to a **structure**. It does not include loss caused by:

        (1) Earthquake or earth movement, landslide or volcanic eruption; or

        (2) Collapse of storm, water seepage, or sewer drains.

    b. **Structure(s)** means a dwelling, building or fixture permanently affixed to realty, but does **not** include land, trees, plants or crops.

2. For an additional premium, we insure by this endorsement for direct physical loss, caused by **mine subsidence**, to **structures** located in Kentucky and listed in the schedule above.

    In the event of a covered loss under this endorsement, we will also pay for removal of debris of the **structures** damaged by **mine subsidence**. Payment for debris removal is limited to and included in the amount of coverage provided under the terms of this endorsement for the damaged property.

    This endorsement does **not** insure the cost of filling land.

3. The Earth Movement exclusion in this policy does not apply to loss caused by **mine subsidence**.

4. The following amend the Loss Settlement condition of this policy with respect to Mine Subsidence Coverage.

    The provisions of this policy will determine the settlement of covered losses, provided, however, that regardless of any policy provision to the contrary we will not pay more than the least of the following amounts for a covered loss to any **structure**:

(a) $50,00

(b) The limit applicale to the **structure** as listed in the schedule above; or

(c) The amount available in the Mine Subsidence Insurance Fund to reimburse us.

5. The following deductible provision applies to each **structure** for loss covered under this endorsement:

    We will pay only that part of the loss which exceeds 2% of the Limit of Liability applicable to the **structure**, but in no event shall the deductible be less than $250 nor more than $500.

    No other deductible in this policy applies to the coverage provided by this endorsement.

* Entries may be left blank is shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

## CONTRACT OF SALE CLAUSE
### 137 (Ed. 9/83)

Effective Date*:
Policy Number*:
Insured's Name*:

We agree that*:

(the VENDOR) has an interest in the property described in the Declarations and covered by this policy for Coverages A and B, by virtue of Contract of Sale to (the VENDEE)*.

If loss is payable to a mortgagee, trustee or beneficiary under deed of trust, payment will be applied to such payee's interest first. Any balance, subject to the terms and conditions of this policy, will be payable to the Vendor and/or Vendee as outlined below. If there is no loss payee, any loss payment, subject to the terms and conditions of this policy, will be payable as follows:

FIRST:       To the Vendor, up to but not more than the unpaid balance, at the time of the loss, on the Contract of Sale.

SECOND:    Any balance to the Vendee.

NO EVENT WILL WE PAY MORE THAN THE APPLICABLE LIMIT OF LIABILITY, REGARDLESS OF THE NUMBER OF THE ABOVE PAYMENTS MADE OR INTERESTS INVOLVED. IF ANY LOSS COVERED BY THIS POLICY IS ALSO COVERED BY OTHER INSURANCE, WE WILL PAY ONLY THE PROPORTION OF THE LOSS THAT THE LIMIT OF LIABILITY THAT APPLIES UNDER THIS POLICY BEARS TO THE TOTAL AMOUNT OF INSURANCE COVERING SUCH LOSS.

(18)          UP-450 (5/95)

(19)          UP-450 (5/95)

Exhibit A-75

---

## PREMISES ALARM OR FIRE PROTECTION SYSTEM
### HO-216 (Ed. 7/82)

---

For a premium credit, we acknowledge the installation of an alarm system or automatic sprinkler system approved by us on the **residence premises.** You agree to maintain this system in working order and to notify us promptly of any change made to the system or if it is removed.

All other provisions of this policy apply.

---

## PERSONAL PROPERTY REPLACEMENT COST
### HO-290 (Ed. 5/95)

---

For an additional premium, under Section I — Conditions, Condition 3. Loss Settlement, the loss settlement provisions applicable to the property described in a.(1), (2), and (3) below are amended as follows:

    a. (1) Personal property at replacement cost. This includes loss to property insured by a personal articles floater made part of this policy and subject to the other conditions of that floater.

        (2) Awnings, carpeting, domestic appliances, outdoor equipment, whether or not attached to buildings, at replacement cost.

        (3) Structures that are not buildings at actual cash value at the time of loss but not exceeding the amount to repair or replace.

## 1. PROPERTY NOT ELIGIBLE

Property listed below, whether separately insured on a personal articles floater or not, is not eligible for replacement cost settlement. Any loss shall be settled at actual cash value at the time of loss but not exceeding the amount necessary to repair or replace.

    a. Antiques, fine arts, paintings and similar articles of rarity or antiquity which cannot be replaced.

    b. Memorabilia, souvenirs, collectors items and similar articles whose age or history contribute to its value.

    c. Articles not maintained in good or workable condition.

    d. Articles that are outdated or obsolete and are stored or not being used.

(20)          UP-450 (5/95)

---

    e. Postage stamps or rare coins and current coins covered on a blanket basis.

Good and workable condition means property currently in use or available for the purpose originally intended.

## 2. REPLACEMENT COST

    a. We will pay no more than the smallest of the following amounts:

        (1) Replacement cost at the time of loss without deduction for depreciation;

        (2) The full cost of repair at the time of loss;

        (3) The limit of liability applying to Coverage C;

        (4) Any special limits of liability stated in this policy; or

        (5) For loss to any item seperately described and specifically insured in this policy, the limit of liability that applies to the item.

    b. When the replacement cost for the entire loss under this endorsement exceeds $500, we will pay no more than the actual cash value for the loss or damage until the actual repair or replacement is completed.

    c. You may make a claim for loss on an actual cash value basis and then make claim within 180 days after the loss for any additional liability in accordance with this endorsement.

All other provisions of this policy apply.

---

## INCREASED LIMITS ON BUSINESS PROPERTY
### HO-312 (Ed. 7/85)

---

For an additional premium, the Coverage C — Personal Property Special Limit of Liability item 9. that applies to **business property** is increased to $2,500, but not more than $200 applies to:

    a. **business** property in storage or held as sample or for sale or for delivery after sale; and

    b. **business** property pertaining to a business actually conducted on the **residence premises.**

This endoresement does not increase the limit of liability for Coverage C — Personal Property.

All other provisions of this policy apply.

(21)          UP-450 (5/95)

Exhibit A-76

## INCIDENTAL MOTORIZED
## LAND CONVEYANCES
### HO-313 (Ed. 5/95)

**SECTION II**

For an additional premium, Coverage E — Personal Liability and Coverage F — Medical Payments to Others apply to **bodily injury** or **property damage** arising out of:

1.  The ownership, maintenance, use, loading or unloading of a motorized land conveyance;

2.  The entrustment by an **insured** of a motorized land conveyance to any person; or

3.  Vicarious liability, whether or not statutorily imposed, for the actions of a child or minor using a motorized land conveyance.

However, coverage provided by this endorsement does not apply to a motorized bicycle, moped or motorized golf cart and does not apply to any other conveyance:

   a.  With a maximum attainable speed of more than 15 miles per hour;

   b.  Subject to motor vehicle registration;

   c.  While used to carry persons for a charge;

   d.  While used for **business** purposes other than farming;

   e.  While rented to others; or

   f.  While being operated in any prearranged or organized race, speed contest or other competition.

Section II exclusion 1.f. does not apply to conveyanances covered by this endorsement.

With respect to conveyances covered by this endorsement, the definition of "**insured**" includes any person or organization legally responsible for the covered conveyance owned by an **insured** but does not include a person or organization using or having custody or possession of the conveyance without the permission of the owner.

All other provisions of this policy apply.

