1  STROOCK & STROOCK & LAVAN LLP
   MICHAEL F. PERLIS (State Bar No. 095992)
2  EMAIL: MPERLIS@STROOCK.COM
   ALLAN S. COHEN (State Bar No. 115532)
3  EMAIL: ACOHEN@STROOCK.COM
   RICHARD R. JOHNSON (State Bar No. 198117)
4  EMAIL: RJOHNSON@STROOCK.COM
   2029 Century Park East, Suite 1600
5  Los Angeles, CA  90067-3086
   Telephone:  310-556-5800
6  Facsimile:  310-556-5959
   lacalendar@stroock.com
7

8  Attorneys for Defendant
    FEDERAL INSURANCE COMPANY
9

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CALIFORNIA CASUALTY INSURANCE COMPANY, | Case No. CV 08-2701 VRW |
| Plaintiff, | [Assigned to the Honorable Vaughn R. Walker] |
| vs. | **NOTICE OF MOTION AND MOTION OF FEDERAL INSURANCE COMPANY FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| FEDERAL INSURANCE COMPANY, DOES 1-10, ROES 1-10, AND MOES 1-10, inclusive, | |
| Defendants. | **[F.R.C.P. 56(b)]** |
| | Date:      December 11, 2008 |
| | Time:      2:30 p.m. |
| | Ctrm:      6 |
| | [Declaration of Jeffrey Gunchick and Request for Judicial Notice filed; and [Proposed] Order lodged concurrently] |

# PART 4 OF 4

---

NOTICE OF MOTION AND MOTION OF DEFENDANT FEDERAL INSURANCE COMPANY FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# EXHIBIT C

EXHIBIT __1__ PAGE 112

Peter W. Alfert, SBN 83139
Elise R. Sanguinetti, SBN 191389
HINTON, ALFERT & SUMNER
A Professional Corporation
1646 North California Blvd., Suite 600
Walnut Creek, CA 94596
Telephone: (925) 932-6006
Facsimile: (925) 932-3412

Michael J. Cochrane, SBN 118196
KING, KING & FISHLEDER
The 555 City Center Building
555 Twelfth Street, Suite 1440
Oakland, CA 94607-4046
Telephone: (510) 844-3400
Facsimile: (510) 444-3401

Karen H. Kahn, SBN 98404
KAHN BROWN & POORE LLP
2200 Powell Street, Suite 745
Emeryville, CA 94608
Telephone: (510) 923-6280
Facsimile: (510) 923-6285

Attorneys for Plaintiffs

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SACRAMENTO

| | |
|---|---|
| JAMES HAROLD, et al., | ) Case No.: 02AS04291 |
| Plaintiffs, | ) PLAINTIFFS JAMES HAROLD'S AND D. LEE HAROLD'S TRIAL BRIEF |
| vs. | ) |
| CALIFORNIA CASUALTY INSURANCE COMPANY, et al., | ) DATE: February 21, 2006 ) TIME: 9:00 a.m. ) DEPT.: 31 |
| Defendants. | ) |

0

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

EXHIBIT 1 PAGE 113

# I.     INTRODUCTION

This case for insurance bad faith and negligent mold abatement has its genesis in a series of events that occurred during the span of eighteen (18) months, from November, 2000 through July, 2002. In November, 2000, before a covered water loss occurred at their home, plaintiffs James and D. Lee Harold ("the Harolds") lived happily in their custom-built family home of 35 years. In July, 2002, defendants California Casualty Insurance Company and California Casualty Management Company ("California Casualty") abandoned the Harolds after its two attempts to abate mold in the Harolds' house proved unsuccessful, leaving the Harolds with a gutted and mold contaminated house.

The Harolds returned from a week long trip in November, 2000 to discover that a pressurized hot water pipe had burst in their crawlspace. The Harolds made an insurance claim with their homeowners insurance carrier, California Casualty, who in turn hired defendant Westmont Construction Company, Inc., ("Westmont") to abate mold and repair damages to the Harolds' real and property that occurred as a consequence of the water loss.

In the first phase of the Harolds' loss, from November, 2000 through May, 2001, California Casualty and Westmont took control of the Harolds' home and attempted to perform repairs. At the conclusion of the first phase, both defendants represented the home was fully repaired and habitable. During this phase of the Harolds' loss California Casualty used unfair and unreasonable claims practices by:

- Taking control of the Harold repair in direct violation of its contractual duties under the policy and applicable laws;

- Failing to have the Harolds' home tested for mold by a Certified Industrial Hygienist ("CIH");

- Failing to hire a contractor knowledgeable in mold remediation, and instead, hiring Westmont, a company with no training or experience in mold remediation;

- Concealing from the Harolds the fact that their home was contaminated with toxic mold, and;

1

1      •     Concealing from the Harolds benefits due them pursuant to the additional living expenses

2      section of their insurance policy.

3      The motivation for these actions was simple: it saved California Casualty money.

4      In May, 2001 California Casualty and Westmont informed the Harolds that their water loss had

5  been repaired, and that the Harolds could now move back into their home.  Prior to moving back in, and

6  following the suggestion of Mr. Harold's doctor, the Harolds hired John Sacco, a CIH, to perform

7  testing at their home.  His testing showed that the contents of the house were contaminated with harmful

8  molds.

9      The second phase of the Harolds' loss began with Sacco's testing in May, 2001, and continued

10  into November, 2001.  During this second phase of the case, absolutely no mold was abated from the

11  crawlspace, living area, or contents inside the Harolds' home.  Instead of abating mold from the

12  Harolds' home during the second phase, California Casualty instead assigned the Harolds' loss to its

13  National Litigation Coordinator, Melvyn Gantman, and Gantman hired attorney Robert McLay.

14  California Casualty took these steps even though the Harolds' were patiently waiting for California

15  Casualty to repair their home, and had not retained an attorney or threatened legal action.  Ultimately

16  California Casualty hired David Carls, a CIH, to evaluate the Harolds' home and prepare a mold

17  abatement protocol.  Work on the Carls' mold abatement protocol did not begin until November 2001.

18  The second phase of this case was one of delay and inaction.  Mold continued to grow in the home

19  unabated, and the insurance company canceled the Harolds' ALE benefits, attempting to force the

20  Harolds to resume living in the home before the results of the mold clearance test were known.

21      The third phase of the Harolds' case began in November 2001, when work commenced on Carls'

22  mold abatement protocol.  Carls, who was retained by California Casualty, supervised the mold

23  abatement work that took place and deemed the house ready for clearance testing six months later in

24  March, 2002.  The clearance testing showed that harmful molds were still present in the crawlspace of

25  the Harolds' home.  In an April 1, 2002, meeting, Gantman told Mr. Harold that California Casualty

26  would pay to demolish the home and rebuild it without regard to policy limits.  In July 2002, California

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

EXHIBIT 1  PAGE 115

1  Casualty reneged on this agreement and mailed the Harolds a sum of money which it contended was the

2  remaining policy benefits, thereby attempting to pass the risk that the home could be successfully abated

3  to the Harolds.

4  When the third phase of the Harolds' case came to a close in early July 2002, the Harolds had not

5  lived in their house for eighteen months. Gaping holes existed in the subfloor of almost every room, and

6  sheetrock had been removed from interior walls in almost every room. The Harolds hired an industrial

7  hygienist to test the home, which testing was performed in August 2003.

8  The First Amended Complaint is the operative complaint in this action. The Harolds have

9  pleaded causes of action against California Casualty as follows: Breach of Contract (Cause of Action

10 [C.O.A.] No. One); Breach of Implied Covenant of Good Faith and Fair Dealing (C.O.A. No. Two);

11 Negligence (C.O.A. No. Three); Intentional Infliction of Emotional Distress (C.O.A. No. Five); Fraud

12 based upon Concealment (C.O.A. No. Six); Fraud based upon Misrepresentation (C.O.A. No. Seven);

13 Nuisance (C.O.A. No. Eight); and Breach of California's Unfair Competition Law (C.O.A. No. Nine).

14 The Harolds have pleaded causes of action against Westmont as follows: Negligence (C.O.A.

15 No. Four); Intentional Infliction of Emotional Distress (C.O.A. No. Five); Fraud based upon

16 Concealment (C.O.A. No. Six); Fraud based upon Misrepresentation (C.O.A. No. Seven), and Nuisance

17 (C.O.A. No. Eight).

18 California Casualty successfully moved to summarily adjudicate the Harolds' punitive damages

19 claims associated with the above described causes of action. The Harolds still maintain their punitive

20 damages claims against Westmont.

21 **II.    STATEMENT OF FACTS**

22 **A. Facts Relevant to Phase I.**

23 Jim and Lee Harold will testify that they returned from a trip to Southern California to visit their

24 adult children on November 24, 2000. When they entered their house, they noticed a musty odor and

25 observed condensation on the inside of windows in the family room, kitchen, and living room. The

26 Harolds saw that hardwood flooring in parts of the family room, kitchen, and living room was cupped

3

EXHIBIT  1  PAGE  116

1  and bowing. The Harolds immediately suspected a water leak, but a thorough examination of their

2  home did not reveal any visible signs of water intrusion.

3      The Harolds called California Casualty, their homeowners insurance carrier, to report the

4  problem. The Harolds then called a plumber, who arrived at the house two days later and found that the

5  hot water supply line feeding the laundry room had ruptured. The rupture occurred in the crawlspace

6  and because it was a pressurized line, water had sprayed continuously onto the subfloor and into the

7  crawlspace. The plumber repaired the leak.

8      California Casualty claims adjuster Vernon Moulton ("Moulton") arrived at the Harold home on

9  December 5, 2000, approximately one week after the loss was reported. Moulton will testify (or

10 testimony will be read from his videotaped deposition) that he suspected mold in the Harolds' home as a

11 result of the water loss during his first inspection, but he did not share that information with the Harolds.

12 Instead, Moulton told the Harolds that he would send a contractor to the house that would take care of

13 the problem.

14     Moulton had attended seminars concerning mold, and had been taught that mold can appear as a

15 consequence of a water loss in a matter of a few days. Moulton had a dismissive attitude towards mold,

16 however, and did not take appropriate steps to ensure that the Harold home was promptly dried out. In

17 fact, Moulton will testify that he never considered hiring a mold remediation contractor for the Harold

18 house. Instead he hired Westmont, an entity he knew had no experience in mold remediation. This was

19 consistent with Moulton's custom and practice, as Moulton testified that he could not ever recall hiring a

20 certified industrial hygienist on the water damage claims he adjusted even when he learned that mold

21 existed. Moulton's actions, in failing to hire a certified industrial hygienist to consult on losses where it

22 was known that mold infestation existed, was in keeping with California Casualty's established business

23 practices.