## REPLACEMENT OR REPAIR COST PROTECTION
## COVERAGE A — DWELLING
### HO-314 (Ed. 5/95)

For an additional premium, we agree to amend the present coverage amounts indicated on the declarations page in accordance with the following provisions:

(22)      UP-450 (5/95)

If you have:

   a.  Allowed us to adjust the Coverage A limit and the premium in accordance with:

      (1)  The property evaluations we make; and

      (2)  Any increases in inflation; and

   b.  Notified us, within 90 days of the start of any additions or other physical changes that increase the value of the dwelling or other structure by $5,000 or more and pay any additional premium due for the increase in value; and

   c.  Elected to repair or replace any damaged dwelling or other structure after a covered loss;

We will:

   a.  Increase the Coverage A limit of liability up to 150% of the Coverage A limit to equal the current replacement cost of the dwelling if the amount of loss to the dwelling is more than the limit of liability indicated on the Declarations page.

   b.  Also increase the limit of liability for Coverage B by the same percentage applied to Coverage A. However, we will do this only if the Coverage A limit of liability is increased under paragraph a. above as a result of a Coverage A loss.

If you comply with the provisions of this endorsement and there is a loss to a building insured under Coverage A, Section I Conditions 3. Loss Settlement paragraph b. is deleted and replaced by paragraphs b., c. and d. as follows:

   b.  Buildings under Coverage A or B at replacement cost without deduction for depreciation. We will pay no more than the smaller of the following amounts for equivalent construction and use of the same premises:

      (1)  The replacement cost of the building or any parts of it up to 150% of the Coverage A limit; or

      (2)  The amount actually and necessarily spent to repair or replace the building or any parts of it.

   c.  We will pay no more than the actual cash value of the damage until actual repair or replacement is completed.

(23)      UP-450 (5/95)

Exhibit A-77

d. You may disregard the replacement cost settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis and then make claim within 180 days after loss for any additional liability on a replacement cost basis.

All other provisions of this policy apply.

---

### HOME DAY CARE BUSINESS
### HO-322 (Ed. 7/90)

---

**When this endorsement is attached to a Homeowners, Renters, or Condominium Unit Owners Policy the following amendments apply:**

If an insured regularly provides home day care services to a person or persons other than insureds and receives monetary or other compensation for such services, that enterprise is a **business** pursuit. Mutual exchange of home day care services, however, is not considered compensation. The rendering of home day care services by an **insured** to a relative of an **insured** is not considered a **business** pursuit.

With respect to home day care enterprise that is considered to be a **business** pursuit, this policy:

1. Does not provide **Section II — Liability Coverage** because **business** pursuits of an insured are excluded under exclusion 1.b. of **Section II — Exclusions;**

2. Does not provide **Section I — Coverage B** coverage where other structures are used in whole or in part for **business;**

3. Limits coverage for property used for a home day care enterprise because **Coverage C — Special Limits of Liability** items 9. and 10. impose limits on property used at any time or in any manner for any **business** purpose.

All other provisions of this policy apply.

**When this endorsement is attached to a Dwelling Property Policy the following amendments apply:**

If an insured regularly provides home day care services to a person or persons other than insureds and receives monetary or other compensation for such services, that enterprise is a **business** pursuit. Mutual exchange of home day care services, however, is not considered compenstion. The rendering of home day services by an insured to a relative of an insured is not considered a business pursuit.

(24)                UP-450 (5/95)

---

**COVERAGE B — OTHER STRUCTURES —** This section is deleted and replaced by the following:

We cover other structures on the Described Location separated from the dwelling by clear space. Structures connected to the dwelling by only a fence, utility line or similar connection are considered to be other structures.

We do not cover other structures:

1. Used in whole or in part for commercial, manufacturing or farming purposes; or

2. Rented or held for rental to any person not a tenant of the dwelling, unless used soley as a private garage; or

3. Used in whole or in part for home day care business.

This coverage does not apply to land, including land on which other structures are located.

All other provisions of this policy apply.

---

### HOME DAY CARE COVERAGE ENDORSEMENT
### HO-323 (Ed. 5/95)

---

For an additional premium, we cover the home day care **business** described below, conducted by an **insured** on the **residence premises,** subject to the following:

**Description of Business***

No. of persons receiving day care services: _____

Business conducted in (check which):

☐ The dwelling as described in the Declarations.

☐ An Other Structure (describe).

**SECTION I**

1. **Coverage B** does not apply to the Other Structure described above.

We cover the Other Structure described above for direct physical loss by a Peril Insured Against for not more than:

Limit of Liability $*

2. **Coverage C — Personal Property —** Items 9. and 10. are deleted and replaced by the following:

9. $200 on property on the **residence premises** used at any time or in any manner for any **business** purpose, other than furnishings, supplies and equipment of the **business** described above.

The **Coverge C Limit of Liability** applies to property of the **business** described above.

(25)                UP-450 (5/95)

Exhibit A-78

## SECTION II

**Coverage E — Personal Liability and Coverage F — Medical Payments to Others** apply to **bodily injury** and **property damage** arising out of home day care services regularly provided by an **insured** and for which an **insured** receives monetary or other compensation. The **business pursuits** portion of **Section II Exclusion** 1.b. does not apply to the coverage provided under this endorsement.

However, the **bodily injury** and **property damage** coverage provided under this endorsement does not apply:

  a. To **bodily injury** or **property damage** arising out of sexual molestation, corporal punishment or physical or mental abuse inflicted upon any person by or at the direction of an **insured**, an **insured's** employee or any other person involved in any capacity in the day care enterprise;

  b. To **bodily injury** or **property damage** arising out of the maintenance, use, loading or unloading, or entrustment by the **insured** to any person, of:

  (1) Draft or saddle animals or vehicles for use therewith;

  (2) Aircraft;

  (3) Motor vehicles or all other motorized land conveyances; or

  (4) Watercraft;

  owned or operated, or hired by or for the **insured** or employee or used by the **insured** for the purpose of instruction in the use thereof; or

  c. To **bodily injury** to any employee of an **insured** arising out of the **business** use described above other than to a **residence employee** while engaged in the employee's employment by an **insured**.

With respect to the coverage provided by this endorsement, **Section II — Conditions** items 1. Limit of Liability and 2. Severability of Insurance are deleted and replaced by the following:

### 1. Limit of Liability

Aggregate Limit of Liability: Our total limit of liability in an annual policy period for the sum of damages payable under **Coverage E** and medical expense payable under **Coverage F** will not be more than the Annual Aggregate Limit of Liability shown below. This is the most we will pay regardless of the number of **occurences, insureds,** claims made or persons injured. Subject to the Annual Aggregate Limit of Liability shown below:

  a. Our total liability under **Coverage E** for all damages payable for **bodily injury** or **property damage** caused by one **occurrence** will not be more than the Sub-Limit of Liability for **Coverage E** as shown below. This Sub-Limit of Liability does not increase the Annual Aggregate Limit of Liability.

  b. Our total liability under **Coverage F** for all medical expense payable for **bodily injury** to one person as the result of one accident will not be more than the Sub-Limit of Liability for **Coverage F** as shown below. This Sub-Limit of Liability does not increase the Annual Aggregate Limit of Liability.

| Annual Aggregate Limit of Liability | |
|---|---|
| Coverge E and F combined | $300,000 |
| Coverage E — Sub-Limit of Liability | $100,000 |
| Coverage F — Sub-Limit of Liability | $  2,000 |

The limits described above apply regardless of any provision to the contrary contained in this policy, including the policy Declarations.