24     Susan Sheehan, Westmont's surviving principal, will testify that she and her late husband,

25 Bernard Sequira, arrived at the Harold home on Saturday, December 9, 2000, and immediately installed

26 a blower and dehumidifier in the laundry room in an attempt to dry out the house. This was a critical

4

1    error because Westmont installed the equipment without any containment of the area, as is standard in

2    the industry.  The dehumidifier and blower ran continuously for one week, while the Harolds continued

3    to live in the house.

4         During Westmont's repairs to the Harold home, its crew observed and suspected mold on the

5    particleboard underlayment in the laundry room.  Westmont did not inform the Harolds of the fact that it

6    had found mold in the house.   Instead, the evidence will show that Westmont actively concealed the

7    existence of the suspected mold from the Harolds.  Westmont's active concealment began with its

8    contact of William Anderson, an asbestos abatement specialist, who collected a sample of the

9    contaminated underlayment from the Harold home.

10        Anderson arrived on site on January 3, 2001, and met with a carpenter on Westmont's crew who

11   provided Anderson with a piece of contaminated particleboard from the loss area (the laundry room of

12   the Harolds' house).  Anderson instructed the Westmont employee to provide him with the most visibly

13   blackened piece of underlayment.  After collecting the sample, Anderson also used a hand held moisture

14   meter to measure the degree of moisture in the affected drywall, framing, and flooring in the laundry and

15   adjacent family rooms.  Anderson testified that his moisture meter "pegged" at the highest level at each

16   location indicating that the laundry and family room walls and floors were saturated with water.

17   Significantly, Anderson also collected samples of interior ceiling material from the Harold home in the

18   vicinity of the loss area in order to test the samples for asbestos.

19        On January 19, 2001, Anderson issued a report to Westmont identifying the type and quantity of

20   mold in the sample taken from the underlayment in the loss area.  The molds were toxic and harmful

21   types and the quantities were enormous. The Anderson report also contained a detailed warning of the

22   health hazards present in the house due to the existence of mold, and a mold remediation protocol.

23   Westmont did not provide a copy of the January 19, 2001 Anderson report to the Harolds.  Westmont

24   personnel did not discuss the contents of the January 19, 2001 Anderson report with the Harolds.

25        Instead of alerting the Harolds about the significance of Anderson's findings, Westmont

26   forwarded the Anderson report to California Casualty.  Moulton, the adjuster assigned to the loss, did

5

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief                    EXHIBIT __1__ PAGE __118__

1   not provide the Anderson report to the Harolds, nor did he warn the Harolds about the existence of mold

2   and asbestos in their home.  There is no doubt that Moulton knew of the existence of the report and

3   knew that some of the molds identified as being present in the Harold house were harmful, toxic, and

4   constituted health hazards.  Even armed with this knowledge, Moulton still did not retain a CIH or any

5   other company that specialized in mold remediation.

6        California Casualty and Westmont actively concealed the Anderson report and its contents from

7   the Harolds.  The Harolds did not receive this report until August 2001, approximately eight months

8   after it was written.  Even then, the Anderson report was only disclosed to them by California

9   Casualty's recently retained attorney, Robert McLay, Esq.

10       Westmont failed to follow the recommendations set forth in the Anderson report that called for

11  the removal and replacement of all building materials that were wet or damaged by water from the hot

12  water pipe break and/or otherwise showed signs of mold growth.  Inexplicably, Westmont spread lime

13  over the ground in the crawlspace of the Harold home which adversely affected the drainage under the

14  home.  The work that was performed by Westmont was done pursuant to California Casualty's direction,

15  approved and paid for by California Casualty.  The Harolds did not contract with Westmont for this

16  work, and did not pay Westmont for this work.  California Casualty paid Westmont directly for the

17  water damage and mold repairs identified above.  No estimates for the work were given to the Harolds

18  and no scope of repair was prepared by either Westmont or California Casualty.

19       During Westmont's repair efforts Jim Harold arrived each day at the site to open the house for

20  Westmont's work crew, and returned each afternoon to retrieve mail and close and lock the house.  At

21  no time did Sheehan, Sequeira or any other Westmont or California Casualty employee ever tell Jim

22  Harold what was known to them: that the house was contaminated with harmful and toxic molds, and

23  that the repairs that were underway were not in accord with the Anderson protocol and were not within

24  accepted mold abatement standards.

25       Indeed, Westmont took steps to actively conceal their knowledge of the existence of mold.  In

26  May 2001, when California Casualty and Westmont advised the Harolds that their home was fully

6

EXHIBIT ___1___ PAGE __119__

1    repaired and habitable both entities dismissed and denied observations made by Lee Harold that her

2    home still had a strong musty odor.  Westmont first denied that the musty odor existed, and then

3    represented to Lee Harold that the odor could be properly taken care of by an air freshener.

**B. Facts Relevant to Phase II.**

5        In May 2001, California Casualty advised the Harolds that the work had been finished, and

6    advised the Harolds that their home was ready for occupancy.  Although Moulton knew that a mold

7    clearance test was necessary to determine if the home was still contaminated, Moulton failed to obtain

8    one.  Rather, he approved and paid for the return of the Harolds' possessions to their home, thereby

9    exposing their contents once again to an environment that continued to be affected by water damage and

10   mold.  Moreover, Moulton never obtained an asbestos clearance either, although Anderson had

11   identified the existence of asbestos in the ceiling materials of the Harolds' home.

12       Jim Harold advised Moulton that his doctor had recommended that the house be tested by a

13   Certified Industrial Hygienist.  Moulton insisted that the home was repaired, and told Harolds that their

14   Alternative Living Expenses were being cancelled.  The Harolds refused to move back into the house –

15   they moved in with friends while the suggested testing took place.

16   At the Harolds' insistence, Moulton agreed to pay for the Harolds to hire John Sacco, a Sacramento

17   CIH, to perform testing of the Harold home.  Sacco tested the Harolds' home and performed air and bulk

18   sampling of the carpet and contents on May 16, 2001.  Shortly thereafter the lab results were received

19   and reviewed by Sacco, and Sacco subsequently concluded that the air in the house was not degraded,

20   but the contents were contaminated by mold.  In July, Sacco inspected the crawlspace and found mold,

21   high moisture content in wood framing, and insulation wet to the touch.  He wrote a protocol for

22   remediation of the contents, and for drying and work in the crawlspace.

23       Mr. Sacco reported his findings to California Casualty through Vernon Moulton. Instead of

24   hiring John Sacco for purposes of further investigation, testing, and writing of additional protocols if

25   needed, California Casualty assigned the file, on July 18, 2001, to Mel Gantman, California Casualty's

26

_____

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

EXHIBIT  1  PAGE 1 20

1  National Litigation Coordinator. Mr. Gantman immediately hired Robert McLay, Esq., admittedly in

2  anticipation of litigation, and Mr. McLay retained David Carls, another Certified Industrial Hygienist.

3      On August 23, 2001, McLay for the first time provided the Harolds with the January 19, 2001

4  Anderson report.

5      California Casualty refused to use Mr. Sacco as the CIH for the Harolds' water loss, and instead

6  told the Harolds that Carls would be responsible for providing a protocol for abating the mold and

7  supervising the job.  Carls prepared a mold remediation protocol and supervised the work of mold

8  remediation contractor Randy Kay.  The work performed pursuant to Carls' mold remediation protocol

9  did not commence until November, 2001.  In the time between May, 2001, when Sacco confirmed the

10  presence of harmful molds in the Harold home, and November, 2001, when remediation efforts began,

11  California Casualty and its agents and employees made no attempt made to:

12      •    Dry out the framing members in the Harolds' home;

13      •    Dry out the crawlspace of the Harolds' home;

14      •    Abate mold in any manner whatsoever;

15      •    Repair the Harolds' home in any manner whatsoever, and;

16      •    Perform a comprehensive inspection of the Harolds' home and property to determine if

17           any other conditions were causing or contributing to the difficulty in abating the mold.

18  C.    **Facts Relevant to Phase III.**

19      Randy Kay's mold abatement efforts began in November, 2001 under Carls' supervision and

20  control.  In March 2002, Carls determined that the house was ready for clearance testing.  He instructed

21  Kay to set up various containment areas and to scrub the air in each.  Clearance testing was performed

22  on March 8, 2002.  On March 10th, Carls wrote to McLay stating that upstairs spore levels were "at

23  background levels," but that additional work was needed in the crawlspace due to the finding of elevated

24  levels of Penicillium, Aspergillus, and Basidiospores attributable to incomplete mold remediation in the

25  area.  In other words, the mold had still not been abated from the Harold home.

26

EXHIBIT 1 PAGE 121

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

1    At a meeting with Gantman and McLay on April 1, 2002, called by California Casualty to

2    discuss the options available to the parties to repair the Harolds' home, Mr. Harold was told that

3    California Casualty would pay to demolish the home and rebuild it without regard to the policy limits.

4    In a letter he wrote several days later, Mr. Harold confirmed the substance of the agreement, but McLay

5    wrote back stating that Mr.Harold had misunderstood the discussion and that demolishing and rebuilding

6    was but one of three options under consideration.

7    Gantman will testify that at the time of the April 1, 2002, meeting, he believed that the home

8    could be rebuilt for $200,000, and that when estimates came in which exceeded the policy limits,

9    rebuilding was no longer an option. The other two options allegedly considered were continuing with

10    the remediation as before with California Casualty controlling the scope and implementation of the

11    remediation, or California Casualty paying the Harolds the fair market value of their home. Gantman

12    admitted that California Casualty did not follow through on any of the three options that were discussed

13    on April 1, 2002. Instead, California Casualty gave Mr. Harold the ostensible balance of the policy

14    limits and passed the risk that the home could not be remediated for that sum to the Harolds.

15    When California Casualty walked away from the Harold home, it had gaping holes in the family

16    room, dining room, kitchen and hall bath. As of July, 2002 there was no separation of the upstairs from

17    the crawlspace, exposing the entirety of the house to contaminants in the crawlspace. The Harold home

18    has been in this condition since at least July, 2002, and there is no hope of a successful remediation at a

19    reasonable cost. The ground under the Harold home was contaminated with lime spread by Westmont,

20    and the drainage adversely affected. This negative condition will need to be abated as part of any repair

21    or remediation effort. This condition, and others, which resulted from Carls' oversight of the

22    remediation, caused even further damage to the house.

23    Moulton told the Harolds that they had to rent a one bedroom, one bathroom apartment.

24    Eventually the Harolds moved to a two bedroom apartment, and then a three bedroom apartment, but

25    California Casualty never told the Harolds that their insurance policy provided them with the right to be

26    placed in comparable living quarters at California Casualty's expense. In the Harolds' case, their

9

1  Carmichael home is a four bedroom, three bath structure with a pool and approximately 2,800 square

2  feet of living space.

3       Mr. Harold has diabetes and a compromised immune system from metastatic colon cancer,

4  radiation and chemotherapy, making his fear of being exposed to mold reasonable. Mr. Harold is even

5  more afraid of returning to his home and taking back his personal possessions that have been in storage

6  for more than two years.