### 2. Severability of Insurance.

This insurance applies separately to each **insured** except with respect to the Limit of Liability. Therefore, this condition will **not** increase the **Coverage E** — Sub-Limit of Liability or the Annual Aggregate Limit of Liability regardless of the number of **insureds.**

\*  Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

---

### MORTGAGEE CLAUSE
### 372 (Ed. 11/50)

---

Subject to the terms, covenants and conditions set forth in this rider, loss (if any) under this policy, on buildings only, shall be payable to the Mortgagee(s), if named as payee(s) on the first page of this policy, as mortgagee(s) under any present or future mortgage upon the property described in and covered by this policy, as interest may appear, and in order of precedence of said mortgages.

  1. The terms "mortgage," "mortgagee" and "mortgagor" wherever used in this rider shall be deemed to include deeds of trust and the respective parties thereto.

  2. This insurance as to the interest of the mortgagee only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the described property, nor by the use of the premises for purposes more hazardous than are permitted by this policy.

(26)         UP-450 (5/95)

(27)         UP-450 (5/95)

Exhibit A-79

2. This insurance as to the in....t of t....mortgagee only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the described property, nor by the use of the premises for purposes more hazardous than are permitted by this policy.

3. Any mortgagee who shall have or acquire knowledge that the premises are being used for purposes more hazardous than are permitted by this policy or that the premises have been vacant or unoccupied beyond the period permitted by this policy, shall forthwith notify this company thereof and shall cause the consent of the company thereto to be noted on this policy; and in the event of failure so to do, all rights of such mortgagee hereunder shall forthwith terminate.

4. In case the mortgagor or owner shall fail to pay any premium due or to become due under this policy, the mortgagee hereby covenants and agrees to pay the same on demand. The mortgagee also covenants and agrees to pay on demand the premium for any increased hazard for the term of the existence thereof.

5. This company shall not be liable to the mortgagee for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, under policies issued to, held by, or payable to the mortgagee, whether collectible or not.

6. The policy provisions relating to "Mortgagee interests and obligations" are specifically referred to and made a part of this rider.

---

## INFLATION PROTECTION
### HO-377 (Ed. 6/86)

We may increase the limit of liability applying to Coverage C — Personal Property and Coverage D — Loss of Use to reflect increases in costs of personal property values. Any such change will be made effective on the renewal date. Payment of the renewal premium will constitute your acceptance of the revised limits of liability.

All other provisions of this policy apply.

---

## LENDER'S LOSS PAYABLE ENDORSEMENT
### 438 BFUNDS (Ed. 5/42)

1. Loss or damage, if any, under this policy, shall be paid to the Payee named on the first page of this policy, its successors and assigns, hereinafter referred to as "the Lender," in whatever form or capacity its interests may

(28)                    UP-450 (5/95)

appear ....d v.....her said interest be vested in said Lender in its individual or in its disclosed or undisclosed fiduciary or representative capacity, or otherwise, or vested in a nominee or trustee of said Lender.

2. The insurance under this policy, or any rider or endorsement attached thereto, as to the interest only of the Lender, its successors and assigns, shall not be invalidated nor suspended: (a) by any error, omission, or change respecting the ownership, description, possession, or location of the subject of the insurance or the interest therein, or the title thereto; (b) by the commencement of foreclosure proceedings or the giving of notice of sale of any of the property covered by this policy by virtue of any mortgage or trust deed; (c) by any breach of warranty, act, omission, neglect, or non-compliance with any of the provisions of this policy, including any and all riders now or hereafter attached thereto by the named insured, the borrower, mortgagor, trustor, vendee, owner, tenant, warehouseman, custodian, occupant, or by the agents of either or any of them or by the happening of any event permitted by them or either of them, or their agents, or which they failed to prevent, whether occurring before or after the attachment of this endorsement, or whether before or after a loss, which under the provisions of this policy of insurance or of any rider or endorsement attached hereto would invalidate or suspend the insurance as to the named insured, excluding herefrom, however, any acts or omissions of the Lender while exercising active control and management of the property.

3. In the event of failure of the insured to pay any premium or additional premium which shall be or become due under the terms of this policy or on account of any change in occupancy or increase in hazard not permitted by this policy, this Company agrees to give written notice to the Lender of such non-payment of premium after sixty (60) days from and within one hundred and twenty (120) days after due date of such premium and it is a condition of the continuance of the rights of the Lender hereunder that the Lender when so notified in writing by this Company of the failure of the insured to pay such premium shall pay or cause to be paid the premium due within ten (10) days following receipt of the Company's demand in writing therefor. If the Lender shall decline to pay said premium or additional premium, the rights of the Lender under this Lender's Loss Payable Endorsement shall not be terminated before ten (10) days after receipt of said written notice by the Lender.

(29)                    UP-450 (5/95)

*Exhibit A-80*

4. Whenever this Company shall pay the Lender any sum for loss or damage under this policy and shall claim that as to the insured no liability therefor exists, this company, at its option, may pay to the Lender the whole principal sum and interest and other indebtedness due or to become due from the insured, whether secured or unsecured, (with refund of all interest not accrued), and this Company, to the extent of such payment shall thereupon receive a full assigment and transfer, without recourse, of the debt and all rights and securities held as collateral thereto.

5. If there be any other insurance upon the within described property, this Company shall be liable under this policy as to the Lender for the proportion of such loss or damage that the sum hereby insured bears to the entire insurance of similar character on said property under policies held by, payable to and expressly consented to by the Lender. Any Contribution Clause included in any Fallen Building Clause Waiver or any Extended Coverage Endorsement attached to this contract of insurance is hereby nullified, and also any Contribution Clause in any other endorsement or rider attached to this contract of insurance is hereby nullified except Contribution Clauses for the compliance with which the insured has received reduction in the rate charged or has received extension of the coverage to include hazards other than fire and compliance with such Contribution Clause is made a part of the consideration for insuring such other hazards. The Lender upon the payment to it of the full amount of its claim, will subrogate this Company (pro rata with all other insurers contribution to said payment) to all of the Lender's rights of contribution under said other insurance.

6. This Company reserves the right to cancel this policy at any time, as provided by its terms, but in such case this policy shall continue in force for the benefit of the Lender for ten (10) days after written notice of such cancellation is received by the Lender and shall then cease.

7. This policy shall remain in full force and effect as to the interest of the Lender for a period of ten (10) days after its expiration unless an acceptable policy in renewal thereof with loss thereunder payable to the Lender in accordance with the terms of this Lender's Loss Payable Endorsement, shall have been issued by some insurance company and accepted by the Lender.

8. Should legal title to and beneficial ownership of any of the property covered under this policy become vested in the Lender or its agents, insurance under this policy

shall continue the term therof for the benefit of the Lender but, in such event, any privileges granted by this Lender's Loss Payable Endorsement which are not also granted the insured under the terms and conditions of this policy and/or under other riders or endorsements attached thereto shall not apply to the insurance hereunder as respects such property.

9. All notices herein provided to be given by the Company to the Lender in connection with this policy and this Lender's Loss Payable Endorsement shall be mailed to or delivered to the Lender at its office or branch described on the first page of the policy.

Approved:

Board of Fire Underwriters of the Pacific,
California Banker's Association,
Committee on Insurance.