7  **III.    LEGAL ARGUMENT**

8      **A.    California Casualty Breached the Insurance Contract with the Harolds.**

9       California Casualty will not dispute that the Harolds' water loss was a covered loss. Its adjuster,

10  Vernon Moulton, will testify that the Harolds' November 2000 loss was a covered loss, as will

11  Moulton's supervisors, Mel Gantman and Yale Moulin. The breach of contract occurred when, after

12  California Casualty took control of the loss by hiring Westmont and Carls and managing the repair

13  efforts, it abandoned the Harolds with a mold infested house and no viable method to remediate it short

14  of tearing the house down and starting over.

15       California Casualty contends that because, after its expenditure of approximately $250,000 of the

16  Harolds' insurance policy proceeds, it paid the balance of the policy benefits to the Harolds, it did not

17  breach the insurance contract. California Casualty ignores the fact that its actions did not provide the

18  Harolds with any tangible benefits and, in fact, actually worsened the condition of the Harolds' home,

19  health, and property.

20       Specifically, all the money paid by California Casualty to Westmont for Westmont's repair

21  efforts was for naught. Westmont not only failed to remediate the mold that existed in the home when it

22  took over the repair, it negligently spread the mold throughout the crawlspace and house and

23  significantly impaired the ability of the crawlspace soils to drain water. After California Casualty

24  retained CIH David Carls to take over from Westmont, Carls essentially recommended that all

25  Westmont's work be redone. After Carls directed remediation efforts at the Harolds' home, the home

26  failed to pass inspection, as it still was contaminated with harmful molds. By the time California

EXHIBIT 1 PAGE 123

1  Casualty had paid for the work done pursuant to Carls' instructions, it had expended approximately

2  $250,000. California Casualty then deducted this amount of money from the Harolds' policy benefits

3  and paid the Harolds the balance in cash, claiming that it had now satisfied its obligations pursuant to

4  the insurance policy. The truth is, California Casualty's expenditure of funds did not provide any

5  tangible benefit to the Harolds – the Harolds were left with an unrepaired, contaminated house and

6  insufficient funds with which to repair it.

7      An insurer must treat its policyholder's interests with equal regard to its own. Under this

8  standard, an insurer is obligated to do the following when handling a claim:

9     •   Conduct a full, fair, reasonable and prompt investigation and adjustment of the claim at
          its own expense;

10

11     •   Pay the claim promptly upon a determination that payment is warranted;

12     •   Pay undisputed amounts and not withhold benefits due under the contract;

13     •   Fairly and honestly represent policy terms to the insured, and disclose any and all
          benefits and coverages that may apply to a claim.

14      In this case California Casualty failed to conduct a full, fair, reasonable and prompt investigation

15  and adjustment of the claim it its first phase when it failed to initially hire a CIH, even though Moulton

16

17  knew that there was a likelihood that there was mold at the Harolds' home when he made his first visit

18  to the site. California Casualty also failed to hire a CIH in the first phase of this claim after it received

19  the January 19, 2001 Anderson report, which also constitutes a breach of its duty to conduct a full, fair,

20  reasonable and prompt investigation and adjustment of claim.

21      Moreover, the second phase of this claim is dominated by inaction and delay. California

22  Casualty took no physical steps to dry the Harolds' house or crawlspace, or otherwise physically remove

23  or abate mold from the Harolds' home from May 2001, through November 2001.

24      Finally, the third phase of the claim is marked by Carls' inadequate and incomplete investigation

25  into the conditions that caused the mold to occur or otherwise frustrated efforts to abate it. Payment of

26  the purported policy benefits is not a shield to a claim of breach of contract or bad faith. *Wilson v. 21ˢᵗ*

*Century Insurance Company*, 06 D.D.O.S. 940.

11

EXHIBIT 1 PAGE 134

In *Tomaselli v. TransAmerica Insurance Co.* (1994) 25 Cal. App. 4th 1766, 1770, the court said:

"The failure to pay benefits owed under a policy is both a breach of contract, entitling the insured to contractual damages, and a potentially tortious breach of the implied covenant of good faith. However, both sets of obligations, in contract and in tort, spring from and depend on the existence of the contractual duty to pay."

Emphasis added.

**B.    California Casualty Breached Its Covenant of Good Faith and Fair Dealing.**

A cause of action for breach of the implied covenant requires a showing that the plaintiff suffered a loss covered under the policy and that the insurer unreasonably failed to pay for the loss or unreasonably delayed payment, causing harm to the plaintiff. CACI 2331. An insurer can also be liable for breach of the implied covenant if it unreasonably fails to properly investigate a loss and delays payment of the insurance benefits, causing harm to plaintiff. CACI 2332. Finally, an action for breach of the implied covenant is also warranted where an insurer fails to inform the plaintiff of his or her rights under the policy, causing damage to the plaintiff. CACI 2333. Plaintiffs assert that California Casualty violated the breach of the implied covenant in each of these ways.

**1.    California Casualty Unreasonably Failed to Investigate the Harolds' Loss**

The implied covenant of good faith and fair dealing requires that the insurer conduct a prompt and adequate investigation. *KPFF v. California Union Ins. Co.*, 56 Cal. App. 4th 963, 973 (1997); *Brown v. Guarantee Ins. Co.*, 155 Cal. App. 2d 679, 689 (1957); Ins. Code § 790.03(h)(3), (11). An insurance company is required "to make a diligent effort to ascertain the facts upon which only an intelligent and good-faith judgment may be predicated." *Brown*, 155 Cal. App. 2d at 686. If an insurer fails to exhaust the sources of information open to it to ascertain the facts, then it has not done all that is possible to secure the knowledge upon which a good-faith judgment may be exercised and it may be held liable for bad faith. *Id.* An insurer may be liable for breach of the covenant of good faith and fair dealing not only if the insurer fails to conduct a sufficient investigation, but also if it engages in wrongful conduct in the course of its investigation. *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 578 (1973).

12

EXHIBIT 1 PAGE 125

1    The obligation to investigate is governed by a rule of reasonableness. *Egan v. Mutual of Omaha*

2    *Ins. Co.*, 24 Cal.3d 809, 819 (1979), *cert. denied*, 440 U.S. 912 (1980).  CCIC not only handled the

3    Harolds' water claim unreasonably but it acted in a despicable manner by placing its interests above

4    those of its insured.  California Casualty acted unreasonably by taking seven days from the Harolds' first

5    notification to California Casualty to examine the water loss.  Moulton knew that mold can begin within

6    days, but despite this knowledge did not take action within a reasonable time. Even when Moulton

7    appeared on December 5, 2000, to examine the home and promised the Harolds that California Casualty

8    would take charge of fixing the problem, he did not attempt to make contact with a repair company until

9    he sent a fax at 7:00 P.M. on December 6, 2000, to Westmont Construction Company.  Moulton

10   suspected mold on his first visit yet failed to hire a certified industrial hygienist.  California Casualty's

11   failure to investigate promptly was an unfair claims practice in violation of Ins. Code §790.03(h)(2).

12       California Casualty also failed to reasonably investigate the Harolds' claim when it hired

13   Westmont, a company with no training or experience with mold.  Moulton candidly admitted in

14   deposition that he knew Westmont was not a mold remediation company and that he didn't consider

15   Westmont's work to be mold remediation.  Moulton's handling of the mold damage conformed to

16   California Casualty's corporate practice of not hiring a CIH to investigate water loss damage when mold

17   was suspected or confirmed.  California Casualty has admitted that prior to the Harolds' claim,

18   California Casualty had not previously hired or paid for a CIH to investigate mold in an insured home in

19   Northern California.  California Casualty's failure to hire a CIH to investigate and develop a remediation

20   protocol, when mold related to the Harolds' loss was discovered or even suspected, was unreasonable

21   conduct.  California Casualty's practice of not hiring competent contractors to investigate and make

22   needed repairs of water damage claims when mold was suspected was a violation of Ins. Code

23   §790.03(h)(3).

24       By the end of December, Westmont confirmed there was mold.  By January, Westmont and

25   California Casualty knew the mold was toxic when they received the Anderson report.  This information

26   was concealed from the Harolds.  Despite this knowledge, California Casualty still did not hire a CIH or

13

EXHIBIT 1 PAGE 126

1   a company knowledgeable in mold remediation. This failure to act reasonably was a violation of custom

2   and practice and below the standard of care.

3       During the third phase of this loss, Trudy Howell, another California Casualty insurance adjuster,

4   hired a geotechnical engineer, Timothy Williams. for the stated purpose of evaluating drainage

5   conditions at the Harolds' lot. Instead of being retained by California Casualty to conduct a fair and

6   thorough inspection, however, Williams will testify that he was told by Ms. Howell to look for "other

7   sources of water intrusion." Ms. Howell's intentions were clear; to attempt to develop facts that could

8   be used as a basis to claim that the mold existing in the Harolds' home in the spring and summer of 2002

9   came from a source other than the loss, or that the facts otherwise existed that could be used as a basis to

10  blame the Harolds for the failure of the house to clear, or to deny coverage.   These actions violate

11  California Casualty's duty to conduct a prompt, fair, reasonable and adequate investigation of the

12  Harolds' claim. *Eagan v. Mutual of Omaha Ins. Co.* 24 Cal.3d 809, 819 – 820 (1979).

13      California Casualty's unreasonable failure to properly investigate the Harold's claim was a

14  breach of the covenant of good faith and fair dealing. was in violation of fair claims practices, and

15  exposed the Harolds to mold and ultimately created mold contamination of the entire Harold home and

16  all of their possessions. Mr. Harold also suffered adverse health consequences from his exposure to the

17  mold.

18      **2.    California Casualty Unreasonably Failed to Inform the Harold's of Their Rights
            and Obligations Under the Policy**

19

20      When an insurer receives notice of a claim, the implied covenant of good faith and fair dealing

21  requires that the insurer reasonably advise and promptly inform the insured of the insured's rights and

22  obligations under the policy. *Davis v. Blue Cross of Northern California*, 25 Cal.3d 418, 428 (1979).

23  An insurer must take affirmative steps to insure that the insured is informed of the remedial rights under

24  the policy. *Sarchett v. Blue Cross of California*, 43 Cal.3d 1, 14-15 (1987). In violation of the implied

25  covenant, California Casualty failed to inform the Harolds of their rights under the policy.

26  //

EXHIBIT 1 PAGE 12

1    In conformity with its practice of placing its interests above its insureds, California Casualty told

2  the Harolds that they were entitled to move into a one bedroom apartment while repairs were

3  effectuated.  California Casualty failed to tell the Harolds they were entitled to comparable living

4  quarters, which would have costs three to four times as much as a one bedroom apartment.  This is a

5  violation of the custom and practice in the insurance industry and 10 C.C.R. §2695.4(a).