---

### OPTIONAL EDUCATORS AND SCHOOL EMPLOYEES EXCESS LIABILITY ENDORSEMENT
### HO-966 (Ed. 5/95)

---

**Business Pursuits** - (Including Liability for Corporal Punishment of Pupils)

**Coverage E — Personal Liability and Coverage F — Medical Payments to Others** is extended to include your **business** pursuits as described in 1.a. and 1.b. below, only if there is underlying, primary, collectible insurance coverage, subject to the following:

1. This insurance is excess coverage only. There must be other underlying, primary and collectible insurance, including, but not limited to, policies or programs of self-insurance purchased or established by or on behalf of your employer to insure against liability arising from activities of your employer or its employees, available to you for:

a. Your acts or omissions in connection with **business** pursuits within the course and scope of your employment as an educator or school employee while employed by an accredited public school or other accredited educational institution;

b. The maintenance, operation, use, loading or unloading of:

(1) Draft or saddle animals;

(2) Vehicles for use therewith;

(30)    UP-450 (5/95)

(31)    UP-450 (5/95)

(3) Private passenger autos,

(4) Watercraft; or

(5) Aircraft;

not owned, operated or hired by or for you or your employer, except only when used by you for the purpose of instruction in the use thereof.

2. This insurance does not apply to:

a. Your acts or omissions in connection with **business pursuits** which are not directly related to your employment by an accredited public school or other accredited educational institution;

b. **Bodily injury** to any of your employees while engaged in your employment; or to any obligation for which you or your employer may be held liable under any;

(1) Workers' or workmen's compensation law; or

(2) Non-occupational disability law; or

(3) Occupational disease law.

c. Any liability arising from occurences caused by you:

(1) While under the influence of intoxicants or narcotics; or

(2) As the result of any of your criminal acts.

3. Any other provisions of this policy notwithstanding:

a. **Bodily injury** to any pupil arising out of corporal punishment administered by you or at your direction shall not be deemed to be **bodily injury** caused intentionally by you or at your direction, except when caused as a result of or in connection with any of your criminal acts.

b. There is no premium charge for this endorsement. The coverage provided by this endorsement will be excess, not contributory, over any other insurance or program of self-insurance, except insurance specifically written to apply as excess over our limit of liability. This is true whether such policy is issued to you or extends to you as an employee or agent.

c. We will not pay nor grant any coverage for the benefit of any educational institution or affiliate.

4. The following definition applies:

Private passenger auto means an auto of the private passenger or station wagon type, excluding any school

(32)                    UP-450 (5/95)

bus or school . . . . ry type vehicle designed for the transportation of students or other persons.

All other provisions of this policy apply.

---

## INFLATION COST ENDORSEMENT
### HO-996 (Ed. 6/84)

The limits of liability shown in the Declarations for Coverage A — Dwelling, Coverage B — Other Structures, Coverage C — Personal Property and Coverage D — Loss of Use shall be increased at the same rate as the increase in construction costs based upon reports of recognized agencies.

To determine the limits of liability on a particular date, the latest available index will be divided by the index as of the effective date of this endorsement and the resulting factor multiplied by the limits of liability for Coverage A, Coverage B, Coverage C and Coverage D separately.

If Coverage A limit is amended during the policy term, at your request, then the effective date of this endorsement is also amended to coincide with such change.

In no event will the limits of liability be reduced to less than those shown in the policy or most recent premium billing notice, whichever is greater. Payment of the renewal premium will constitute your acceptance of the revised limit of liability.

All other provisions of this policy apply.

---

## MOBILEHOME POLICY
### Homeowners Policy Only
### MH-200 (Ed. 7/90)

This insurance is subject to all applicable provisions of the Homeowners Policy except as revised in the following areas.

### DEFINITIONS

Definition 8. **"residence premises"** is deleted and replaced by the following:

8. **"Residence premises"** means the mobilehome and other structures located on land owned or leased by you where you reside and which is shown as the **residence premises** in the Declarations.

### SECTION I — COVERAGES

**Coverage A — Dwelling** — Paragraph 1. is deleted and replaced by the following:

(33)                    UP-450 (5/95)

Exhibit A-82

1.  The mobilehome on the reside          nises shown in the Declarations used principally as a private residence, including structures and utility tanks attached to the mobilehome and the following and similar type items installed on a permanent basis: floor coverings, appliances, dressers and cabinets.

## ADDITIONAL COVERAGES

The following paragraph is added to item 5. Property Removed:

If, at any time, the mobilehome is endangered by a Peril Insured Against and removal is necessary to avoid damage, we will pay the reasonable expense incurred by you, not to exceed $500, for the removal and return. No deductible applies to this expense.

## SECTION I — CONDITIONS

The following is added to item 4. Loss to a Pair or Set:

**4. Loss to a Pair, Set or Panels.**

c.  Pay, in any loss involving part or a series of pieces or panels, the reasonable cost of repairing or replacing the damaged part to match the remainder as closely as possible. However, we do not guarantee the availablity of replacements, nor in the event of damage to a part, will we be liable for the value of or to repair or replace the entire series of pieces or panels.

## SECTION — CONDITIONS

The following is added to item 12. Mortgage Clause:

**12. Mortgage Clause.** The word "mortgagee" includes trustee or lienholder.

All other provisons of this policy apply.

---

### MOBILEHOME POLICY
### Dwelling Property Policy Only
### MH-200DP (Ed. 7/90)

---

This insurance is subject to all applicable provisions of the Dwelling Property Policy except as revised in the following areas.

## DEFINITIONS

**Described Location** means the mobilehome and other structures located on land owned or leased by you where you reside and which is shown as the **Described Location** in the Declarations.

(34)    UP-450 (5/95)

## COVERAGES

**Coverage A — Dwelling** — Paragraph a. is deleted and replaced by the following:

a.  The mobilehome on the **Described Location** shown in the Declarations used principally as a private residence, including structures and utility tanks attached to the mobilehome and the following and similar type items installed on a permanent basis: floor coverings, appliances, dressers and cabinets.

## OTHER COVERAGES

The following paragraph is added to item 4. Property Removed:

If, at any time, the mobilehome is endangered by a Peril Insured Against and removal is necessary to avoid damage, we will pay the reasonable expense incurred by you, not to exceed $500, for the removal and return. No deductible applies to this expense.

## CONDITIONS

The following is added to item 6. Loss to a Pair or Set:

**6. Loss to a Pair, Set or Panels.**

c.  Pay, in any loss involving part or a series of pieces or panels, the reasonable cost of repairing or replacing the damaged part to match the remainder as closely as possible. However, we do not guarantee the availability of replacements, nor in the event of damage to a part, will we be liable for the value of or to repair or replace the entire series of pieces or panels.

## CONDITIONS

The following is added to item 15. Mortgage Clause:

**15. Mortgage Clause.** The word "mortgagee" includes trustee or lienholder.

All other provisions of this policy apply.

*Thomas R. Beaw*
Chairman of the Board

*Peter Sedbury*
President

*John G. Velcah*
Secretary - Treasurer

(35)    UP-450 (5/95)

Exhibit A-83

I, Danny Kuhn, underwriting analyst
(Name)                    (Title)
certify under penalty of perjury that this is
a true and correct duplicate of the original
_endorsements_ as it existed on the date of
certification shown below. This is issued as
a duplicate and does not constitute additional
coverage or insurance.

Policy # 2n4 115581  Date of Cert. 6/28/02

Signature _[signature]_

San Mateo, California    Date 6/28/02

Exhibit A-84

ADDITION TO YOUR
ENDORSEMENT BOOKLET
FROM CALIFORNIA CASUALTY

**AMENDATORY ENDORSEMENT
CALIFORNIA**
HO-300-CA (Ed. 5/95)

**SECTION I AND II - CONDITIONS** - Items 5.b. (3) and 5.d. are deleted and replaced by the following:

5. **Cancellation.**

   b. We may cancel this policy only for the reasons stated below by notifying you in writing of the date cancellation takes effect. This cancellation notice may be delivered to you or mailed to you at your mailing address shown in the Declarations. Proof of mailing shall be sufficient proof of notice.