6    In violation of the implied covenant of good faith and fair dealing, California Casualty failed to

7  inform the Harolds that they were entitled to remain in control of the work on their home.  Instead,

8  California Casualty unreasonably hired its own contractor, Westmont, and its own CIH, Carls, to

9  develop a remediation protocol without obtaining the Harolds' approval or taking into consideration

10  their wishes of using the CIH of their choosing.  Also in violation of the implied covenant, California

11  Casualty failed to inform the Harolds of a third party report that disclosed property damage and health

12  risks.

13    California Casualty's failure to inform the Harolds of their rights under the policy was in direct

14  violation of the implied covenant of good faith and fair dealing.

15    **3.    California Casualty Unreasonably Failed to Pay for the Harolds' Loss and**
     **Unreasonably Delayed Payment to the Harolds**
16

17  The implied covenant of good faith and fair dealing includes a duty by the insurer not to

18  withhold or delay payments unnecessarily.  See *Egan*, supra, 24 Cal.3d at 818-820.  Implicit in the

19  insurer's obligation to not unreasonably withhold or delay payments is the notion that the insurer must

20  give at least as much consideration to the insured's interests as it gives its own.  *Id.*  For this reason, the

21  insurer's attitude and motives are substantial factors in determining reasonableness.  See e.g., *Blake v.*

22  *Aetna Life Ins. Co.*, 99 Cal. App. 3d 901, 922 (1979); *Sprague v. Equifax, Inc.*, 166 Cal. App. 3d 1012,

23  1025 (1985).

24    No specific period of delay in providing benefits is reasonable or unreasonable per se.  Rather,

25  the reasonableness of the delay is a *question of fact* that must be determined on a case by case basis in

26  light of the circumstances.  See *Blake*, 99 Cal.App.3d at 922-924;  see also *Fleming v. Safeco Ins. Co.*,

15

EXHIBIT 1 PAGE 128

1   160 Cal.App.3d 31, 36-38 (1984). The reasonableness of an insurer's claims handling practices *only*

2   becomes a question of law when the evidence is undisputed and only one inference can be drawn from

3   the evidence. *Carlton v. St. Paul Mercury Ins. Co.*, 30 Cal. App. 4th 1450, 1456, 1459 (1994). Such is

4   not the case here.

5          The Harolds believe that California Casualty will argue that the "genuine dispute" doctrine will

6   preclude a finding of breach of the covenant of good faith and fair dealing. *Chateau Chamberay*

7   *Homeowners Assn. v. Associated Internat. Ins. Co.* 90 Cal.App.4th 335, 347. Throughout this case

8   California Casualty has been deceptively mischaracterizing the factual basis for the Harolds' cause of

9   action for bad faith by attempting to limit the breach to the question of whether the Harolds' residence

10  could have been remediated or had to be rebuilt. As the *Chateau Chamberay* court recognized,

11  however, the genuine dispute defense does not apply when the dispute arose because the insurance

12  company failed to conduct a thorough investigation. *Chateau Chamberay*, supra, pps. 348 – 349. In

13  other words, a breach of the covenant of good faith and fair dealing can be found even where the insurer

14  harbors actual doubts about the amounts of benefits which should be paid on a covered claim if a

15  reasonable investigation would have disclosed information making those doubts no longer tenable.

16  *Wilson v. 21st Century Insurance Company*, 06 D.D.O.S. 940.

17         In any event, as discussed above, the basis for the Harolds' cause of action for the breach of the

18  implied covenant of good faith and fair dealing is much broader. For example, California Casualty

19  unreasonably failed to pay benefits when it failed to hire a CIH once it knew that harmful mold was

20  present, and further failed to hire a qualified mold remediation contractor. Additionally, California

21  Casualty unreasonably failed to pay benefits due under the policy when it failed to obtain a mold

22  clearance test before canceling the Harolds' additional living expenses. Not only did California

23  Casualty cancel the living expenses, in addition it instructed the Harolds that they could return to their

24  home, absent confirmation that the toxic mold was remediated. There cannot be a "genuine dispute."

25         California Casualty also unreasonably delayed the payment of benefits. California Casualty

26  failed to hire a CIH at the onset of the claim and failed to hire a company with experience in mold

16

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief                    EXHIBIT 1  PAGE 129

1    remediation. The delay in hiring such persons damaged the Harolds' home, possessions and health. The

2    Harolds were not told that the home was tested for mold, they were not given the mold report, they were

3    not told that toxic mold was confirmed in their home, and they were not warned of the health risks of

4    being exposed to mold. California Casualty's wrongful conduct damaged the Harolds' home and their

5    possessions, exposed the Harolds to harmful toxins, and damaged Mr. Harold's health. Having caused

6    the damage through its wrongful conduct, California Casualty has ostensibly spent the Harolds' policy

7    limits to correct the harm it was responsible for causing. The policy limits were not spent on repairing

8    the damage caused by the water loss, they were spent trying to correct the damage caused by California

9    Casualty's tortious conduct. As such, California Casualty unreasonably delayed and denied benefits due

10   under the policy.

11   **B.      California Casualty Is Liable for Fraud.**

12        **1.      California Casualty Concealed Material Facts from the Harolds.**

13        The evidence produced at trial will show that California Casualty failed in its duty to inform and

14   warn the Plaintiffs about the presence of toxic mold in the property and the foreseeable risk of harm to

15   the Plaintiffs and their property from exposure to contaminants, mold and bacteria. Evidence will also

16   be presented at trial proving that that California Casualty concealed that the Harold's home was tested

17   for mold, that California Casualty concealed the results of the environmental sampling, and concealed

18   the true reason for asking the Plaintiffs to move out of the property (the discovery of harmful or toxic

19   mold). Finally, California Casualty concealed its attempt to clean up the mold through ordinary repair

20   methods, rather than using remediation, contrary to accepted standards.

21        California Casualty also concealed or suppressed from Plaintiffs information concerning the

22   presence of toxic mold and bacteria found during repairs even though California Casualty was aware of

23   the potential health risks associated with mold. For example, California Casualty knew that Westmont

24   had performed its repairs without the benefit of any containment fields. California Casualty knew that

25   some of the Harolds' possessions had not been moved out and were continuously exposed to the

26   uncontained remedial repairs by Westmont. California Casualty knew that these exposed possessions

17

1   were not cleaned before the Harolds moved in. California Casualty knew that it was not proper to send

2   an insured back into a mold contaminated location without first testing to ensure that the mold had been

3   eradicated. Yet, neither California Casualty nor Westmont obtained a mold clearance before telling the

4   Harolds to move back into their home.

5          As a result of Defendants' concealment of the presence of toxic and pathogenic mold and their

6   intent to clean it up through ordinary repair methods, Plaintiffs and their property were exposed to toxic

7   mold and bacteria.

8          **2.    California Casualty Misrepresented Material Facts to the Harolds.**

9          California Casualty represented in its insurance policy that it would cover and indemnify the

10  Harolds for water loss. This representation was false because California Casualty did not intend to hire

11  a CIH to investigate or to pay for proper remediation by a qualified company. California Casualty hired

12  Westmont even though California Casualty suspected that mold existed in the Harolds' house on first

13  visit, and Moulton knew that Westmont was not a mold remediation contractor and in fact had no

14  experience or skill in mold remediation. The evidence will show that California Casualty knowingly

15  and falsely represented to the Harolds that Westmont would take care of the damage caused by the water

16  loss, even though Moulton knew that Westmont was not qualified to deal with mold. California Casualty

17  and Westmont falsely misrepresented to the Harolds that they had to move out of their home during the

18  repair period because of noise and dust when, in reality, the purpose for the move was the existence of

19  the harmful mold. Defendants made false representations as to the habitability and adequacy of the

20  repair to Plaintiffs' home knowing that the representations were false. Defendants knew of the potential

21  health risks associated with mold exposure. Yet, Defendants led Plaintiffs to believe that their house

22  had been repaired.

23         **3.    The Harolds Justifiably Relied on California Casualty's Misrepresentations and
               Were Harmed by California Casualty's Concealment**

24

25         Defendants may argue that the Harolds knew about the existence of mold in March 2001 and, as

26  such, the existence of mold was not concealed nor did the Harolds justifiably rely on any

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

EXHIBIT __1__ PAGE __131__

1    misrepresentations by California Casualty or Westmont.  This argument fails because in March 2001 the

2    Harolds knew only of the existence of a small patch of mold on a kitchen wall that a painter was to fix.

3    Most importantly, they did not know that the subfloor of their home and the inside of the walls of their

4    house were contaminated with toxic mold, although this information was known to both California

5    Casualty and Westmont.  The fact that the Harolds were completely unsophisticated about the hazards of

6    mold and the proper methods to remediate it is proven by the estimate on which the Defendants rely.

7    The estimate suggests priming and painting the small area of mold that was found.  California Casualty

8    knew that the suggested repair was inappropriate, but did not share such information with the Harolds,

9    nor did California Casualty inform the Harolds at that time that toxic mold existed in the subfloor and in

10   the walls.

11          The fact that the Harolds knew of a small patch of mold in their home in March 2001 did not

12   make them aware that their home was infested with mold nor that their possessions and health were in

13   danger.  Of course, California Casualty knew about the toxic mold and appreciated the health hazards.

14   California Casualty concealed its knowledge and misrepresented the fact and the Harolds' home,

15   possessions and health were damaged as a result.

16   **C.     California Casualty Is Liable to the Harolds for Intentional Infliction of Emotional**
        **Distress.**

17

18          Outrageous conduct is described in general terms as a "case…in which the recitation of the facts

     to an average member of the community would arouse his resentment against the actor, and lead him to

19

     exclaim, "Outrageous!"" Comment (d), Restatement of the Law, Second, Torts, § 46 (1965).  California

20

     Casualty's and Westmont's actions, in failing to disclose the presence of harmful toxic mold to the

21

     Harolds, intentionally exposing the Harolds to adverse health consequences, failing to hire a CIH and an

22

     experienced contractor to remediate the mold, failing to obtain a mold clearance test before returning the

23

     Harolds' possessions to their still-contaminated home in May 2001, and cutting off their ALE payments

24

     in an attempt to force them back into the uninhabitable house all constitute conduct that would certainly

25

     cause any average member of the community to exclaim "Outrageous!"

26

                                         19

                                                        EXHIBIT  1  PAGE 132

1    Reckless disregard has been characterized as acts performed with "little or no thought" to the

2    probable consequences of the conduct. *KOVR-TV v. Superior Court*, 31 Cal. App. 4th 1023, 1031-1032

3    (1995), citing *Miller v. National Broadcasting Co.,* 187 Cal. App. 3d 1463, 1487 (1986). California

4    Casualty and Westmont exhibited reckless disregard to the possibility that their conduct would result in

5    emotional distress to the Harolds.