   (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel if there has been:

      (a) Conviction of a crime having as one of its necessary elements an act increasing the hazards insured against; or

      (b) Discovery of fraud or material misrepresentation; or

      (c) Discovery of grossly negligent acts or omisssions substantially increasing any of the hazards insured against; or

      (d) Physical changes in the property insured against which result in the property becoming uninsurable.

   This can be done by notifying you at least 30 days before the date cancellation takes effect.

   d. If, when we cancel this policy, the return premium is not refunded with the notice of cancellation, we will refund it within 25 days after the date cancellation takes effect. If, when you cancel this policy, the return premium is not refunded when this policy is returned to us, we will refund it within a reasonable time after cancellation takes effect.

1.                        HO-300 CA (5/95)

WORKERS' COMPENSATION — ALIFORNIA
ONLY
Residence Employees
HO-90 (Ed. 7/84)

We agree, with respect to residence employees:

**Under Coverage I**

To pay when due all benefits required of an **insured** by the California Workers' Compensation Law; and

**Under Coverage II**

To pay on behalf of an **insured** all damages for which the **insured** is legally liable because of **bodily injury** sustained by a **residence employee**. The **bodily injury** must be caused by accident or disease and arise out of and in the course of employment by the **insured** while:

(a) In the United States of America, its territories or possessions, or Canada, or

(b) Temporarily elsewhere if the **residence employee** is a citizen or resident of the United States or Canada.

Coverage II does not apply to any suit brought in or any judgment rendered by any court outside the United States of America, its territories or possessions, or Canada, or to any action on such judgment.

**Who is Covered**

A **residence employee** is covered if during the 90 calendar days immediately before the date of injury the employee has:

(a) Actually been engaged in such employment by the **insured** for no less than 52 hours, and

(b) Earned no less than one hundred dollars ($100) in wages.

**Application of Coverage**

This insurance applies only to **bodily injury** which occurs during the policy period. If the **bodily injury** is a disease, it must be caused or aggravated by the conditions of the **residence employee's** employment by the **insured**.

**Policy Provisions**

This insurance is subject to all the provisions of this endorsement and the following provisions of this policy.

2.        HO-300 CA (5/95)

a. Under ( )n I and II — Conditions:

4. Waiver L _hange of Policy Provisions.

5. Cancellation.

7. Assignment

8. Subrogation.

b. Under Section II — Conditions:

3. Duties After Loss.

6. Suit Against Us.

c. Our agreement to defend the **insured** as provided under Coverage E — Personal Liability

d. Under Section II — Additional Coverages:

1. Claim Expenses.

2. First Aid Expenses.

e. The definition of **"bodily injury," "business," "insured"** and **"residence employee."**

**Additional Provisions Applicable to Coverage I**

The following provisions are applicable to Coverage I:

a. We shall be directly and primarily liable to any **residence employee** of an **insured** entitled to the benefits of the California Workers' Compensation Law.

b. As between the **residence employee** and us, notice to or knowledge of the **occurrence** of the injury on the part of an **insured** will be deemed notice or knowledge on our part.

c. The jurisdiction of an **insured** will, for the purpose of the law imposing liability for compensation, be our jurisdiction.

d. We will be subject to the orders, findings, decisions or awards rendered against an **insured**, under the provisions of the law imposing liability for compensation, subject to the provisions, conditions and limitations of this policy. This policy shall govern as between an **insured** and us as to payments by either in discharge of an **insured's** liability for compensation.

e. The **residence employee** has a first lien upon any amount which we owe you on account of this insurance. In case of your legal incapacity or inability to receive the money and pay it to the **residence employee**, we will pay it directly to the **residence employee**. Your obligation to the **residence employee** will be discharged to the extent of such payment.

3.        HO-300 CA (5/95)

Exhibit A-86

Limits of Liab          verage II

Our total limit of liability will not exceed $100,000 for all damages because of **bodily injury**:

a. Sustained by one or more **residence employees** in any one accident; or

b. Caused by disease and sustained by a **residence employee**.

Our total limit of liability will not exceed $500,000 for all damages arising out of **bodily injury** by disease regardless of the number of **residence employees** who sustain **bodily injury** by disease.

**Other Insurance**

This insurance does not apply to any loss to which other valid and collectible Workers' Compensation or Employers' Liability Insurance applies.

**Conformity to Statute**

Terms of this insurance which are in conflict with the California Workers' Compensation Law are amended to conform to that law.

**Exclusions**

This policy does not apply:

a. To liability for additional compensation imposed on an **insured** under Sections **4553** and **4557**, Division IV, Labor Code of the State of California, because of the serious and willfull misconduct of an **insured**, or because of **bodily injury** to an employee under 16 years of age and illegally employed at the time of injury ;

b. To liability for **bodily injury** arising out of **business** pursuits of an **insured**.

c. Under Coverage II:

   1. To liability assumed by the **insured** under any contract or agreement.

   2. To **bodily injury** by disease unless a written claim is made or suit brought against the insured within 36 months after the end of the policy period.

4.          HO-300 CA (5/95)

Exhibit A-87

3. To any obligation under a w(   )rs' compensa-
tion, unemployment or disability benefits law or
any similar law.

All other provisions of this policy apply.



Danny Kiehn, Underwriting analyst

(Title)

I (we) certify that this is
certify a true copy of the original
a true endorsement of the policy of
casualty insurance issued as
or certifies a true and
or casualty concluded endorsed

Policy #204 U5581 Date of Cert. 4/28/02

Signature _____  Date 4/28/02
San Mateo, California

Includes copyrighted material of Insurance Services
Office, Inc., with its permission.

Copyright Insurance Services Office, Inc., 1994

5.          HO-300 CA (5/95)

Exhibit A-88

1   Peter W. Alfert, SBN 83139
    Elise R. Sanguinetti, SBN 191389
2   HINTON, ALFERT & SUMNER
    A Professional Corporation
3   1646 North California Blvd., Suite 600
    Walnut Creek, CA 94596
4   Telephone: (925) 932-6006
    Facsimile: (925) 932-3412
5
    Michael J. Cochrane, SBN 118196
6   KING, KING & FISHLEDER
    The 555 City Center Building
7   555 Twelfth Street, Suite 1440
    Oakland, CA 94607-4046
8   Telephone: (510) 844-3400
    Facsimile: (510) 444-3401
9
    Karen H. Kahn, SBN 98404
10  KAHN BROWN & POORE LLP
    2200 Powell Street, Suite 745
11  Emeryville, CA 94608
    Telephone: (510) 923-6280
12  Facsimile: (510) 923-6285
13
    Attorneys for Plaintiffs
14

15              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
16
17                       FOR THE COUNTY OF SACRAMENTO
18

19  JAMES HAROLD, et al.,              )   Case No.: 02AS04291
                                       )
20          Plaintiffs,                )   PLAINTIFFS JAMES HAROLD'S AND D.
                                       )   LEE HAROLD'S TRIAL BRIEF
21      vs.                            )
                                       )
22  CALIFORNIA CASUALTY INSURANCE      )   DATE:  February 21, 2006
    COMPANY, et al.,                   )   TIME:  9:00 a.m.
23                                     )   DEPT.: 31
            Defendants.                )
24  _____ )

25

26

                                      0

_____
Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

Exhibit A-89

## I.    INTRODUCTION

This case for insurance bad faith and negligent mold abatement has its genesis in a series of events that occurred during the span of eighteen (18) months, from November, 2000 through July, 2002. In November, 2000, before a covered water loss occurred at their home, plaintiffs James and D. Lee Harold ("the Harolds") lived happily in their custom-built family home of 35 years.  In July, 2002, defendants California Casualty Insurance Company and California Casualty Management Company ("California Casualty") abandoned the Harolds after its two attempts to abate mold in the Harolds' house proved unsuccessful, leaving the Harolds with a gutted and mold contaminated house.