6    Emotional distress is measured by considering the facts of each case, as well as the intensity and

7    duration of the distress. Comment (j), Restatement of the Law, Second, Torts, § 46 (1965). Substantial

8    evidence exists to prove that the Harolds' emotional distress is severe. The Harolds need not show

9    purely physical symptoms of severe emotional distress. "The requisite emotional distress may consist of

10   any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger,

11   chagrin, disappointment or worry." *Crisci v. Security Ins. Co.,* 66 Cal.2d 425, 433 (1967). The

12   discovery that California Casualty concealed the presence of toxic mold, the fact that Westmont likewise

13   concealed the same information, the failure of California Casualty to hire a mold remediation contractor

14   the revelation that the Harolds had been exposed to toxic mold, the Harolds' inability to come in contact

15   with personal possessions and family treasures and their inability to live in the family home they built

16   together, are all the basis for their severe emotional distress. The Harolds suffered disappointment, fear,

17   sadness and sorrow as a result of California Casualty's and Westmont's actions.

18   Greater proof that mental suffering occurred is found in the Defendants' conduct designed to

19   bring it about than in physical injury that may or may not have resulted therefrom. *Golden v. Dungan,*

20   20 Cal. App. 3d 295, 308 (1971). Defendants engaged in a course of conduct which was intentional,

21   extreme and outrageous, and which was in wanton and reckless disregard of Plaintiffs' rights and

22   interests

23   **D.    California Casualty and Westmont Are Liable for Nuisance.**

24   Nuisance has been found in all manner of activity that causes interference with use and

25   enjoyment of property. See *Stevens v. Moon,* 54 Cal. App. 737 (1921) (damage to trees); *Sierra Screw*

26   *Prods. v. Azusa Greens Inc.,* 88 Cal.App.3d 358 (1979) (golf balls from golf courses); and *McIvor v.*

20

EXHIBIT  1  PAGE 133

1    *Mercer-Fraser Co.*, 7 Cal. App. 2d 247 (1946) (excavation causing loss of use of strip of land and fear

2    of collapse).  A trier of fact may find that California Casualty interfered with the Harolds' use and

3    enjoyment of their property by permitting repairs without containment in a home known to California

4    Casualty to be contaminated with mold, or by exposing the Harolds' possessions to harmful and

5    damaging mold.  In addition, Defendants failure to remediate the toxic mold contamination has rendered

6    the Harolds' home completely uninhabitable to this day, thus wholly interfering with their use and

7    enjoyment of their family home – in that they cannot live there without exposing themselves to serious

8    health hazards.  Nuisance is defined as "anything which is injurious to health…so as to interfere with the

9    comfortable enjoyment of life or property."  Civil Code § 3479.  Defendants' conduct and the resulting

10    injury to the Harolds fits squarely within this definition.

11        All of these actions by Defendants constitute substantial and unreasonable interferences of the

12    Harolds' use and enjoyment of their home in every sense of Civil Code § 3479.

13    **E.    California Casualty Has Violated California's Unfair Competition Law.**

14        An unfair business practice is a practice that is "deceptive or sharp."  *Klien v. Earth Elements*, 59

15    Cal.App.4th 965, 970 (1997).  A fraudulent business practice under §17200, unlike the strict standards

16    for the separate fraud tort cause of action, only requires a showing that "members of the public are likely

17    to be deceived."  *South Bay Chevrolet v. General Motors Acceptance Corporation*, 72 Cal. App. 4th 861,

18    888 (1999).  The unlawful standard is self-explanatory.  California Casualty's practices in this case were

19    clearly fraudulent.

20        In direct violation of Business and Professions Code Section 17200, Defendant California

21    Casualty had a fraudulent practice of misrepresenting its obligations, including it obligations to pay

22    actual cash value, to pay to repair or replace the premises, and to pay additional living expense benefits.

23    In addition, California Casualty had a fraudulent practice of not retaining CIHs and mold abatement

24    contractors in cases where mold appears as a consequence of a water damage claim.

25        It is California Casualty's business practice not to hire a CIH, even when suspected to be needed.

26    Moulton's handling of the Harolds' claim conformed to California Casualty's fraudulent corporate

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

EXHIBIT 1 PAGE 134

1    practice of not hiring a CIH to investigate water loss damage when mold was suspected or confirmed.

2    California Casualty has admitted that prior to the Harolds' claim, California Casualty had not previously

3    hired or paid for a CIH to investigate mold in an insured's home in Northern California.

4         California Casualty's corporate practices certainly rise to the level of "deceptive or sharp." In

5    addition, a jury could easily find that such practices are "likely to deceive" California Casualty's

6    insureds who reasonably believe that their claims will be handled in a manner to protect the insured's

7    interests. Finally, California Casualty's practices clearly constitute a fraudulent business practice.

8    **IV.    DAMAGES**

9         The Harolds are entitled to recover three types of damages in this case. First, damages for

10   breach of contract, which in a first party case is measured by the benefits due under the policy, together

11   with interest from the dates the benefits were due. The second type of damages are recovered pursuant

12   to the bad faith theories of liabilities, and these damages include both economic and noneconomic harm

13   incurred by the Harolds, in this case, the cost to repair the damage at the Harold home, and the Harolds'

14   emotional distress damages, respectively. The third type of damages are as of this writing available only

15   against the Westmont, i.e., punitive damages.

16        A.    Contractual Damages.

17        California Civil Code § 3300 states:

18   "For the breach of an obligation arising from contract, the measure of damages
        . . . is the amount which will compensate the party aggrieved  for all the
19   detriment proximately caused thereby, or which in the ordinary course of things
        would be likely to result therefrom."
20

21        The Harolds understand that California Casualty contends that it has paid the Harolds all benefits

22   due under the insurance policy at issue. The Harolds will present evidence that the contract benefits

23   have not been paid them, and in fact that California Casualty owes them several hundred thousand

24   dollars in policy benefits, plus interest.

25   //

26   //

EXHIBIT 1  PAGE 135

B.    Extracontractual damages.

As a result of the wrongful acts described herein, the Harolds will present proof at trial that their home cannot be successfully remediated as is.  The Harold home must be razed to the ground, scraped from the lot, and rebuilt from the ground up.  The Harolds will present evidence that the cost to repair their residence will exceed $800,000.  In addition to their cost of repair damages, the Harolds have incurred personal injury and emotional distress damages and loss of use damages.

Moreover, the Harolds will be entitled to fees and costs pursuant to *Brandt v. Superior Court*, 37 Cal.3d 813, 817 (1985), which states that if breach of the implied covenant of good faith and fair dealing is proved, reasonable and necessary attorney's fees incurred by the insured to recover policy benefits may be recoverable under the extracontractual measure of damages.

**IV    Conclusion**

Plaintiffs estimate that this case will take three to four weeks to try.

Respectfully submitted,

DATED:  February 6, 2006.

HINTON, ALFERT & SUMNER

By _____

PETER W. ALFERT

23

EXHIBIT 1 PAGE 136

Plaintiffs James Harold's and D. Lee Harolds' Trial Brief

# PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 1646 N. California Blvd., Suite #600, , Walnut Creek, California 94596. On February 6, 2006, I caused the within documents to be served:

**Plaintiffs James Harold's and D. Lee Harold's Trial Brief**

( )       by transmitting via facsimile the document(s) listed above to the fax number(s) set for below on this date before 5:00 p.m.

( )       by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Walnut Creek, California, addressed as set forth below.

( x )       by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

( )       by placing a true copy thereon enclosed in a sealed envelope, at a station designated for collection and processing of envelopes and packages for overnight delivery as part of the ordinary business practices of Hinton, Alfert & Sumner described above, addressed as follows:

**SEE ATTACHED SERVICE LIST**

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited with the US Postal Service that same day in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on February 6, 2006, at Walnut Creek, California.

*Shari K. McMurry*
SHARI K. MCMURRY

EXHIBIT 1 PAGE 137

1

<u>**SERVICE LIST**</u>
*Harold v. California Casualty Insurance Company, et al.*
**Sacramento County Superior Court No. 02AS04291**

2

3

4  <u>Attorneys for Defendant California Casualty Insurance Company</u>

<u>Attorneys for Defendant Westmont Construction, Inc.</u>

5

6  Robert S. McLay, Esq.
HAYES, DAVIS, ELLINGTON, McLAY & SCOTT, LLP
400 Capitol Mall
Suite 900
Sacramento, CA 95814
Fax Number: (916) 449-8257

Ronald E. Enabnit, Esq.
MATHENY, SEARS, LINKERT& LONG
3638 American River Drive
P. O. Box 13711
Sacramento, CA 95853-4711
Fax Number: (916) 978-3430

7

8

9

10  <u>Attorneys for Plaintiffs James Harold and D. Lee Harold</u>

<u>Attorneys for Plaintiffs James Harold and D. Lee Harold</u>

11  Michael J. Cochrane, Esq.
KING, KING & FISHLEDER
The 555 City Center Building
555 Twelfth Street, Suite 1440
Oakland, CA 94607-4046
Fax Number: (510) 444-3401

Karen H. Kahn, Esq.
KAHN BROWN & POORE LLP
2200 Powell Street
Suite 745
Emeryville, CA 94608
Fax Number: (510) 923-6285

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1 PAGE 138

PROOF OF SERVICE

# EXHIBIT D

EXHIBIT __1__ PAGE 139

FILED
ENDORSEI
02 OCT 29 PM 2 06
LEGAL PROCESS #11

1  DANIEL A. KING, ESQ. (SBN 130150)
   KING, KING & FISHLEDER, A Professional Corporation
2  Lake Merritt Plaza, Suite 810
   1999 Harrison Street
3  Oakland, California 94612
   Telephone: (510) 874-4333
4  Facsimile: (510) 874-4399

5  KAREN H. KAHN, ESQ. (SBN 098404)
   LAW OFFICES OF KAREN KAHN
6  2100 Embarcadero, Suite 100
   Oakland, CA 94606
7  Telephone: (510) 532-9575
   Facsimile: (510) 535-2579

8
   Attorneys for Plaintiffs
9  JAMES HAROLD and D. LEE HAROLD

10

11              SUPERIOR COURT OF CALIFORNIA

12            CITY AND COUNTY OF SACRAMENTO

13

14  JAMES HAROLD and D. LEE HAROLD,          CASE NO. 02AS04291
    individuals
15
                    Plaintiffs,
16                                            FIRST AMENDED COMPLAINT
       v.
17                                            Jury Trial Demanded
    CALIFORNIA CASUALTY INSURANCE
18  COMPANY, WESTMONT CONSTRUCTION,
    INC. and DOES 1 through 50
19
                    Defendants.                      BY FAX
20

21

22      Plaintiffs JAMES HAROLD and D. LEE HAROLD ("Plaintiffs") complain of defendants

23  CALIFORNIA CASUALTY INSURANCE COMPANY ("California Casualty"), WESTMONT

24  CONSTRUCTION, INC. ("Westmont Construction"), and DOES 1 through 50, and allege as

25  follows.