The Harolds returned from a week long trip in November, 2000 to discover that a pressurized hot water pipe had burst in their crawlspace.  The Harolds made an insurance claim with their homeowners insurance carrier, California Casualty, who in turn hired defendant Westmont Construction Company, Inc., ("Westmont") to abate mold and repair damages to the Harolds' real and property that occurred as a consequence of the water loss.

In the first phase of the Harolds' loss, from November, 2000 through May, 2001, California Casualty and Westmont took control of the Harolds' home and attempted to perform repairs.  At the conclusion of the first phase, both defendants represented the home was fully repaired and habitable. During this phase of the Harolds' loss California Casualty used unfair and unreasonable claims practices by:

- Taking control of the Harold repair in direct violation of its contractual duties under the policy and applicable laws;

- Failing to have the Harolds' home tested for mold by a Certified Industrial Hygienist ("CIH");

- Failing to hire a contractor knowledgeable in mold remediation, and instead, hiring Westmont, a company with no training or experience in mold remediation;

- Concealing from the Harolds the fact that their home was contaminated with toxic mold, and;

1

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

Exhibit A-90

1    •     Concealing from the Harolds benefits due them pursuant to the additional living expenses

2          section of their insurance policy.

3        The motivation for these actions was simple: it saved California Casualty money.

4        In May, 2001 California Casualty and Westmont informed the Harolds that their water loss had

5    been repaired, and that the Harolds could now move back into their home. Prior to moving back in, and

6    following the suggestion of Mr. Harold's doctor, the Harolds hired John Sacco, a CIH, to perform

7    testing at their home. His testing showed that the contents of the house were contaminated with harmful

8    molds.

9        The second phase of the Harolds' loss began with Sacco's testing in May, 2001, and continued

10   into November, 2001. During this second phase of the case, absolutely no mold was abated from the

11   crawlspace, living area, or contents inside the Harolds' home. Instead of abating mold from the

12   Harolds' home during the second phase, California Casualty instead assigned the Harolds' loss to its

13   National Litigation Coordinator, Melvyn Gantman, and Gantman hired attorney Robert McLay.

14   California Casualty took these steps even though the Harolds' were patiently waiting for California

15   Casualty to repair their home, and had not retained an attorney or threatened legal action. Ultimately

16   California Casualty hired David Carls, a CIH, to evaluate the Harolds' home and prepare a mold

17   abatement protocol. Work on the Carls' mold abatement protocol did not begin until November 2001.

18   The second phase of this case was one of delay and inaction. Mold continued to grow in the home

19   unabated, and the insurance company canceled the Harolds' ALE benefits, attempting to force the

20   Harolds to resume living in the home before the results of the mold clearance test were known.

21       The third phase of the Harolds' case began in November 2001, when work commenced on Carls'

22   mold abatement protocol. Carls, who was retained by California Casualty, supervised the mold

23   abatement work that took place and deemed the house ready for clearance testing six months later in

24   March, 2002. The clearance testing showed that harmful molds were still present in the crawlspace of

25   the Harolds' home. In an April 1, 2002, meeting, Gantman told Mr. Harold that California Casualty

26   would pay to demolish the home and rebuild it without regard to policy limits. In July 2002, California

1   Casualty reneged on this agreement and mailed the Harolds a sum of money which it contended was the

2   remaining policy benefits, thereby attempting to pass the risk that the home could be successfully abated

3   to the Harolds.

4       When the third phase of the Harolds' case came to a close in early July 2002, the Harolds had not

5   lived in their house for eighteen months. Gaping holes existed in the subfloor of almost every room, and

6   sheetrock had been removed from interior walls in almost every room. The Harolds hired an industrial

7   hygienist to test the home, which testing was performed in August 2003.

8       The First Amended Complaint is the operative complaint in this action. The Harolds have

9   pleaded causes of action against California Casualty as follows: Breach of Contract (Cause of Action

10  [C.O.A.] No. One); Breach of Implied Covenant of Good Faith and Fair Dealing (C.O.A. No. Two);

11  Negligence (C.O.A. No. Three); Intentional Infliction of Emotional Distress (C.O.A. No. Five); Fraud

12  based upon Concealment (C.O.A. No. Six); Fraud based upon Misrepresentation (C.O.A. No. Seven);

13  Nuisance (C.O.A. No. Eight); and Breach of California's Unfair Competition Law (C.O.A. No. Nine).

14      The Harolds have pleaded causes of action against Westmont as follows: Negligence (C.O.A.

15  No. Four); Intentional Infliction of Emotional Distress (C.O.A. No. Five); Fraud based upon

16  Concealment (C.O.A. No. Six); Fraud based upon Misrepresentation (C.O.A. No. Seven), and Nuisance

17  (C.O.A. No. Eight).

18      California Casualty successfully moved to summarily adjudicate the Harolds' punitive damages

19  claims associated with the above described causes of action. The Harolds still maintain their punitive

20  damages claims against Westmont.

21  **II.   STATEMENT OF FACTS**

22      **A. Facts Relevant to Phase I.**

23      Jim and Lee Harold will testify that they returned from a trip to Southern California to visit their

24  adult children on November 24, 2000. When they entered their house, they noticed a musty odor and

25  observed condensation on the inside of windows in the family room, kitchen, and living room. The

26  Harolds saw that hardwood flooring in parts of the family room, kitchen, and living room was cupped

3

1   and bowing. The Harolds immediately suspected a water leak, but a thorough examination of their

2   home did not reveal any visible signs of water intrusion.

3       The Harolds called California Casualty, their homeowners insurance carrier, to report the

4   problem. The Harolds then called a plumber, who arrived at the house two days later and found that the

5   hot water supply line feeding the laundry room had ruptured. The rupture occurred in the crawlspace

6   and because it was a pressurized line, water had sprayed continuously onto the subfloor and into the

7   crawlspace. The plumber repaired the leak.

8       California Casualty claims adjuster Vernon Moulton ("Moulton") arrived at the Harold home on

9   December 5, 2000, approximately one week after the loss was reported. Moulton will testify (or

10  testimony will be read from his videotaped deposition) that he suspected mold in the Harolds' home as a

11  result of the water loss during his first inspection, but he did not share that information with the Harolds.

12  Instead, Moulton told the Harolds that he would send a contractor to the house that would take care of

13  the problem.

14      Moulton had attended seminars concerning mold, and had been taught that mold can appear as a

15  consequence of a water loss in a matter of a few days. Moulton had a dismissive attitude towards mold,

16  however, and did not take appropriate steps to ensure that the Harold home was promptly dried out. In

17  fact, Moulton will testify that he never considered hiring a mold remediation contractor for the Harold

18  house. Instead he hired Westmont, an entity he knew had no experience in mold remediation. This was

19  consistent with Moulton's custom and practice, as Moulton testified that he could not ever recall hiring a

20  certified industrial hygienist on the water damage claims he adjusted even when he learned that mold

21  existed. Moulton's actions, in failing to hire a certified industrial hygienist to consult on losses where it

22  was known that mold infestation existed, was in keeping with California Casualty's established business

23  practices.