26

27

28

                                                      EXHIBIT 1 PAGE 140

King, King & Fishleder
Lake Plaza
Harrison Street, Suite 810
O, CA 94612
874-4333

FIRST AMENDED COMPLAINT                    1

### GENERAL ALLEGATIONS

1.     Plaintiffs purchased the homeowners insurance policy described below, and are the insureds and owners of the policy. They sue on behalf of themselves and on behalf of the general public for recovery of the sums and damages herein alleged.

2.     California Casualty is and at all times mentioned was, a business organization of a form unknown to Plaintiffs. Plaintiffs are informed and believe, and thereupon allege, that California Casualty is a corporation authorized under the laws of the State of California to transact business in this state as an insurance company.

3.     Westmont Construction is and at all times mentioned was, a business organization of a form unknown to Plaintiffs. Plaintiffs are informed and believe, and thereupon allege, that Westmont Construction is a corporation authorized under the laws of the State of California to transact business in this state.

4.     Plaintiffs do not know the true names, capacities, and identities, whether corporate, partnership, individual or otherwise, of defendants sued herein as Does 1 through 50, inclusive, and for this reason sue such defendants by such fictitious names in accordance with Section 474 of the Code of Civil Procedure. Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously-named defendants is legally responsible for the events and actions referred to in this Complaint and wrongfully caused injury and damages to them, as alleged below. Plaintiffs will seek leave to amend this complaint to state these defendants' true names and capacities when they are ascertained.

5.     California Casualty issued a homeowners insurance policy to Plaintiffs, policy number 204 1155871 05 03, which took effect on or about September 5, 2001 (the "Policy"). The Policy is presently in full force and effect, and was in full force and effect at all pertinent times mentioned herein. The Policy provides that California Casualty "will pay the reasonable cost incurred by you for necessary repairs" and assumes certain other obligations in the event of direct physical loss to Plaintiffs' property, including their home at 1160 Glen Aulin Court, Carmichael, California 95608 (the "Property"). A copy of the insurance policy provided to the Plaintiffs by California Casualty during the claims process is attached hereto as Exhibit A.

6.    In November 2000, a hot water pipe broke causing direct physical loss to the Property. Plaintiffs promptly reported a claim to California Casualty and otherwise performed all terms and conditions of the Policy which they were required to perform for obtaining payments of insurance benefits.

7.    California Casualty responded to the loss, agreeing that the damage caused by the break in the hot water pipe was covered under the Policy. California Casualty, however, failed to acknowledge its obligations pursuant to the terms of the Policy, including to indemnify Plaintiffs under the terms of the Policy. Instead, California Casualty misrepresented those obligations, including its obligations to pay actual cash value, to pay to repair or replace the premises and to pay additional living expense benefits.

8.    Despite its obligations under the Policy, including the obligation to reimburse Plaintiffs for the cost of repairs, California Casualty volunteered to protect the property from further damage and to repair the damage itself. California Casualty employed Westmont Construction to do this work and assumed the right and responsibility to direct and control work performed by Westmont Construction. Thereafter, California Casualty took control of Plaintiffs' property ostensibly to allow its contractor to perform this work.

9.    During the course of this work, California Casualty (including but not limited to Westmont Construction) learned that the property had become contaminated with toxic mold and bacteria as a result of the break in the hot water pipe. California Casualty (including but not limited to Westmont Construction) was aware that exposure to this type of mold and bacteria could cause serious health problems to Plaintiffs and others.

10.    Knowing that Plaintiffs were being exposed and would continue to be exposed to the toxic mold and bacteria, California Casualty (including but not limited to Westmont Construction) concealed from Plaintiffs the existence of the toxic mold and bacteria at the Property. California Casualty (including but not limited to Westmont Construction) also made misrepresentations in order to hide the existence of the toxic mold and bacteria.

11.    Without Plaintiffs' knowledge, California Casualty (including but not limited to Westmont Construction) attempted to remove visible mold and bacteria using industrial strength