24      Susan Sheehan, Westmont's surviving principal, will testify that she and her late husband,

25  Bernard Sequira, arrived at the Harold home on Saturday, December 9, 2000, and immediately installed

26  a blower and dehumidifier in the laundry room in an attempt to dry out the house. This was a critical

_Plaintiffs James Harold's and D. Lee Harolds' Trial Brief_

Exhibit A-93

1    error because Westmont installed the equipment without any containment of the area, as is standard in

2    the industry. The dehumidifier and blower ran continuously for one week, while the Harolds continued

3    to live in the house.

4         During Westmont's repairs to the Harold home, its crew observed and suspected mold on the

5    particleboard underlayment in the laundry room. Westmont did not inform the Harolds of the fact that it

6    had found mold in the house.   Instead, the evidence will show that Westmont actively concealed the

7    existence of the suspected mold from the Harolds. Westmont's active concealment began with its

8    contact of William Anderson, an asbestos abatement specialist, who collected a sample of the

9    contaminated underlayment from the Harold home.

10        Anderson arrived on site on January 3, 2001, and met with a carpenter on Westmont's crew who

11   provided Anderson with a piece of contaminated particleboard from the loss area (the laundry room of

12   the Harolds' house). Anderson instructed the Westmont employee to provide him with the most visibly

13   blackened piece of underlayment. After collecting the sample, Anderson also used a hand held moisture

14   meter to measure the degree of moisture in the affected drywall, framing, and flooring in the laundry and

15   adjacent family rooms. Anderson testified that his moisture meter "pegged" at the highest level at each

16   location indicating that the laundry and family room walls and floors were saturated with water.

17   Significantly, Anderson also collected samples of interior ceiling material from the Harold home in the

18   vicinity of the loss area in order to test the samples for asbestos.

19        On January 19, 2001, Anderson issued a report to Westmont identifying the type and quantity of

20   mold in the sample taken from the underlayment in the loss area. The molds were toxic and harmful

21   types and the quantities were enormous. The Anderson report also contained a detailed warning of the

22   health hazards present in the house due to the existence of mold, and a mold remediation protocol.

23   Westmont did not provide a copy of the January 19, 2001 Anderson report to the Harolds.  Westmont

24   personnel did not discuss the contents of the January 19, 2001 Anderson report with the Harolds.

25        Instead of alerting the Harolds about the significance of Anderson's findings, Westmont

26   forwarded the Anderson report to California Casualty. Moulton, the adjuster assigned to the loss, did

5

1    not provide the Anderson report to the Harolds, nor did he warn the Harolds about the existence of mold

2    and asbestos in their home. There is no doubt that Moulton knew of the existence of the report and

3    knew that some of the molds identified as being present in the Harold house were harmful, toxic, and

4    constituted health hazards. Even armed with this knowledge, Moulton still did not retain a CIH or any

5    other company that specialized in mold remediation.

6        California Casualty and Westmont actively concealed the Anderson report and its contents from

7    the Harolds. The Harolds did not receive this report until August 2001, approximately eight months

8    after it was written. Even then, the Anderson report was only disclosed to them by California

9    Casualty's recently retained attorney, Robert McLay, Esq.

10       Westmont failed to follow the recommendations set forth in the Anderson report that called for

11   the removal and replacement of all building materials that were wet or damaged by water from the hot

12   water pipe break and/or otherwise showed signs of mold growth. Inexplicably, Westmont spread lime

13   over the ground in the crawlspace of the Harold home which adversely affected the drainage under the

14   home. The work that was performed by Westmont was done pursuant to California Casualty's direction,

15   approved and paid for by California Casualty. The Harolds did not contract with Westmont for this

16   work, and did not pay Westmont for this work. California Casualty paid Westmont directly for the

17   water damage and mold repairs identified above. No estimates for the work were given to the Harolds

18   and no scope of repair was prepared by either Westmont or California Casualty.

19       During Westmont's repair efforts Jim Harold arrived each day at the site to open the house for

20   Westmont's work crew, and returned each afternoon to retrieve mail and close and lock the house. At

21   no time did Sheehan, Sequeira or any other Westmont or California Casualty employee ever tell Jim

22   Harold what was known to them: that the house was contaminated with harmful and toxic molds, and

23   that the repairs that were underway were not in accord with the Anderson protocol and were not within

24   accepted mold abatement standards.

25       Indeed, Westmont took steps to actively conceal their knowledge of the existence of mold. In

26   May 2001, when California Casualty and Westmont advised the Harolds that their home was fully

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

Exhibit A-95

1   repaired and habitable both entities dismissed and denied observations made by Lee Harold that her

2   home still had a strong musty odor. Westmont first denied that the musty odor existed, and then

3   represented to Lee Harold that the odor could be properly taken care of by an air freshener.

4   **B. Facts Relevant to Phase II.**

5       In May 2001, California Casualty advised the Harolds that the work had been finished, and

6   advised the Harolds that their home was ready for occupancy. Although Moulton knew that a mold

7   clearance test was necessary to determine if the home was still contaminated, Moulton failed to obtain

8   one. Rather, he approved and paid for the return of the Harolds' possessions to their home, thereby

9   exposing their contents once again to an environment that continued to be affected by water damage and

10  mold. Moreover, Moulton never obtained an asbestos clearance either, although Anderson had

11  identified the existence of asbestos in the ceiling materials of the Harolds' home.

12      Jim Harold advised Moulton that his doctor had recommended that the house be tested by a

13  Certified Industrial Hygienist. Moulton insisted that the home was repaired, and told Harolds that their

14  Alternative Living Expenses were being cancelled. The Harolds refused to move back into the house –

15  they moved in with friends while the suggested testing took place.

16  At the Harolds' insistence, Moulton agreed to pay for the Harolds to hire John Sacco, a Sacramento

17  CIH, to perform testing of the Harold home. Sacco tested the Harolds' home and performed air and bulk

18  sampling of the carpet and contents on May 16, 2001. Shortly thereafter the lab results were received

19  and reviewed by Sacco, and Sacco subsequently concluded that the air in the house was not degraded,

20  but the contents were contaminated by mold. In July, Sacco inspected the crawlspace and found mold,

21  high moisture content in wood framing, and insulation wet to the touch. He wrote a protocol for

22  remediation of the contents, and for drying and work in the crawlspace.

23      Mr. Sacco reported his findings to California Casualty through Vernon Moulton. Instead of

24  hiring John Sacco for purposes of further investigation, testing, and writing of additional protocols if

25  needed, California Casualty assigned the file, on July 18, 2001, to Mel Gantman, California Casualty's

26

1    National Litigation Coordinator. Mr. Gantman immediately hired Robert McLay, Esq., admittedly in

2    anticipation of litigation, and Mr. McLay retained David Carls, another Certified Industrial Hygienist.