Jo
Aing & Fishfeder
well Plaza
```` Row Ste #10

EXHIBIT 1 PAGE 142

1   clorox and without using any containment to prevent the spread of mold and bacteria. California

2   Casualty (including but not limited to Westmont Construction) caused further damage, spreading

3   the mold and bacteria throughout the Property and onto Plaintiffs' personal property.

4       12.   In addition to the foregoing, California Casualty engaged in a practice of

5   misrepresenting to Plaintiffs the coverage available for Additional Living Expenses.

6       13.   Plaintiffs are informed and believe, and based thereon allege, that California

7   Casualty's conduct as alleged in paragraphs 8 through 12 are the result of the policies and

8   procedures of California Casualty for handling property insurance claims.

9

10                          **CAUSES OF ACTION**

11                          <u>**First Cause of Action**</u>
        **(For Breach of Contract Against California Casualty)**

12

13      14.   Plaintiffs reallege and incorporate by this reference in this claim the allegations

14   contained in Paragraphs 1 through 13 of this Complaint.

15      15.   Plaintiffs duly performed each and every condition and obligation that they were

16   required to perform under the Policy.

17      16.   Defendant breached its contractual duties to Plaintiffs by failing to fulfill the

18   express obligations assumed by Defendant, including but not limited to its obligation to pay

19   insurance benefits under the Policy in a timely manner and their obligation to exercise

20   reasonable care in the handling of Plaintiffs' insurance claims. Also, Defendant breached its

21   contractual duties by intentionally misrepresenting and concealing information concerning its

22   obligations and Plaintiffs' rights under the Policy.

23      17.   As a direct and legal result of Defendant's breach of its obligations, Plaintiffs

24   have suffered and will continue to suffer damages, including but not limited to loss of insurance

25   benefits, interest on those benefits, attorneys' fees, adjusters' fees, medical costs, other financial

26   losses and incidental damages, out-of-pocket expenses, loss of use of the property, and physical

27   injuries, all to their damage in an amount well in excess of the jurisdiction of this Court to be

28   shown according to proof.

Lor
ing & Frahleder
Plaza
Mission Street Suite 810

4

EXHIBIT 1 PAGE 143

<center>Second Cause of Action</center>
<center>(For Breach Of Implied Covenant of Good Faith<br>
And Fair Dealing Against California Casualty)</center>

18.    Plaintiffs reallege and incorporate by reference in this claim the allegations contained in Paragraphs 1 through 17 of this Complaint.

19.    Defendant owed to Plaintiffs the duties of good faith and fair dealing implied by law in every contract of insurance.

20.    Defendant breached these duties by, among other things, unreasonably and wrongfully:  (a) refusing to pay to Plaintiffs the benefits due under the Policy; (b) attempting to avoid payment of Plaintiffs' legitimate claims, (c) failing and refusing to properly investigate Plaintiffs' claims for benefits, and (d) intentionally misrepresenting and concealing information concerning its obligations under the Policy.

21.    As a direct and legal result of Defendant's actions, Plaintiffs have suffered and continue to suffer personal injuries, emotional and mental distress, anxiety, injuries to their nervous systems and persons, all of which have caused and continue to cause Plaintiffs mental harm, and physical injury and pain and suffering, in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

22.    As a further direct and legal result of Defendant's actions, Plaintiffs have suffered and will continue to suffer other damages, including but not limited to the loss of benefits due under the Policy, loss of use of the property, interest on those insurance benefits, attorneys' fees, adjusters' fees, medical costs, other financial losses and incidental damages, and other consequential damages and out-of-pocket expenses, in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

23.    The acts complained of in this Complaint were wilful, wanton, malicious, fraudulent and oppressive, and Defendant is guilty of oppression, fraud and malice.  Further, all of the alleged acts were performed, authorized or ratified by one or more of Defendant's officers, directors, managing agents, or managerial employees, who acted with knowledge that said conduct would cause Plaintiffs harm.  Defendant is therefore subject to the imposition of punitive and exemplary damages.

EXHIBIT  1  PAGE 144

### Third Cause of Action
(For Negligence Against Defendant California Casualty
and Does 1 through 10)

24.    Plaintiffs reallege and incorporate by reference in this claim the allegations contained in Paragraphs 1 through 23 of this Complaint.

25.    California Casualty and Does 1 through 10 undertook duties toward Plaintiffs to exercise reasonable care in the investigation, evaluation, and determination of Plaintiffs' claims for benefits under the Policy, including the duty to inform the Plaintiffs of their right to hire a contractor of their own choosing. Defendants breached their duties of due care by failing to exercise ordinary and reasonable care in the investigation, evaluation, and determination of Plaintiffs' claim under the Policy and by failing to inform the Plaintiffs of their right to hire a contractor of their own choosing.

26.    By volunteering and undertaking the responsibility to protect the property from further damage and repair the damage, California Casualty and Does 1 through 10 also undertook duties toward Plaintiffs, including a duty to exercise reasonable care in the selection and supervision of any contractor it employed; to direct and control the repairs; to take special precautions to prevent peculiar, recognizable dangers arising out of the particular kind of work involved; to reasonably establish the scope of work to be performed so that it included all steps necessary to restore the Property to a habitable condition; and to disclose any known risks of harm to Plaintiffs.

27.    California Casualty and Does 1 through 10 also breached their duties of care by failing to exercise ordinary and reasonable care in the selection and supervision of Westmont Construction; failed to take special precautions to prevent the growth and spread of mold which was a foreseeable and likely danger when the repairs to the Property were undertaken; failed to adequately direct and control the contractor with respect to the work performed in order to restore the Property to a habitable condition; limited the scope and extent of repairs performed for, and consequently the amount of benefits paid to, the Plaintiffs by arranging to have the work performed by its own agent, Westmont Construction; and failed to disclose any known risks of harm to Plaintiffs.

28.    As a direct and legal result of those breaches of duty, Plaintiffs have suffered and will continue to suffer damages, including but not limited to the loss of insurance benefits, loss of use of the property, interest on those benefits, attorneys' fees, adjusters' fees, medical costs, and other incidental damages, and other consequential damages and out-of-pocket expenses, all to their damage in an amount in excess of the jurisdiction of this Court to be shown according to proof.

29.    As a further direct and legal result of the actions of California Casualty and Does 1 through 10, Plaintiffs have suffered and continue to suffer personal injuries, emotional and mental distress, anxiety, injuries to their nervous systems and persons, all of which have caused and continue to cause Plaintiffs mental harm, and physical injury and pain and suffering, in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

30.    The acts complained of in this Complaint were wilful, wanton, malicious, fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice.  Further, all of the alleged acts were performed, authorized or ratified by one or more of California Casualty's officers, directors, managing agents, or managerial employees, who acted with knowledge that said conduct would cause Plaintiffs harm.  Defendants and each of them are therefore subject to the imposition of punitive and exemplary damages.

### Fourth Cause of Action
(For Negligence Against Westmont Construction and Does 11 through 25)

31.    Plaintiffs reallege and incorporate by reference in this claim the allegations contained in Paragraphs 1 through 30 of this Complaint.

32.    Defendants, Westmont Construction and Does 11 through 25, also undertook duties toward Plaintiffs, including the duty to exercise reasonable care in the repair of the Property and to disclose and warn the Plaintiffs about any known risks of harm to Plaintiffs, including the presence and effects on them of toxic mold.

33.    Defendants, Westmont Construction and Does 11 through 25, breached their duties of due care by failing to exercise ordinary and reasonable care in repairing the Property

EXHIBIT 1 PAGE 146

1  and by failing to disclose and warn the Plaintiffs about any known risks of harm to Plaintiffs,

2  including the presence and effects on them of toxic mold.

3      34.    As a direct and legal result of those breaches of duty, Plaintiffs have suffered and

4  will continue to suffer damages, including but not limited to the loss of insurance benefits, loss

5  of use of the property, interest on those benefits, attorneys' fees, adjusters' fees, medical costs,

6  and other incidental damages, and other consequential damages and out-of-pocket expenses, all

7  to their damage in an amount in excess of the jurisdiction of this Court to be shown according to

8  proof.

9      35.    As a further direct and legal result of the actions of Westmont Construction and

10  Does 1 through 25, Plaintiffs have suffered and continue to suffer personal injuries, emotional

11  and mental distress, anxiety, injuries to their nervous systems and persons, all of which have

12  caused and continue to cause Plaintiffs mental harm, and physical injury and pain and suffering,

13  in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

14      36.    The acts complained of in this Complaint were wilful, wanton, malicious,

15  fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice. Further,

16  all of the alleged acts were performed, authorized or ratified by one or more of Westmont

17  Construction's officers, directors, managing agents, or managerial employees, who acted with

18  knowledge that said conduct would cause Plaintiffs harm. Defendants and each of them are

19  therefore subject to the imposition of punitive and exemplary damages.

20

                         **Fifth Cause of Action**

21          **(For Intentional Infliction of Emotional Distress Against**
            **California Casualty, Westmont and Does 1 through 25)**

22

23      37.    Plaintiffs reallege and incorporate by reference in this cause of action the

24  allegations contained in Paragraphs 1 through 36 of this Complaint.

25      38.    In doing the acts alleged above, Defendants engaged in a course of conduct which

26  was intentional, extreme and outrageous, and which was in wanton and reckless disregard of

27  Plaintiffs' rights and interests.

28

EXHIBIT 1 PAGE 147

39.    As a direct and legal result of Defendants' conduct as alleged herein, Plaintiffs have suffered (and continue to suffer) damages, including but not limited to severe emotional distress, personal injuries, loss of income, loss of benefits due under the Policy, loss of use of the property, adjusters' fees, medical costs, and other consequential damages, all to their damage in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

40.    As a further direct and legal result of Defendants' actions as alleged herein, Plaintiffs were humiliated, hurt and injured in their health, strength and activity, sustained injuries to their nervous systems and persons, all of which injuries have caused and continue to cause Plaintiffs severe emotional distress. As a result of these injuries, Plaintiffs have suffered damage in amount to be shown according to proof.

41.    The acts complained of in this Complaint were wilful, wanton, malicious, fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice. Further, all of the alleged acts were performed, authorized or ratified by one or more of Defendants' officers, directors, managing agents or managerial employees, who acted with knowledge that said conduct would cause Plaintiffs harm. Defendants and each of them are therefore subject to the imposition of punitive and exemplary damages.

**Sixth Cause of Action**
**(For Fraud By Concealment**
**Against Defendants California Casualty,**
**Westmont Construction and Does 1 through 25)**

42.    Plaintiffs reallege and incorporate by reference in this cause of action the allegations contained in Paragraphs 1 through 41 of this Complaint.

43.    In doing the acts alleged above, Defendants concealed or suppressed information concerning the presence of toxic mold and bacteria from Plaintiffs.

44.    While preparing the scope of damage to the Plaintiffs' home, Sue Nelson and Bernard Sequeira, the owners of Westmont Construction and Vern Moulton of California Casualty became aware of suspect mold growing as a result of the original water damage. Westmount Construction and California Casualty were aware of the potential health risks

1     associated with the mold.

2         45.    Ms. Nelson, Mr. Sequeira and Mr. Moulton concealed the presence of mold and

3 the potential health risks associated with the mold from Plaintiffs. They had a duty to inform

4 and warn the Plaintiffs about the presence of mold in the Property and the foreseeable risk of

5 harm to the Plaintiffs from exposure to toxic mold and bacteria, but they concealed the presence

6 of mold with the intent to defraud Plaintiffs.

7         46.    Westmont Construction with the concurrence of California Casualty had the

8 property tested for mold by Anderson Environmental Consulting Group. They had this testing

9 performed without the knowledge or consent of Plaintiffs. The testing revealed in January 2001

10 that toxic mold was present in the house. Anderson Environmental Consulting Group also

11 warned Westmont Construction that the particles produced by the mold were toxic and might

12 cause serious health problems to persons exposed to the mold. Westmont Construction

13 immediately notified Vern Moulton of California Casualty about the results of the test and the

14 health risks associated with exposure to the mold. California Casualty and Westmont

15 Construction had a duty to inform and warn the Plaintiffs that mold discovered in the Property

16 had been tested and that toxic mold was present in the Property. They concealed the presence of

17 toxic mold and the foreseeable risk of harm to the Plaintiffs from exposure to toxic mold and

18 bacteria, with the intent to defraud Plaintiffs.

19         47.    Mr. Sequeira, with the concurrence of Vern Moulton, advised Plaintiffs that they

20 needed to move out of the Property due to work to be performed on the floors. Mr. Sequeira and

21 Mr. Moulton concealed from Plaintiffs the true reason for asking the Plaintiffs to move out of the

22 Property, which was their discovery of the presence of toxic mold and the intent of California

23 Casualty and Westmont Construction to clean-up the mold contrary to expensive protocols

24 required for abating mold. Defendants were under a duty to inform and warn the Plaintiffs that

25 they intended to clean up the mold through ordinary repair methods but, instead, they concealed

26 their intent to clean-up the mold contrary to expensive protocols required for abating mold, with

27 the intent to defraud Plaintiffs.

28

EXHIBIT 1 PAGE 149

48. Unaware of the toxic mold because of Westmount's and California Casualty's concealment of the presence of toxic mold and their intent to clean it up through ordinary repair methods, Plaintiffs continued to regularly enter their home in order to obtain supplies and for other reasons. As a result, Plaintiffs unknowingly were exposing themselves to toxic mold and bacteria which could, foreseeably, cause injury to the Plaintiffs. Plaintiffs would not have entered the Property if they had they known of the presence of toxic mold and bacteria which was intentionally concealed from them. They also would have hired competent companies to abate the mold at their property, which would have decreased Plaintiffs' out-of-pocket expenses and time associated with abating the mold problem.

49. As a direct and legal result of Defendants' conduct as alleged herein, Plaintiffs have suffered (and continue to suffer) damages, including but not limited to severe emotional distress, personal injuries, loss of income, loss of benefits due under the Policy, adjusters' fees, medical costs, and other consequential damages, all to their damage in an amount well in excess of the jurisdiction of this Court to be shown according to proof.