3            On August 23, 2001, McLay for the first time provided the Harolds with the January 19, 2001

4    Anderson report.

5            California Casualty refused to use Mr. Sacco as the CIH for the Harolds' water loss, and instead

6    told the Harolds that Carls would be responsible for providing a protocol for abating the mold and

7    supervising the job. Carls prepared a mold remediation protocol and supervised the work of mold

8    remediation contractor Randy Kay. The work performed pursuant to Carls' mold remediation protocol

9    did not commence until November, 2001. In the time between May, 2001, when Sacco confirmed the

10   presence of harmful molds in the Harold home, and November, 2001, when remediation efforts began,

11   California Casualty and its agents and employees made no attempt made to:

12        •    Dry out the framing members in the Harolds' home;

13        •    Dry out the crawlspace of the Harolds' home;

14        •    Abate mold in any manner whatsoever;

15        •    Repair the Harolds' home in any manner whatsoever, and;

16        •    Perform a comprehensive inspection of the Harolds' home and property to determine if

17             any other conditions were causing or contributing to the difficulty in abating the mold.

18   C.    **Facts Relevant to Phase III.**

19           Randy Kay's mold abatement efforts began in November, 2001 under Carls' supervision and

20   control. In March 2002, Carls determined that the house was ready for clearance testing. He instructed

21   Kay to set up various containment areas and to scrub the air in each. Clearance testing was performed

22   on March 8, 2002. On March 10th, Carls wrote to McLay stating that upstairs spore levels were "at

23   background levels," but that additional work was needed in the crawlspace due to the finding of elevated

24   levels of Penicillium, Aspergillus, and Basidiospores attributable to incomplete mold remediation in the

25   area. In other words, the mold had still not been abated from the Harold home.

26

8

Exhibit A-97

1   At a meeting with Gantman and McLay on April 1, 2002, called by California Casualty to

2   discuss the options available to the parties to repair the Harolds' home, Mr. Harold was told that

3   California Casualty would pay to demolish the home and rebuild it without regard to the policy limits.

4   In a letter he wrote several days later, Mr. Harold confirmed the substance of the agreement, but McLay

5   wrote back stating that Mr.Harold had misunderstood the discussion and that demolishing and rebuilding

6   was but one of three options under consideration.

7       Gantman will testify that at the time of the April 1, 2002, meeting, he believed that the home

8   could be rebuilt for $200,000, and that when estimates came in which exceeded the policy limits,

9   rebuilding was no longer an option.  The other two options allegedly considered were continuing with

10  the remediation as before with California Casualty controlling the scope and implementation of the

11  remediation, or California Casualty paying the Harolds the fair market value of their home.  Gantman

12  admitted that California Casualty did not follow through on any of the three options that were discussed

13  on April 1, 2002.  Instead, California Casualty gave Mr. Harold the ostensible balance of the policy

14  limits and passed the risk that the home could not be remediated for that sum to the Harolds.

15      When California Casualty walked away from the Harold home, it had gaping holes in the family

16  room, dining room, kitchen and hall bath.  As of July, 2002 there was no separation of the upstairs from

17  the crawlspace, exposing the entirety of the house to contaminants in the crawlspace.  The Harold home

18  has been in this condition since at least July, 2002, and there is no hope of a successful remediation at a

19  reasonable cost. The ground under the Harold home was contaminated with lime spread by Westmont,

20  and the drainage adversely affected.  This negative condition will need to be abated as part of any repair

21  or remediation effort.  This condition, and others, which resulted from Carls' oversight of the

22  remediation, caused even further damage to the house.

23      Moulton told the Harolds that they had to rent a one bedroom, one bathroom apartment.

24  Eventually the Harolds moved to a two bedroom apartment, and then a three bedroom apartment, but

25  California Casualty never told the Harolds that their insurance policy provided them with the right to be

26  placed in comparable living quarters at California Casualty's expense.  In the Harolds' case, their

9

1   Carmichael home is a four bedroom, three bath structure with a pool and approximately 2,800 square

2   feet of living space.

3        Mr. Harold has diabetes and a compromised immune system from metastatic colon cancer,

4   radiation and chemotherapy, making his fear of being exposed to mold reasonable. Mr. Harold is even

5   more afraid of returning to his home and taking back his personal possessions that have been in storage

6   for more than two years.

7   III.    **LEGAL ARGUMENT**

8        A.    **California Casualty Breached the Insurance Contract with the Harolds.**

9        California Casualty will not dispute that the Harolds' water loss was a covered loss. Its adjuster,

10  Vernon Moulton, will testify that the Harolds' November 2000 loss was a covered loss, as will

11  Moulton's supervisors, Mel Gantman and Yale Moulin. The breach of contract occurred when, after

12  California Casualty took control of the loss by hiring Westmont and Carls and managing the repair

13  efforts, it abandoned the Harolds with a mold infested house and no viable method to remediate it short

14  of tearing the house down and starting over.

15       California Casualty contends that because, after its expenditure of approximately $250,000 of the

16  Harolds' insurance policy proceeds, it paid the balance of the policy benefits to the Harolds, it did not

17  breach the insurance contract. California Casualty ignores the fact that its actions did not provide the

18  Harolds with any tangible benefits and, in fact, actually worsened the condition of the Harolds' home,

19  health, and property.

20       Specifically, all the money paid by California Casualty to Westmont for Westmont's repair

21  efforts was for naught. Westmont not only failed to remediate the mold that existed in the home when it

22  took over the repair, it negligently spread the mold throughout the crawlspace and house and

23  significantly impaired the ability of the crawlspace soils to drain water. After California Casualty

24  retained CIH David Carls to take over from Westmont, Carls essentially recommended that all

25  Westmont's work be redone. After Carls directed remediation efforts at the Harolds' home, the home

26  failed to pass inspection, as it still was contaminated with harmful molds. By the time California

10

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

Exhibit A-99

1   Casualty had paid for the work done pursuant to Carls' instructions, it had expended approximately

2   $250,000. California Casualty then deducted this amount of money from the Harolds' policy benefits

3   and paid the Harolds the balance in cash, claiming that it had now satisfied its obligations pursuant to

4   the insurance policy. The truth is, California Casualty's expenditure of funds did not provide any

5   tangible benefit to the Harolds – the Harolds were left with an unrepaired, contaminated house and

6   insufficient funds with which to repair it.

7        An insurer must treat its policyholder's interests with equal regard to its own. Under this

8   standard, an insurer is obligated to do the following when handling a claim:

9        •    Conduct a full, fair, reasonable and prompt investigation and adjustment of the claim at
             its own expense;

10

11       •    Pay the claim promptly upon a determination that payment is warranted;

12       •    Pay undisputed amounts and not withhold benefits due under the contract;

13       •    Fairly and honestly represent policy terms to the insured, and disclose any and all
             benefits and coverages that may apply to a claim.

14       In this case California Casualty failed to conduct a full, fair, reasonable and prompt investigation

15  and adjustment of the claim it its first phase when it failed to initially hire a CIH, even though Moulton

16  knew that there was a likelihood that there was mold at the Harolds' home when he made his first visit

17  to the site. California Casualty also failed to hire a CIH in the first phase of this claim after it received

18  the January 19, 2001 Anderson report, which also constitutes a breach of its duty to conduct a full, fair,

19  reasonable and prompt investigation and adjustment of claim.

20       Moreover, the second phase of this claim is dominated by inaction and delay. California

21  Casualty took no physical steps to dry the Harolds' house or crawlspace, or otherwise physically remove

22  or abate mold from the Harolds' home from May 2001, through November 2001.

23       Finally, the third phase of the claim is marked by Carls' inadequate and incomplete investigation

24  into the conditions that caused the mold to occur or otherwise frustrated efforts to abate it. Payment of

25  the purported policy benefits is not a shield to a claim of breach of contract or bad faith. *Wilson v. 21*[st]

26  *Century Insurance Company*, 06 D.D.O.S. 940.

11