50. As a further direct and legal result of Defendants' actions as alleged herein, Plaintiffs were humiliated, hurt and injured in their health, strength and activity, sustained injuries to their nervous systems and persons, all of which injuries have caused and continue to cause Plaintiffs severe emotional distress. As a result of these injuries, Plaintiffs have suffered damage in amount to be shown according to proof.

51. The acts complained of in this Complaint were wilful, wanton, malicious, fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice. Further, all of the alleged acts were performed, authorized or ratified by one or more of Defendants' officers, directors, managing agents, or managerial employees, who acted with knowledge that said conduct would cause Plaintiffs harm. Defendants and each of them are therefore subject to the imposition of punitive and exemplary damages.

EXHIBIT 1 PAGE 150

11

<div align="center">

Seventh Cause of Action

(For Fraud By Misrepresentation Against Defendants
California Casualty, Westmont Construction and Does 1 through 25)
</div>

52.     Plaintiffs reallege and incorporate by reference in this cause of action the allegations contained in Paragraphs 1 through 51 of this Complaint.

53.     In doing the acts alleged above, Defendants made false representations as to the habitability of the Plaintiffs' Property.

54.     While preparing the scope of damage to the Plaintiffs' home, Sue Nelson and Bernard Sequeira, the owners of Westmont Construction and Vern Moulton of California Casualty became aware of suspect mold growing as a result of the original water damage. Westmount Construction and California Casualty were aware of the potential health risks associated with the mold.

55.     Ms. Nelson, Mr. Sequeira and Mr. Moulton made representations about the nature of repairs being performed at the property, indicating that the house continued to be habitable, knowing these representations were false because of the potential health risks associated with the presence of mold in the house. They misrepresented the habitability of the Property and the nature of repairs with the intent to defraud Plaintiffs.

56.     Westmont Construction with the concurrence of California Casualty had the property tested for mold by Anderson Environmental Consulting Group. The testing revealed in January 2001 that toxic mold was present in the house. Anderson Environmental Consulting Group also warned Westmont Construction that the particles produced by the mold were toxic and may cause serious health problems to persons exposed to the mold. Westmont Construction immediately notified Vern Moulton of California Casualty about the results of the test and the health risks associated with exposure to the mold.

57.     Mr. Sequeira, with the concurrence of Vern Moulton, misrepresented to Plaintiffs that they needed to move out of the Property due to work to be performed on the floors. Mr. Sequeira and Vern Moulton knew their representations about the reasons for asking Plaintiffs to move out of the Property were false because the true reason Mr. Sequeira and Vern Moulton wanted the Plaintiffs to move out of the Property was their discovery of the presence of

EXHIBIT 1 PAGE 151

1    toxic mold and the intent of California Casualty and Westmont Construction to clean-up the

2    mold contrary to expensive protocols required for abating mold.

3        58.    Unaware of the falsity of Defendants' representations concerning the habitability

4    of the Property, Plaintiffs continued to regularly enter their home in order to obtain supplies and

5    for other reasons. As a result, Plaintiffs unknowingly were exposing themselves to toxic mold

6    and bacteria which could, foreseeably, cause injury to the Plaintiffs.

7        59.    Unaware of the falsity of the representations of Westmont and California

8    Casualty concerning the nature of repairs at the Property and the intent of Westmont

9    Construction and California Casualty to use ordinary repair methods to remediate the mold,

10    Plaintiffs were deprived of their rights under the terms of the insurance policy to hire competent

11    companies to abate the mold at their property, which would have decreased Plaintiffs'

12    out-of-pocket expenses and time associated with abating the mold problem.

13        60.    Defendants misrepresented to the Plaintiffs that the Property was habitable, and

14    that ordinary repairs were being made at the Property, with an intent to defraud the Plaintiffs and

15    to induce them to forego further repairs, including expensive protocols for the remediation of

16    toxic mold and bacteria.

17        59.    Plaintiffs were unaware of the falsity of the representations that their Property had

18    been repaired and made habitable and Plaintiffs were also unaware of the concealed fact that

19    toxic mold and bacteria were present in the house. Plaintiffs were justified in relying upon the

20    representations of Defendants who had superior knowledge about the status of repairs of the

21    Property and whose attempts to remove the toxic mold prevented the Defendants from

22    discovering it. In reliance upon the Defendants' representations about the habitability of the

23    Property and the nature of repairs being undertaken at the Property, Plaintiffs initially stayed in

24    the house and thereafter continued to go into the house exposing themselves to toxic mold and

25    suffering personal injuries.

26        60.    As a direct and legal result of Defendants' conduct as alleged herein, Plaintiffs

27    have suffered (and continue to suffer) damages, including but not limited to severe emotional

28    distress, personal injuries, loss of income, loss of benefits due under the Policy, adjusters' fees,

ng & Fishleder
0 Plaza
EXHIBIT 1 PAGE 152

1   medical costs, and other consequential damages, all to their damage in an amount well in excess

2   of the jurisdiction of this Court to be shown according to proof.

3       61.    As a further direct and legal result of Defendants' actions as alleged herein,

4   Plaintiffs were humiliated, hurt and injured in their health, strength and activity, sustained

5   injuries to their nervous systems and persons, all of which injuries have caused and continue to

6   cause Plaintiffs severe emotional distress. As a result of these injuries, Plaintiffs have suffered

7   damage in amount to be shown according to proof.

8       62.    The acts complained of in this Complaint were wilful, wanton, malicious,

9   fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice. Further,

10  all of the alleged acts were performed, authorized or ratified by one or more of Defendants'

11  officers, directors, managing agents, or managerial employees, who acted with knowledge that

12  said conduct would cause Plaintiffs harm. Defendants and each of them are therefore subject to

13  the imposition of punitive and exemplary damages.

14

15                              **Eighth Cause of Action**
16  **(For Nuisance Against Defendants California Casualty,**
    **Westmont Construction and Does 1 through 25)**

17      63.    Plaintiffs reallege and incorporate by reference in this cause of action the

18  allegations contained in Paragraphs 1 through 62 of this Complaint.

19      64.    Defendants interfered with Plaintiffs' private use and enjoyment of their interest

20  in the Property.

21      65.    The interference was substantial and unreasonable.

22      66.    As a direct and legal result of Defendants' conduct as alleged herein, Plaintiffs

23  have suffered (and continue to suffer) damages, including but not limited to severe emotional

24  distress, personal injuries, loss of income, loss of benefits due under the Policy, loss of use of the

25  property, adjusters' fees, medical costs, and other consequential damages, all to their damage in

26  an amount well in excess of the jurisdiction of this Court to be shown according to proof.

27      67.    As a further direct and legal result of Defendants' actions as alleged herein,

28  Plaintiffs were humiliated, hurt and injured in their health, strength and activity, sustained

ing & FishNeder
ie Plan
oom Street, Suite 810

EXHIBIT 1 PAGE 153

1    injuries to their nervous systems and persons, all of which injuries have caused and continue to

2    cause Plaintiffs severe emotional distress. As a result of these injuries, Plaintiffs have suffered

3    damage in amount to be shown according to proof.

4        68.    The acts complained of in this Complaint were wilful, wanton, malicious,

5    fraudulent and oppressive, and Defendants are guilty of oppression, fraud and malice. Further,

6    all of the alleged acts were performed, authorized or ratified by one or more of Defendants'

7    officers, directors, managing agents, or managerial employees, who acted with knowledge that

8    said conduct would cause Plaintiffs harm. Defendants and each of them are therefore subject to

9    the imposition of punitive and exemplary damages.

10

11    **Ninth Cause of Action**
12    **(For Unfair Business Practices Against**
    **Defendants California Casualty and Does 1 through 25)**

13        69.    Plaintiffs reallege and incorporate by reference in this cause of action the

14    allegations contained in Paragraphs 1 through 68 of this Complaint.

15        70.    California Casualty has committed acts of unfair competition, as defined by

16    Business and Professions Code section 17200, by engaging in the following practices.

17        71.    California Casualty had and continues to have an unfair, unlawful and fraudulent

18    practice of failing to acknowledge its obligations pursuant to the terms of property insurance

19    policies it issues, including its obligation to indemnify policyholders under the terms of the

20    policies. Instead, California Casualty has an unfair, unlawful and fraudulent practice of

21    misrepresenting those obligations, including its obligations to pay actual cash value, to pay to

22    repair or replace the premises and to pay additional living expense benefits as described below.

23        72.    California Casualty had and continues to have an unfair, unlawful and fraudulent

24    practice of representing to policyholders that it will undertake to protect their property from

25    further damage and to repair the damage itself. With respect to this practice, California Casualty

26    has the practice of repairing toxic mold damage without taking proper precautions to protect

27    policyholders from the risk of serious health problems and further damage to property, and

28    without disclosing to policyholders the risks associated with the toxic mold and by concealing

: & Fishleder
Plaza
n Street, Suite 810

EXHIBIT 1 PAGE 154

1   the existence of toxic mold from policyholders.

2   73.    California Casualty had and continues to have an unfair, unlawful and fraudulent

3   practice of misrepresenting to policyholders coverage available for Additional Living Expenses.

4   74.    As a direct and legal result of the aforementioned acts, California Casualty has

5   received and continues to receive ill-gotten gains.  The court has extraordinarily broad power

6   under section 17203 of the Business and Professions Code to fashion remedies which will

7   prevent unlawful business practices from occurring in the future and to restore to those who have

8   been injured any money or property, real or personal, and rights thereto, which have been

9   acquired by means of the defendant's unlawful business acts or practices.

10

11   **Tenth Cause of Action**
     **(For Negligence Against Does 20 through 50)**

12

13   75.    Plaintiffs reallege and incorporate by reference in this claim the allegations

14   contained in Paragraphs 1 through 6 of this Complaint.

15   76.    Defendants undertook duties toward Plaintiffs to exercise reasonable care in the

16   investigation, evaluation, and repair of the Property.

17   77.    Defendants breached their duties of due care by failing to exercise ordinary and

18   reasonable care in the investigation, evaluation, and repair of the Property.

19   78.    As a direct and legal result of those breaches of duty, Plaintiffs have suffered and

20   will continue to suffer damages, including but not limited to property damage and other

21   incidental damages, and other consequential damages and out-of-pocket expenses, all to their

22   damage in an amount in excess of the jurisdiction of this Court to be shown according to proof.

23   WHEREFORE, Plaintiffs prays for judgment as follows:

24   1.    For all benefits due under the Policy, together with interest thereon at the legal

25   rate;

26   2.    For general damages for emotional distress, mental suffering and physical injury

27   in an amount according to proof;

28

& FieNeder
"\ass
\ Sdreek Suite 610

16

EXHIBIT 1 PAGE 155

3.    For consequential damages legally caused by Defendants' conduct in an amount according to proof;

4.    For attorneys' fees and other expenses incurred to obtain the benefits due under the Policy;

5.    For exemplary and punitive damages;

6.    For attorneys' fees and costs of suit herein incurred;

7.    For prejudgment interest;

8.    Pursuant to Business and Professions Code section 17203, and pursuant to the equitable powers of this Court, Plaintiffs pray that the defendants be preliminarily and permanently enjoined from the acts of unfair competition alleged above;

9.    Pursuant to Business and Professions Code section 17203, and pursuant to the equitable powers of this Court, Plaintiffs pray that defendants be ordered to restore to the public all funds acquired by means of any act or practice declared by this Court to be unlawful, unfair or fraudulent or to constitute unfair competition under Business and Professions Code section 17200 *et seq.*; and

10.    For such other and further relief as the Court may deem just and proper.


KING, KING & FISHLEDER,
A Professional Corporation


Dated:    October 28, 2002                        By

Daniel A. King
Attorneys for Plaintiffs

F:\WPWIN\3344-1\P11.wpd

EXHIBIT 1 PAGE 156

Re:    HAROLD v. CALIFORNIA CASUALTY, et al.
Sacramento County Superior Court Case No. 02AS04291

## PROOF OF SERVICE
[Code Civ. Proc. §§ 1013(a)(3) & 1011]

I am a resident of the United States and employed in Sacramento County. I am over the age of eighteen years and not a party to the within entitled action. My business address is 3638 American River Drive, Sacramento, California.

On this date, I served:    **WESTMONT CONSTRUCTION, INC.'S BRIEF REGARDING JOINT AND SEVERAL LIABILITY ISSUES**

_____    **BY FAX:** by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

**XXX**    **BY MAIL:** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Sacramento, California addressed as set forth below. I am readily familiar with my firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on the same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date of postage meter date is more than 1 day after date of deposit for mailing in affidavit.

_____    **BY OVERNIGHT MAIL:** by causing document(s) to be picked up by an overnight delivery service company for delivery to the address(es) on the next business day.

_____    **BY PERSONAL DELIVERY:** by causing personal delivery by **of the document(s) listed above to the person(s) at the addressee(s) set forth below.

| (Lead)Counsel for Plaintiffs:<br>Peter W. Alfert, Esq.<br>HINTON, ALFERT & SUMNER<br>1646 N. California Blvd., Suite 600<br>Walnut Creek, CA 94596<br>(925) 932-3412 Fax | Co-Counsel for Plaintiffs:<br>Karen H. Kahn, Esq.<br>KAHN, BROWN & POORE<br>2200 Powell Street, Suite 745<br>Emeryville, CA 94608<br>(510 923-6285 Fax |
|---|---|
| Co-Counsel for Plaintiffs:<br>Michael Cochrane, Esq.<br>KING, KING & FISHLEDER<br>555 Twelfth Street, Suite 1440<br>Oakland, CA 94607<br>(510) 444-3401 Fax | Counsel for Def./X-Comp/X-Def. CA Casualty:<br>Stephen M. Hayes, Esq.<br>HAYES, DAVIS, ELLINGSON, ET AL.<br>203 Redwood Shores Parkway, Suite 480<br>Redwood Shores, CA 94065<br>(650) 637-8071 Fax<br><br>Robert McLay, Esq.<br>HAYES, DAVIS, ELLINGSON, ET AL.<br>400 Capitol Mall, 9th Floor<br>Sacramento, CA 95814<br>(916) 449-8257 Fax |

MATHENY SEARS LINKERT & LONG LLP<br>POST OFFICE BOX 13711<br>SACRAMENTO, CALIFORNIA 95853-4711

EXHIBIT 1 PAGE 157

1    I declare under penalty of perjury, according to the laws of the State of California, that the
2    foregoing is true and correct.

3    Executed on this __25TH__ day of May , 2006, at Sacramento, California.

4

5    _____
     Aline Perusse

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1 PAGE 158